**MILSTEIN JACKSON FAIRCHILD & WADE, LLP**
Gillian L. Wade, State Bar No. 229124
gwade@mjfwlaw.com
Sara D. Avila, State Bar No. 263213
savila@mjfwlaw.com
Marc A. Castaneda, State Bar No. 299001
mcastaneda@mjfwlaw.com
10990 Wilshire Blvd., 8th Floor
Los Angeles, California 90024
Tel: (310) 396-9600
Fax: (310) 396-9635

**wh LAW**
David Slade
slade@wh.law
Brandon Haubert
brandon@wh.law
Jessica Hall
jessica@wh.law
1 Riverfront Place, Suite 745
North Little Rock, AR 72114
Telephone:  501.891.6000
Facsimile:  501.222.3027

*Attorneys for Plaintiffs individually and
on behalf of all others similarly situated*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHANNON IRELAND-GORDY and STEPHANIE IRELAND GORDY, *individually and on behalf of all others similarly situated,*<br><br>Plaintiffs,<br><br>v.<br><br>TILE, INC., LIFE360, INC., and AMAZON.COM, INC.<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>1. Negligence<br>2. Strict Liability- Design Defect (Consumer Expectation Test)<br>3. Strict Liability-Design Defect (Risk-Benefit Test)<br>4. Unjust Enrichment<br>5. Intrusion Upon Seclusion<br>6. Violations of California's Constitutional Right to Privacy<br>7. Violations of CIPA, Cal. Pen. C. § 630, *et seq.*<br>8. Negligence *Per Se*<br>9. Violations of UCL's Unlawful Prong, Cal. Bus. & Prof. C. § 17200, *et seq.*<br>10. Violations of UCL's Unfair Prong, Cal. Bus. & Prof. C. § 17200, *et seq.*<br>11. Violations of UCL's Fraudulent Prong, Cal. Bus. & Prof. C. § 17200, *et seq.*<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1.      Each year, an estimated 13.5 million people are victims of stalking in the United States, with nearly one in three women and one in six men experiencing stalking at some point in their lifetime.[1]

2.      Stalking can manifest in a host of ways, most often through unwanted and repeated behaviors such as phone calls, texts, visits, gifts, internet posts, or any other series of acts that would cause fear in a reasonable person.  Regardless of the acts the stalker employs, the common theme of stalking behavior is the fear elicited in the victim.

3.      This fear undermines and erodes a victim's autonomy and drastically disrupts their day-to-day life.  One in eight employed stalking victims miss time from work because of their victimization and more than half lose more than five days of work.[2]  One in seven stalking victims move as a result of their victimization.[3]  Unsurprisingly, stalking victims suffer much higher rates of depression, anxiety, insomnia, and social dysfunction than people in the general population.[4]

4.      Technology has increased the tools available to a stalker, with burner phones or call blocking software providing anonymity, and free email services and social media platforms providing a limitless vector for harassing electronic messages and posts.

5.      One of the most dangerous and frightening technologies employed by stalkers is the use of real-time location information to track victims.   These technologies allow stalkers to follow their victims' movements in real time and to undo any attempt on the part of the victim to

---

[1] Stalking Prevention Awareness and Resource Center (SPARC), Stalking Fact Sheet (available at https://www.stalkingawareness.org/wp-content/uploads/2019/01/SPARC_StalkngFactSheet_2018_FINAL.pdf)

[2] Baum, K., Catalano, S., & Rand, M. (2009). Stalking Victimization in the United States. Washington, DC: Bureau of Justice Statistics

[3] *Id.*

[4] Blaauw, E., Arensman, E., Winkel, F.W., Freeve, A., & Sheridan, L. (2002). The Toll of Stalking. Journal of Interpersonal Violence 17(1): 50-63

1  evade or hide from the stalker.  If one's location is constantly being transmitted to an abuser,

2  there is no place to run.

3       6.       One of the very first products to make constant, location-based surveillance

4  possible for average consumers is the Tile tracker.  First introduced in 2013, the Tile tracker is a

5  small, plastic square, usually the size of a quarter, that transmits its location back to its owner.

6       7.       From the moment of the Tile tracker's release, Tile marketed its product both

7  explicitly and implicitly for the purpose of tracking people—particularly women.  The platforms

8  on which the company advertised included pornographic websites, where visitors would leave

9  disturbing comments about using the trackers to find and stalk women.  When marketing

10 consultants brought this to the attention of Tile's leadership, the company's executives mocked

11 the findings and fiercely admonished female employees who expressed concern about this

12 advertising strategy.

13      8.       Despite having knowledge of the propensity for misuse of the Tile tracker, Tile

14 waited *nine years* before implementing any type of safety feature on its trackers.

15      9.       Worse still, shortly after the introduction of those safety features, the company

16 released a mechanism by which Tile owners could *disable* the features, thereby intentionally

17 thwarting any recourse or protection a potential victim might have.

18      10.      Importantly, Tile does not act alone.  Within the last several years, the company

19 partnered with Amazon, in order to harness Amazon's nationwide location-tracking Sidewalk

20 network.  This partnership exponentially expanded the reach and efficacy of the Tile tracker, and

21 accordingly the partnership exponentially magnified the danger posed to victims.

22      11.      Plaintiffs, each of whom are victims of stalking through the use of a Tile tracker,

23 bring this action on behalf of themselves and a class and subclasses of individuals who have been

24 and who are at risk of stalking via this dangerous product.

25      12.      Defendants' acts and practices, as detailed further herein, amount to acts of

26 negligence, negligence *per se*, intrusion-upon-seclusion, and product liability, constitute unjust

27 enrichment, and violate California's constitutional right to privacy, California's Invasion of

28 Privacy Act, Cal. Pen. Code § 630, *et seq*. ("CIPA"), and California's Unfair Competition Law,

1    Cal. Bus. & Prof. Code § 17200, *et seq.* ("UCL")*.* Plaintiffs, in a representative capacity, seek

2    statutory damages, actual damages, and punitive damages, as well as injunctive and declaratory

3    relief against Defendants, correcting Defendants' practice of releasing an unreasonably

4    dangerous product into the stream of commerce, misrepresenting the harms associated therewith,

5    and facilitating the unwanted and unconsented to location tracking of Plaintiffs and Class

6    members.

**PARTIES**

7    

8    13.    At all times relevant to the events described herein, Plaintiff Shannon Ireland-

9    Gordy was a citizen of Texas.

10    14.    At all times relevant to the events described herein, Plaintiff Stephanie Ireland

11    Gordy was a citizen of Texas.

12    15.    Defendant Tile, Inc. ("Tile") is an American consumer electronics headquartered

13    in San Mateo, California. Tile's flagship items of consumer electronics are tracking devices that

14    consumers can attach to their belongings, and Tile generally oversees all aspects of these

15    devices, including but not limited to their design, manufacture, marketing, and technical support

16    and maintenance.

17    16.    Defendant Life360 Inc. ("Life360") is an American information technology

18    company headquartered in San Francisco, California. Life360 provides location-based services

19    to consumers on a global level. On or about November 2021, Life360 acquired Tile and

20    announced that it would integrate the two companies' services (e.g., recognizing Tile trackers

21    within the Life360 app), thereby expanding Tile's tracking reach. Life360 similarly oversees the

22    Tile trackers, including but not limited to their design, manufacture, marketing, and technical

23    support and maintenance.

24    17.    Defendant Amazon.com, Inc. is an online retail and media company

25    headquartered in Washington. Defendant Amazon manufactures a host of Amazon-branded

26    consumer products, from a range of household goods to consumer electronics, which include the

27    products that create the Amazon Sidewalk network—devices like, *inter alia*, the Amazon

28    Sidewalk Bridge, Echo, and Ring.

4

CLASS ACTION COMPLAINT

1

**JURISDICTION AND VENUE**

2       18.     Pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of

3   2005 ("CAFA"), this Court has subject matter jurisdiction over this putative nationwide class

4   action because the matter in controversy exceeds $5,000,000.00, exclusive of interest and costs,

5   and is a class action in which some members of the Class are citizens of states different than

6   Defendant. *See* 28 U.S.C. § 1332(d)(2)(A).

7       19.     This Court has personal jurisdiction over Defendant because its worldwide

8   headquarters are in California, and because it conducts in California substantial business from

9   which the claims in this case arise.

10

**INTRADISTRICT ASSIGNMENT**

11      20.     Venue properly lies in this district pursuant to 28 U.S.C. § 1391(b)(1) because

12  Defendants are headquartered in this district and a substantial part of the events or omissions

13  which give rise to the claims alleged herein occurred in in this district.

14

**FACTUAL ALLEGATIONS**

15  **A.  Tile Trackers, Generally**

16      21.     A Tile Tracker is a physical device that the owner attaches to objects for location

17  purposes.

18

19

20              

21

22

23              Fig. 1[5]

24

25

26

27  _____

28  [5] Ryan Haines, *Tile Pro review: The Bluetooth tracker that's built to last*, Android Authority
    (Aug. 28, 2021) (available at https://www.androidauthority.com/tile-pro-review-2739339/)

CLASS ACTION COMPLAINT



Fig. 2[6]

22.     Tile Trackers work by synching the physical Tracker to an app ("Tile App" or "App") on the owner's smartphone.

23.     For nearby items, the Tile App uses Bluetooth Low Energy ("BTE") radio technology to locate the synched Tracker, within a range of 100 feet.

24.     If the Tracker is more than 100 feet from the owner's smartphone, the Tile App uses a "crowd GPS" feature, meaning that if the Tracker is reported as lost, and comes within range of any smartphone with a Tile App, that nearby user's App will send the Tracker's owner an update of the Tracker's location.

25.     On May 7, 2021, Defendant Amazon announced that it was partnering with Tile to enhance its tracking network based on Wi-Fi and Bluetooth technology.[7]  The partnership would allow Amazon to strengthen its tracking network, called Sidewalk, by letting Tile Trackers tap into the Bluetooth networks created by Amazon's Echo, a home electronic device that creates its own network by aggregating consumers' WiFi signals. Tile Trackers began working with Amazon's network as of June 14, 2021.

26.     This partnership allowed Tile to expand its "crowd GPS" network exponentially. Moving forward, Tile would not simply have to rely on the network of smartphones with the Tile App installed.  Instead, it could harness the far more ubiquitous network created by the millions

---

[6] Philip Michaels, *Tile Pro and Tile Mate review*, Tom's Hardware (Dec. 9, 2019) (available at https://www.tomsguide.com/us/tile-mate-tile-pro,review-5795.html)

[7] Jon Fortt, *Amazon partners with Tile to take on Apple AirTags*, CNBC (May 7, 2021) (available at https://www.cnbc.com/2021/05/07/amazon-partners-with-tile-to-take-on-apple-airtags.html)

of Amazon Echo products throughout the country.  This partnership between Defendants Tile and Amazon made the Tile Tracker vastly more effective, and therefore vastly more dangerous.

**B. Even before Tile Trackers were introduced to the general public, technology journalists quickly sounded the alarm at its potential abuses.**

27.     Initially, in 2013, Tile Trackers were released via Selfstarter, a crowd-funding website.  Because the product was being offered by a smaller technology company, Tile Trackers received little attention from mainstream media.  However, technology journalists were quick to sound the alarm on the potential use of the tracking device for stalkers to find the location of their victims.

28.     By July of 2013, in a piece titled *Tile: Crowdsourcing Lost Keys Or Pseudo GPS Stalking On The Cheap?* one reporter cautioned that "There is significant potential for abuse with this product. For example, how can you confirm the purse you put a tracking device in, such as this, belongs to you?"[8]



Fig. 3[9]

29.     Shortly thereafter, in August 2013, the news outlet Vice ran a piece titled *Should We Be Freaked Out About Tile, the World's Cheapest New Location Tracker?* in which the author wrote "When I first saw Tile being advertised, I got an itchy, all-over heebie-jeebies

---

[8] Jean Taggart, *Tile: Crowdsourcing Lost Keys Or Pseudo GPS Stalking On The Cheap?*, Malwarebytes (July 12, 2013) (available at https://www.malwarebytes.com/blog/news/2013/07/tile-crowdsourcing-lost-keys-or-pseudo-gps-stalking-on-the-cheap)

[9] Sarah Perez, *Tile, The Lost-Item Tracker With Millions In Crowdfunding, Was Worth The Wait*, TechCrunch (June 12, 2014) (available at https://techcrunch.com/2014/06/12/tile-the-lost-item-tracker-with-millions-in-crowdfunding-was-worth-the-wait/)

feeling. Adding a whole new matrix of location data to our digital world of oversharing has some potentially scary implications."[10]

30.     The author went on:

> Since Tile is just a small plastic square with an adhesive backing, could you slap one of those on your cheating ex-lover's car, fire up the Tile app, and track their whereabouts through the day?  Since the official FAQ glosses over most of the privacy and security concerns that Tile could potentially cause, I wrote the company and asked them some of my potentially paranoid questions.[11]

31.     In response to the reporter's questions, Tile glossed over the possibility that the product could be used to track people. "A Tile does not contain a GPS unit or a cellular radio and cannot provide continuous automatic location updates. Therefore it is not a good solution for real-time tracking of moving objects. The goal of Tile is to help people keep track of or find items they are likely to lose, and will not support long-distance tracking of moving items."[12]

32.     Unsatisfied by the response, the reporter noted that "the acceptance and reliance on location trackers in society could certainly result in a new wave of security threats, as the technology gets stronger and people learn new and crazy ways to manipulate it. This kind of tech has been available to law enforcement and spy-shop consumers for a while now, but we can be sure that having a cool, sexy marketing machine behind location trackers will put them in more people's hands than ever."[13]

33.     And, of course, this is precisely what happened.  As described, *supra*, Tile Trackers improved in their range and accuracy, rendering the assurances provided by Tile in 2013 totally meaningless.  A more recent product review, put out by Mozilla in late 2021, cautioned that a Tile Tracker is

---

[10] Patrick McGuire, *Should We Be Freaked Out About Tile, the World's Cheapest New Location Tracker?*, Vice (August 30, 2013) (available at https://www.vice.com/en/article/qbedmx/should-we-be-freaked-out-about-tile-the-worlds-cheapest-new-location-tracker)

[11] *Id.*

[12] *Id.*

[13] *Id.*

great for people who have lost things outside of Bluetooth range. It's maybe not so great for people worried about potentially being stalked or unknowingly tracked by someone with bad intentions. While [Tile's competitors seem to] have incorporated protections to help prevent stalking and abuse [with comparable tracking products], we can't confirm Tile has taken the same threats as seriously. That is a concern for sure.

…

So, what's the worst that could happen with Tile's trackers? It's pretty scary to think someone could unknowingly slip a Tile tracker in your car and use it to stalk you all over the US thanks to the big Amazon Sidewalk community network.[14]

**C. From the Moment of Its Release, Tile Was Well Aware of Its Trackers' Capacity for Stalking, and Affirmatively Courted Stalkers and Sexual Predators as Potential Consumers.**

34.     In a 2015 lawsuit filed by a former Tile engineer for workplace discrimination, the engineer stated that in 2013 (i.e., during the initial phases of Tile's launch of the Tile Tracker), "Tile's advertising and marketing strategy…exhibited the Company's lack of respect for women and view of women as sexual objects.  For example, Tile advertised on pornography sites, sites about erectile dysfunction, and other dubious outlets.  Tile's advertising videos also prompted some viewers to post comments about using 'Tiles' to stalk women and commit sexual violence against them.   When an external consultant presented a data finding to Tile's management that consumers perceived Tile's advertising to be sexist, [then-COO of Tile, Michael Farley] mocked the finding."[15]

35.     When the engineer acknowledged the finding of sexism in Tile's advertising, Farley "began yelling at her and telling her that she was out of line."[16]

36.     That said, at some point, Tile appears to have become concerned with the messages implied by its initial advertising, as the videos cited in the above-mentioned articles have been removed from YouTube.  If one goes to the July 16, 2013 Business Insider article

---

[14] *Privacy Not Included – Tile Trackers,* Mozilla Foundation (No. 8, 2021) (available at https://foundation.mozilla.org/en/privacynotincluded/tile-mate/)

[15] Complaint at ¶18, *McCormack v. Tile Inc., et al.*, No. CIV-532992, Superior Court of California, County of San Mateo.

[16] *Id*.

titled *Here's The First Ad For A Small Device That Will Never Let You Lose Your Keys Again*, for example, one sees the following image for an embedded YouTube video:

Check out the ad below:



Fig. 4[17]

37.    While the ad clearly has since been taken down, if one clicks on the "this video is private" image and selects "copy URL at current time"



Fig. 5[18]

Then the copied URL is https://youtu.be/pqDm3gZNZPM

---

[17] Laura Stampler, *Here's The First Ad For A Small Device That Will Never Let You Lose Your Keys Again*, Business Insider (Jul. 16, 2013) (available at https://www.businessinsider.com/first-ad-for-tile-app-that-finds-lost-keys-2013-7)

[18] *Id.*

CLASS ACTION COMPLAINT

38.    Use of the Wayback Machine allows one to see this URL as it was on July 8, 2013 (i.e., before the ad was taken down).[19]

39.    The ad shows imagery of, *inter alia*, a Tile Tracker attached to a bra:



Tile ™ - the world's largest lost and found

Fig. 6[20]

40.    But more alarming are the comments for the video.  For example:



**AzNightmare**   4 days ago

Not going to lie... watched the video several times because of the girl.

Reply   ·   4  👍   👎

…

_____

19
https://web.archive.org/web/20130708170842/https://www.youtube.com/watch?v=pqDm3gZNZPM

20
https://web.archive.org/web/20130708170842/https://www.youtube.com/watch?v=pqDm3gZNZPM (at 0:55)

CLASS ACTION COMPLAINT



**cupcake** 12 hours ago

no more worrying if your woman is cheating.. drop a tile in her purse and the day is saved lol!

Reply · 👍 👎

Figs. 7-8[21]

**D. After Its Release, Reports Emerged of People Being Stalked With Tile Trackers.**

41.     In April 2016, a former Texas beauty queen said a man used a Tile he placed in her purse to stalk her.[22]  "I sleep with my bedroom door locked now," the victim told a reporter. "I'm paranoid throughout the day. Sitting in traffic is the worst, thinking he's looking directly into my car."[23]

42.     Worse, Tile purposely engages in obfuscating and stymieing any inquiries from law enforcement.  This conduct puts victims' lives in serious risk, including but not limited to the lives of Plaintiffs.

43.     Similar reports continue to appear in news outlets,[24] online chat forums,[25] and social media platforms.[26]

**E. Almost Ten Years After the Release of the Tile Tracker, Tile Introduces An Anti-Stalking Feature, But Only For Users of the Tile App.**

---

[21] *Id.*

[22] Rachel Paula Abrahamson, *Texas Beauty Queen Claims Stalker Planted a Tracking Device in Her Purse at Bar*, US Weekly (May 2, 2016) (available at https://www.usmagazine.com/celebrity-news/news/texas-beauty-queen-claims-stalker-planted-a-tracking-device-in-her-bag-w204817/)

[23] *Id.*

[24] Alfonzo Galvan, *Brookings woman finds Bluetooth tracker device in her vehicle, warns others: 'Be careful'*, Sioux Falls Argus Leader (June 11, 2002) (available at https://www.argusleader.com/story/news/crime/2022/06/10/brookings-south-dakota-woman-finds-tile-bluetooth-tracker-vehicle-stalking-safety/7553290001/)

[25] *See, e.g.,* https://www.reddit.com/r/TwoXChromosomes/comments/cmscd2/be_aware_the_tile_app_can_be_used_to_stalk_you/; and https://www.quora.com/Why-did-my-boyfriend-get-angry-when-he-found-out-that-I-put-a-tile-tracker-in-his-wallet-and-inside-his-phone-case

[26] Carly Stern, *'Check your purses!' Texas woman reveals she found a Tile TRACKING device in her bag after a night out - as she warns others to beware of stalkers who could be using them*, Daily Mail (June 15, 2021) (available at TikToker warns women to beware of stalkers using Tile location trackers | Daily Mail Online)

CLASS ACTION COMPLAINT

44.     It was not until early 2022 that Tile finally provided an anti-stalking feature for its products.   Called "Scan and Secure," the technology would require the use of the Tile App, which would enable them to scan for unknown Tiles or Tile-enabled devices that may be traveling with them.[27]



Fig. 9[28]

45.     However, this safety feature—released almost ten years after the release of the Tile Tracker—still leaves the vast majority of the population vulnerable for several reasons.

46.     *First*, the individual would have to be alerted to, or suspect, the potential of being stalked by a Tile Tracker in the first instance.   For Tile owners, who have the Tile App, they are likely to be alerted, but only a negligible percentage of the population has the Tile App. The download numbers on the Google Play Store show roughly 5 million downloads, worldwide.[29] Apple's iTunes marketplace does not provide download numbers, but it is reasonable to assume a comparable number of downloads for Apple devices, as the app has approximately 745,000 reviews.[30]

---

[27] Sarah Perez, *Tile launches its anti-stalking safety feature in its mobile app*, TechCrunch (Mar. 17, 2022) (available at https://techcrunch.com/2022/03/17/tile-launches-its-anti-stalking-safety-feature-in-its-mobile-app/)

[28] *Id.*

[29] https://play.google.com/store/apps/details?id=com.thetileapp.tile&hl=en&gl=US

[30] https://apps.apple.com/us/app/tile-find-lost-keys-phone/id664939913

47.     But apart from these (approximately) 10 million people on the planet, no one else has the ability to scan for Tile Trackers—nor do they likely know about the threat posed by the Trackers, much less the ability to seek out and download the Tile App.

48.     *Second,* even for individuals who do have the Tile App, there are severe limitations to the App's functionality, making it of limited value.

49.     For example, the detection features are not "always on," and instead must be triggered manually by the user.[31]  This limitation is critical and, potentially, deadly: an App user must selectively, and intentionally, engage the App to conduct a scan.  Once that scan concludes, the app will not scan for Tile Trackers again until the App owner once more engages the scan feature.[32]  Put another way, any Tile App owner must decide when and where to scan for Tile Trackers—something a person being unknowingly tracked is unlikely to do.

50.     Additionally, the scan process does not have a precision finding tool to allow people to locate a Tile Tracker that's close to them. Instead, users have to walk or even drive a certain distance away from their original location for the scan to work.[33]

51.     Further, the scan can take up to 10 minutes of uninterrupted time to complete and deliver the most accurate results, and it won't work if the user is just walking around in their home or in a crowded place, like on public transportation, because the scan might detect other Tile Trackers nearby.[34]

52.     Tile has stated that users may need to run multiple scans to eliminate the possibility of devices that had briefly passed by during a scan versus those that were actually traveling with them. It also suggests using the images in the scan to try to locate the devices by

---

[31] Sarah Perez, *Tile launches its anti-stalking safety feature in its mobile app*, TechCrunch (Mar. 17, 2022) (available at https://techcrunch.com/2022/03/17/tile-launches-its-anti-stalking-safety-feature-in-its-mobile-app/)

[32] *Id.*

[33] *Id.*

[34] *Id.*

how they look. Unfortunately, without precision-finding capabilities, it's likely that users will have a hard time locating well-hidden devices.[35]

53.     Ultimately, it is a purely academic exercise to determine whether the above-described features and limitations of the Tile App are enough to prevent stalking.   This is because Tile recently rolled out features for users that render Tile Trackers undetectable by its own Tile App.

**F. Tile Has Now Disabled Security Features for Tile Trackers, Under The Guise Of "Anti-Theft" Efforts, Thereby Rendering The Tile App's "Scan And Secure" Feature Useless.**

54.     In February of 2023, Tile released a new "Anti-Theft" feature for its Trackers, which disabled use of the "Scan and Secure App."[36] Ostensibly created to prevent Tile Trackers from being located in stolen goods, Tile is willing to allow customers to make their Tile Trackers completely undetectable, so long as they provide a government ID (verified with biometric identification).  Users will also have to agree to new terms of use that allow Tile to provide their personal information to law enforcement at its discretion when a criminal investigation is underway. And it further reserves the right to sue anyone who uses Tile to commit crimes that violate its terms of service.[37]

55.     The day of the feature's release, company CEO Chris Hulls published a blog post where he claimed that focus on Tile Trackers' role in stalking was "misguided," and that "anti-stalking features don't solve the problem." Hulls claimed that anti-stalking features within his

---

[35] *Id.*

[36] Charlie Sorrel, *Tile's Odd New Anti-Theft Mode May Make Stalking Even Easier*, LifeWire (Feb, 21, 2023) (available at https://www.lifewire.com/tiles-odd-new-anti-theft-mode-may-make-stalking-even-easier-7111890)

[37] Sarah Perez, *Tile takes extreme steps to limit stalkers and thieves from using its Bluetooth trackers*, TechCrunch (Feb. 16, 2023) (available at https://techcrunch.com/2023/02/16/tile-takes-extreme-steps-to-limit-stalkers-and-thieves-from-using-its-bluetooth-trackers/)

1  product would "put the onus on the victim," and that rather law enforcement and stricter

2  regulation of GPS tracking technology and apps would be more effective.[38]

3      56.     Further, in a PR Statement, Tile claims that notifications provided to a person's

4  phone that there is a nearby Bluetooth tracking device fail to prevent stalking and only

5  emboldens thieves. "The proactive notifications found in the Bluetooth tracker industry were

6  designed to prevent stalking; however, these anti-stalking measures have been criticized for

7  being insufficient for victim protection. Instead, these alerts have the possibility of making

8  Bluetooth trackers easily identifiable by thieves."[39]

9      57.     But these types of statements create a false equivalence. Whether a thief is able to

10 find a Tile Tracker has nothing to do with whether a stalking victim is benefitted by safety

11 measures like alerts.  Rather than trying to make anti-stalking measures *better*, Tile elected to do

12 away with them entirely, in favor of amplifying the anti-theft use case for the Trackers.

13     **G. Notwithstanding the Dangerous Nature of Tile Trackers, Amazon Has Entered Into
        a Partnership with Tile, Greatly Expanding the Reach and Accuracy of Tile**

14     **Trackers, and Accordingly Increasing Their Dangerousness.**

15     58.     On May 7, 2021, Defendant Amazon announced that it was partnering with Tile

16 to enhance Tile's tracking network—and therefore the reach and efficacy of Tile Trackers.[40]  The

17 partnership would allow Amazon to strengthen its tracking network, called Sidewalk, by letting

18 Tile Trackers tap into the Bluetooth networks created Amazon's Echo, Ring, and Sidewalk

19 Bridge products (among others), which are home electronic devices that can creates their own

20

21 _____

22 [38]Chris Hulls, *Tile is Taking a New Approach to Combat Theft and Stalking*, Medium (Feb. 15,
23 2023)  (available  at  https://chrishulls.medium.com/tile-is-taking-a-different-approach-to-the-
   bluetooth-industrys-theft-and-stalking-problems-bd92d3ae4f3c#e643)

24 [39] Life360 Press Release, *Tile Takes Aim at Bluetooth Tracker Industry's Theft and Stalking
   Measures  with  Launch  of  Anti-Theft  Mode*  (Feb.  16,  2023)  (available  at
25 https://www.prnewswire.com/news-releases/tile-takes-aim-at-bluetooth-tracker-industrys-theft-
   and-stalking-measures-with-launch-of-anti-theft-mode-
26 301748350.html#:~:text=The%20proactive%20notifications%20found%20in,trackers%20easily
   %20identifiable%20by%20thieves)

27 [40] Jon Fortt, *Amazon partners with Tile to take on Apple AirTags*,  CNBC (May 7, 2021)
28 (available  at  https://www.cnbc.com/2021/05/07/amazon-partners-with-tile-to-take-on-apple-
   airtags.html)

network by aggregating consumers' WiFi signals.[41] Tile Trackers began working with Amazon's network as of June 14, 2021.

59.     Sidewalk was originally developed for use by Amazon's Ring Doorbell product, to help it stay connected to the Internet even when the product was placed outside, far from the source of the owner's residential WiFi (which emanates from the homeowner's router, which typically is inside the home). This technology enabled Amazon to create a "mesh" network that co-opted and extended existing WiFi networks.   To do this, Amazon uses Bluetooth and unclaimed slices of the wireless spectrum, with Ring cameras and Echo speakers acting as the main bridges (actually called Sidewalk Bridges) to keep everything connected.[42]

60.     Amazon rapidly expanded the Sidewalk network, seizing on the ubiquity of Amazon devices in American homes.[43]  As of March 31, 2023, Amazon claims that the Sidewalk network reaches of 90% of the United States population. In contrast, AT&T's cell service reaches just 68%.[44]

61.     On or about June 14, 2022, Tile devices began utilizing Sidewalk to replace the low-distance Bluetooth connectivity that they had previously been dependent upon.  This greatly enabled Tile's reach and efficacy.  Per the company:

> With this newly-expanded integration, eligible Echo devices can use Amazon Sidewalk to securely search for Tiles. This means that Tiles could get location updates more often, which would make finding your Tiled items faster and more convenient at home and on-the-go.… Tiled items that are lost outside of the home are

---

[41] Amazon, *Welcome to Amazon Sidewalk* (available at https://www.amazon.com/Amazon-Sidewalk/b?ie=UTF8&node=21328123011)

[42] David Nield, *How Amazon Sidewalk Works—and Why You May Want to Turn It Off*, Wired (May 11, 2021) (available at https://www.wired.com/story/how-amazon-sidewalk-works/)

[43]Jennifer Tuohy, *Amazon just opened up its Sidewalk network for anyone to build connected gadgets on*, The Verge (Mar. 28, 2023)  (available at https://www.theverge.com/2023/3/28/23659191/amazon-sidewalk-network-coverage)

[44] *See* Angelo Ilumba, *AT&T Coverage Map: How It Compares*, WhistleOut (Jun. 6, 2023) (available at https://www.whistleout.com/CellPhones/Guides/att-coverage-map)

> typically outside of the Bluetooth range of their owner's phone or tablet and can't be found by making it ring.…Now, eligible Echo Devices around the neighborhood connected to Sidewalk can help you find your Tiled items. These Echo devices can also securely scan for and update the location of Tiles using Sidewalk's Bluetooth frequency. This expanded relationship will exponentially grow the already massive Tile Network, which means lost Tiles outside the home will receive more location updates more often, helping customers track them down faster.[45]

62.     Thus, Defendants' partnership makes Tiles more accurate, and therefore more dangerous.

**H. Victims of Stalking Via Tile Trackers Have Little Meaningful Recourse.**

63.     Even in the event that a victim of Tile stalking is able to discover the Tile Tracker and bring it to law enforcement, there are very few, meaningful protections that such a victim would then be able to receive.  At present, only 23 states have electronic tracking laws,[46] and stalking, in and of itself, is a crime that often goes unprosecuted:

> Stalking goes unrecognized, uncharged, and unprosecuted for a number of reasons. Victims, police, and prosecutors often fail to recognize patterns of behavior as "stalking," or associate the term exclusively with following, monitoring, or surveillance--acts that represent only one variety of the many types of behavior that may fit the statutory definition of stalking. Police and prosecutors may focus on a specific incident that resulted in a law enforcement response (e.g., an assault, an isolated threat, an act of vandalism) and fail to explore the context within which the act was committed—context that may include a course of conduct chargeable as stalking. Prosecutors, failing to understand the strategic value of a stalking charge, may wonder why they should bother "complicating" their case when they have strong evidence of a crime that is perceived to be more serious and easier to prosecute.[47]

---

[45] Tile, *Amazon Sidewalk is About to Strengthen the Finding Power of Your Tiles* (May 7, 2021) (available at https://www.tile.com/en-us/blog/sidewalk-strengthening-the-power-of-your-tiles)

[46] Alexis McAdams, *Defendants AirTags, meant to help you track your stuff, have become tools of stalkers and criminals,* Fox News (June 14, 2022) (available at https://www.foxnews.com/tech/Defendants-airtag-stalking-dangerous-crime)

[47] Stalking Prevention Awareness and Resource Center ("SPARC"). *Prosecutor's Guide to Stalking* (2020) (available at https://www.stalkingawareness.org/wp-content/uploads/2020/01/SPA-19.005-Prosecutors-Guide-to-Stalking-00000002.pdf)

64.     Indeed, the number of individuals who are stalked in the United States is jaw-dropping.  More than 6 million people over the age of 18 are stalked each year in the United States, according to data from the Department of Justice's Bureau of Justice Statistics (BJS).[48] That number is believed to be much higher, however, as BJS statistics indicate just 40% of stalking cases are reported to police.[49]  According to the Stalking Prevention, Awareness, and Resource Center (SPARC), one in six women and one in 17 men are stalking survivors. Roughly 15% of those individuals said the stalking forced them to move.[50]  Yet, once reported to the police, only 8% of stalking perpetrators are arrested.[51]

**I.     The Federal Trade Commission Makes Clear That Stalking Technologies and Unwanted Location Tracking Violates Section 5 of the FTC Act.**

65.     Recent enforcement actions by the FTC directly speak to the plainly-illegal, dangerous, and fundamentally unfair nature of Defendants' conduct.

66.     For example, in August 2022, the Commission filed suit against the data broker Kochava, Inc.

> [F]or selling geolocation data from hundreds of millions of mobile devices that can be used to trace the movements of individuals to and from sensitive locations. Kochava's data can reveal people's visits to reproductive health clinics, places of worship, homeless and domestic violence shelters, and addiction recovery facilities. The FTC alleges that by selling data tracking people, Kochava is enabling others to identify individuals and exposing them to threats of stigma, stalking, discrimination, job loss, and even physical violence.[52]

---

[48] Megan Stone, *After 9-year fight to prosecute her stalker, woman shares story to help other survivors*, ABC News (Jan. 5, 2021) (available at https://abcnews.go.com/GMA/Living/year-fight-prosecute-stalker-woman-shares-story-survivors/story?id=74878256)

[49] *Id.*

[50] *Id.*

[51] *Id.*

[52] Federal Trade Commission, *FTC Sues Kochava for Selling Data that Tracks People at Reproductive Health Clinics, Places of Worship, and Other Sensitive Locations*, (Aug. 29, 2022) (available at https://www.ftc.gov/news-events/news/press-releases/2022/08/ftc-sues-kochava-selling-data-tracks-people-reproductive-health-clinics-places-worship-other)

67.    Per the Commission, the lawsuit involves Kochava's "vast troves of location information derived from hundreds of millions of mobile devices….People are often unaware that their location data is being purchased and shared by Kochava and have no control over its sale or use."[53]

68.    Risks associated with the unwanted collection of location data include identification of individuals' home addresses, and, more broadly, "puts consumers at significant risk. The company's data allows purchasers to track people at sensitive locations that could reveal information about their personal health decisions, religious beliefs, and steps they are taking to protect themselves from abusers. The release of this data could expose them to stigma, discrimination, physical violence, emotional distress, and other harms."[54]

69.    Such acts and practices "reveal consumers' visits to sensitive locations, including, among others, locations associated with medical care, reproductive health, religious worship, mental health, temporary shelters, such as shelters for the homeless, domestic violence survivors, or other at-risk populations, and addiction recovery" and, in turn "cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition." Accordingly, they "constitute unfair acts or practices in violation of Section 5 of the FTC Act."[55]

70.    The enforcement action against Kochava is not an outlier.  In 2019, the FTC brought an enforcement action against Retina-X, a company accused of creating "stalking apps," that could be placed on users phones in order to surreptitiously surveil them.  Like the Kochava action, and like the instant action against Defendants, "these apps were designed to run surreptitiously in the background and are uniquely suited to illegal and dangerous uses. Under

---

[53] *Id.*

[54] *Id.*

[55] Complaint, *Federal Trade Commission v. Kochava, Inc.*, Case No. 2:22-cv-377 (D. Idaho), Dkt. No. 1 at ¶¶ 36-38.

these circumstances, we will seek to hold app developers accountable for designing and marketing a dangerous product."[56]

71.     There, as here, the defendant "sold monitoring products and services that required circumventing certain security protections implemented by the Mobile Device operating system or manufacturer, and did so without taking reasonable steps to ensure that the monitoring products and services will be used only for legitimate and lawful purposes by the purchaser. Respondents' actions cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. This practice is an unfair act or practice [in violation of the FTC Act]"[57]

**J.  Plaintiffs' Experience Being Stalked by Tile Trackers.**

72.     Plaintiffs were stalked, via a Tile Tracker, following a breakup between Plaintiff Stephanie Ireland Gordy and her then-girlfriend, on or about October 17, 2016.

73.     Upon information and belief, on or about October 31st, 2016, Plaintiff Stephanie Ireland Gordy's ex broke into her car, in her garage, and hid a Tile Slim in the console of Plaintiff's Jeep.

74.     Over the next several months, the stalker would mysteriously and unexpectedly appear at locations where Plaintiffs were.  Plaintiffs had moved to a new residence, and refused to tell the stalker where they lived when she asked.  However, she quickly found the location and would drive by the new house, in an effort to intimidate Plaintiffs.

75.     Shortly thereafter, Plaintiff Stephanie Ireland Gordy received a disturbing email from her stalker, which stated, *inter alia,* "I feel like the Stephanie Gordy I knew and loved has died.  You are no longer walking this earth."

---

[56] Federal Trade Commission, *FTC Brings First Case Against Developers of 'Stalking' Apps*, (Oct. 22, 2019) (available at https://www.ftc.gov/news-events/news/press-releases/2019/10/ftc-brings-first-case-against-developers-stalking-apps)

[57] *In the Matter of Retina-X Studios, LLC, a limited liability company; and James N. Johns, Jr., individually and as sole member of Retina-X Studios, LLC.*, FTC Matter/File Number 172-3118, Complaint, at ¶ 32.

76.     Plaintiffs knew that the stalker carried a gun in her car.   Plaintiff Stephanie Ireland Gordy purchased a bullet proof vest and began carrying it with her to her work.

77.     Plaintiffs' cars were also vandalized.   One car was keyed down the driver's side door it sat in front of Plaintiffs' new residence:



Fig. 10

78.     Plaintiffs' other car—the Jeep—had its rear-passenger door dented.   No other vehicles in the neighborhood were damaged.

79.     The stalker also began showing up at destinations out of town when Plaintiffs went on long trips.   For example, In February 2017, Plaintiffs drove to Fredericksburg, Texas— approximately 4 hours from their then-home in Houston—for a long weekend with friends.   That Saturday, Plaintiffs drove to a restaurant just outside of the town, only to be confronted by the stalker when they pulled into the parking lot.

80.      On March 10, 2017, Plaintiff Stephanie Ireland Gordy was driving home from work and searched for something in the middle console of her Jeep.   She found what she thought was an item of trash, but upon pulling it out and inspecting it, realized that it was a Tile Tracker.

1

2

3

4

5

6

7

8

9

 

10

Fig. 11

11     81.     That evening, Plaintiff Stephanie Ireland Gordy contacted Tile via the chat

12   function on its website.  The Tile employee confirmed that the Tile Tracker was associated with

13   the email account of Plaintiffs' stalker.

14        (09:19:36 PM) Tanya @ Tile: Do you no know anyone who's using Tile, Stephanie? :)
          (09:19:39 PM) Tanya @ Tile: *not
15        (09:19:46 PM) Stephanie Gordy MD: yes
          (09:19:50 PM) Stephanie Gordy MD: ███████████
16        (09:20:05 PM) Stephanie Gordy MD: but that's it
          (09:20:45 PM) Stephanie Gordy MD: when I press the middle of this tile, it beeps
17        (09:21:02 PM) Tanya @ Tile: All right! Was it in your vehicle as if it was dropped by
          accident or did it look like it's suspiciously in there for a reason? Hmm
18        (09:21:17 PM) Stephanie Gordy MD: I suspect that it was placed suspiciously...
          (09:21:28 PM) Stephanie Gordy MD: it was in my center console in the bottom

19

20        09:33:44 PM) Tanya @ Tile: I got your report and looks like it is someone's you know.
          Could be ███████
21        (09:34:22 PM) Tanya @ Tile: Let me give you the email address in censored kind of
          format for security purposes:
22        (09:34:35 PM) Stephanie Gordy MD: thank you SO much
          (09:34:40 PM) Tanya @ Tile: ████████████████

23

24

Fig. 12

25

26     82.     Shaken, Plaintiff called the Houston Police Department, who told Plaintiffs that

27   they considered this evidence of stalking and took the Tile Tracker as evidence.

28

CLASS ACTION COMPLAINT

83.     Two weeks later, Plaintiff Stephanie Ireland Gordy arrived home from work to find her stalker sitting in her parked car, several houses away from Plaintiffs' new residence. Plaintiffs again called the police, who made another report.

84.     Several days later, in early April 2017, a Houston Police Department office called the stalker and told her to stay away from Plaintiffs.

85.     Plaintiffs began to fear that their stalker's behavior would escalated, and had locks changed at their work.  However, the behavior continued.  On June 4, 2017, the stalker appeared behind Plaintiffs during their morning commute, weaving in and out of traffic to try to catch up to their car.  The stalker got directly behind Plaintiffs' Jeep, then swerved along side the car and passed Plaintiffs, pulling in front of them and slamming on her brakes.  Plaintiff Shannon Ireland-Gordy was able to get pictures of the event:



Fig. 13

86.     By July 2017, Plaintiffs constantly changed their route to or from work and avoided the places that they previously frequented.  They removed anything recognizable on their Jeep and changed the license plate.  Plaintiff Shannon Ireland-Gordy replaced her car entirely.

87.     Similarly, they stopped gardening in their front yard and no longer allowed their dogs to play outside by themselves.  The stress of being stalked, and the sense of helplessness that came from the fact that their stalker likely knew their whereabouts at all times, made normalcy impossible.  Plaintiffs barely slept.

88.     Around this time, Plaintiffs moved again, breaking their lease with the consent of their landlord and pursuant to the Texas Property Code 92.0161, which affords tenants the right to vacate in the event of stalking.  The new house was unlisted, and Plaintiffs utilized a PO Box for all correspondence and also installed security cameras at the new residence.

89.     At this point, Plaintiff Stephanie Ireland Gordy decided to press charges against the stalker.

90.     However, as Houston Police Officers conducted their investigation, they found that requests to Tile for information were routinely impeded and obstructed.

91.     At first, Tile told the officers that they could not help them unless they purchased an iPhone and downloaded the Tile App.  The officers did this but were unable to get any appreciable information this way.

92.     The officers then subpoenaed Tile for information such as

- "Location history for the Tile, Inc. tracking device in question including Latitude and Longitude and Date and Time for each time thew tracking device connected to or was within Bluetooth range of the electronic or mobile device used or assigned to access the account and device[.]"

- "Any and all support services information related to the aforementioned Tile, Inc. device to include: email request submissions, recorded outbound telephone calls and direct emails, personal information provided to Tile's customer care team; name, email address, phone number, and mailing address."

93.     Tile refused to comply, stating that they would not accept an out-of-state subpoena.

94.     The officers from Houston then contacted the San Mateo police, who aided the investigation by sending their own subpoena to Tile, who then produced only two pages of responsive documents, which were of limited value.  Specifically, they only identified the stalker's User ID and email, and the names and activation dates of the Tile Trackers associated with the stalker's account.  Tile did not provide any information regarding the historical location of these devices, and stated that they had no further responsive information or documents.

1    Moreover, any further requests from the police to help decipher the scant information that Tile

2    did provide were rebuffed.

3         95.    Armed with virtually no helpful information from Tile, the police nonetheless

4    arrested the stalker and charged her with illegal installation of a tracking device in July 2018.

5         96.    But because Tile refused to provide any further information to the authorities, the

6    case against the stalker ultimately was dismissed by the Harris County District Attorney—due to

7    lack of evidence—on May 1, 2019.

8         97.    Ironically, it was only through the civil courts that Plaintiffs received fulsome

9    discovery responses from Tile.   In or about June 2019, Plaintiffs were sued by their stalker

10   following the dismissal of the criminal charges.

11        98.    But in so doing, the stalker opened herself up to discovery.   Among the

12   responsive documents that were provided to Plaintiffs were multiple emails from Tile

13   (found@thetileapp.com) to the stalker, from November 1, 2016 continuing through March 10,

14   2017, showing that the stalker had a Tile Slim labeled "SDG Jeep" (Stephanie D. Gordy) that

15   showed the location of Plaintiffs.  *E.g.*

16


25                              Fig. 13 (November 1, 2016)



Fig. 14 (November 5, 2016)



Fig. 15 (November 6, 2016)



Fig. 16 (January 25, 2017)

Fig. 17 (February 24, 2017)

99.    Further, in response to the civil suit, Tile provided log data associated with the stalker's Tile Trackers (which it had failed—or declined—to provide in the law enforcement

subpoena), which demonstrated that prior to the stalker's breakup with Stephanie Ireland Gordy, her Trackers had been "pinged" (i.e., their location had been sought) only **30 times** from January 31, 2016 to October 25, 2016.  But within one week of the breakup, until March 10, 2017 (the date that Plaintiffs discovered the hidden Tile Tracker in their Jeep), the stalker's phone "pinged" Tile's servers **16,385 times**.

100.   Further, Tile had records of communications from the stalker—both over email and chat—shortly after March 10, 2016 (the date that Plaintiffs discovered the Tile Tracker hidden in their Jeep), seeking to rename the "SDG Jeep" Tile Tracker and then seeking to deactivate all Trackers associated with the account.

101.   Had Tile provided any of the above information in response to the initial inquiries from law enforcement, Plaintiffs' criminal case against their stalker likely would not have been dismissed.  In any event, it is clear that Tile did not respond in good faith to law enforcement's initial subpoenas.

102.   Plaintiffs have since moved once more, and remain in effective hiding in an effort to stay undetectable by their stalker.  They are unable to live normal lives, and are in constant fear of reprisal.

## CLASS ALLEGATIONS

103.   Plaintiffs bring this class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of all members of the following classes and sub-classes, which are jointly referred to throughout this Complaint as the "Class:"

**The Stalked Class:** all persons residing in the United States who were tracked, without consent, by a Tile tracker.

**The At-Risk-Of-Stalking Class:** all persons residing in the United States who risk being tracked, without consent, by a Tile tracker.

**The Multistate Sub-Class:** all persons residing in the States of Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Georgia, Hawaii, Idaho, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Minnesota, Missouri, Nevada, New Hampshire, New Jersey, New Mexico, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South

1    Dakota, Texas, Utah, Vermont, Washington, and West Virginia
2    who were tracked, without consent, by Tile trackers.

3    104.    Plaintiffs are representatives for each Class or Subclass.

4    105.    Excluded from each Class are the following individuals: officers and directors of
5    Defendants and their parents, subsidiaries, affiliates, and any entity in which either Defendant
6    has a controlling interest; and all judges assigned to hear any aspect of this litigation, as well as
7    their immediate family members.

8    106.    Plaintiffs reserve the right to modify or amend the definition of each of the
9    proposed Classes before the Court determines whether certification is appropriate.

10    107.    This action readily satisfies the requirements set forth under Federal Rule of Civil
11    Procedure 23:

12            a.    Each Class is so numerous that joinder of all members is impracticable.
13    Upon Plaintiff's counsel's investigation, information, and belief, the Class numbers in the
14    thousands if not greater.

15            b.    There are questions of law or fact common to the Classes.  These
16    questions include, but are not limited to, the following:

17                    i.            Whether Defendants' acts and practices
18                    complained of herein amount to the use of an electronic tracking
19                    device to determine the location or movement of a person, in violation
20                    of Cal. Pen. Code § 637.7;

21                    ii.            Whether Tiles are "electronic tracking
22                    devices" under Cal. Pen. Code § 637.7(d);

23                    iii.            Whether Defendants' acts and practices
24                    complained of herein amount to egregious breaches of social norms;

25                    iv.            Whether Defendants acted intentionally in
26                    violating Plaintiffs' and Class members' privacy rights;

27                    v.            Whether an injunction should issue; and

28

1            vi.                           Whether declaratory relief should be

2            granted.

3            c.       Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs,

4 like all Class members, were subject to unwanted stalking via the Tile tracker.

5            d.       Moreover, like all Class members, Plaintiffs suffer a substantial risk of

6 repeated injury in the future.  Each Plaintiff continues to be at risk of unwanted and unlawful

7 tracking via a Tile tracker.  Because the conduct complained of herein is systemic, Plaintiffs and

8 all Class Members face substantial risk of the same injury in the future.  Defendants' conduct is

9 common to all Class members and represents a common pattern of conduct resulting in injury to

10 all members of the Class.  Plaintiffs have suffered the harm alleged and have no interests

11 antagonistic to any other Class member.

12            e.       Plaintiffs will fairly and adequately protect the interests of the Class.

13 Plaintiffs' interests do not conflict with the interests of the Class members.  Furthermore,

14 Plaintiffs have retained competent counsel experienced in class action litigation, consumer

15 protection litigation, and electronic privacy litigation.  Plaintiffs' counsel will fairly and

16 adequately protect and represent the interests of the Class.  FRCP 23(a)(4) and 23(g) are

17 satisfied.

18            f.       In acting as above-alleged, and in failing and refusing to cease and desist

19 despite public outcry, Defendants have acted on grounds generally applicable to the entire Class,

20 thereby making final injunctive relief and corresponding declaratory relief each appropriate with

21 respect to the Class as a whole.  The prosecution of separate actions by individual Class

22 members would create the risk of inconsistent or varying adjudications with respect to individual

23 Class members that would establish incompatible standards of conduct for Defendants.

24            g.       Injunctive relief is necessary to prevent further unlawful and unfair

25 conduct by Defendants.  Money damages, alone, could not afford adequate and complete relief,

26 and injunctive relief is necessary to restrain Defendants from continuing to commit their illegal

27 and unfair violations of privacy.

28

1

## CAUSES OF ACTION

2

## COUNT I
### (Negligence)
### (On Behalf of the Class)

3

4

108.    Plaintiffs repeat and reallege all preceding paragraphs contained herein.

5

109.    Defendants owed Plaintiffs and Class members a duty of care in its design,

6

marketing, and introduction into the market of the Tile tracker.  This duty is evidenced by, *inter*

7

*alia*, Defendants' unique position to monitor Plaintiffs' and Class members' behavior through

8

the Tile trackers' access to Defendants' vast network of mobile devices, which in turn are used to

9

locate Plaintiffs and Class members with unparalleled reach and precision.  It is further

10

supported by the surreptitious and non-intuitive nature of Defendants' tracking.

11

110.    Defendants breached that duty by releasing Tile trackers into the marketplace

12

with insufficient safeguards to prohibit their use for stalking purposes.

13

111.    This breach of duty on the part of Defendants was the proximate or legal cause of

14

injury suffered by Plaintiffs and Class members.

15

112.    As a result of Defendants' actions, Plaintiffs and Class members seek injunctive

16

relief, damages and punitive damages in an amount to be determined at trial.  Plaintiffs and Class

17

members seek punitive damages because Defendants' actions—which were malicious,

18

oppressive, and willful—were calculated to injure Plaintiffs and Class members and made in

19

conscious disregard of Plaintiffs' and Class members' rights.  Punitive damages are warranted to

20

deter Defendants from engaging in future misconduct.

21

## COUNT II
### (Strict Liability – Design Defect – Consumer Expectation Test)
### (On Behalf of the Class)

22

23

113.    Plaintiffs repeat and reallege all preceding paragraphs contained herein.

24

114.    Defendants manufacture, distribute, and sell Tile trackers.

25

115.    Defendants' design of Tile trackers was defective because the product did not—

26

and does not—perform as safely as an ordinary consumer would have expected it to perform

27

when used or misused in an intended or reasonably foreseeable way.  The foreseeability of the

28

**CLASS ACTION COMPLAINT**

use/misuse of the Tile trackers for stalking is evidenced by, *inter alia*, the fact that since its inception, comments have been posted in response to Tile's own ads that show people's intent to purchase the trackers for stalking victims.

116.    Plaintiffs and Class members were harmed as a result of the Tile trackers' design defect.

117.    The Tile trackers' design defect was a substantial factor in causing Plaintiffs' and Class members' harm.

118.    As a result of Defendants' actions, Plaintiffs and Class members seek injunctive relief, damages and punitive damages in an amount to be determined at trial.  Plaintiffs and Class members seek punitive damages because Defendants' actions—which were malicious, oppressive, and willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights.  Punitive damages are warranted to deter Defendants from engaging in future misconduct.

**COUNT III**
**(Strict Liability – Design Defect – Risk-Benefit Test)**
**(On Behalf of the Class)**

119.    Plaintiffs repeat and reallege all preceding paragraphs contained herein.

120.    Defendants manufacture, distribute, and sell the Tile tracker product.

121.    The Tile trackers were defectively designed.

122.    Plaintiffs and Class members were harmed as a result of the Tile trackers' design defect.

123.    The Tile trackers' design defect was a substantial factor in causing Plaintiffs' and Class members' harm.

124.    The benefits of Defendants' Tile trackers' design do not outweigh the risks of the design.  A consideration of the following factors—the gravity of the potential harm caused by the design defect (*i.e.*, its propensity for use in stalking and other crimes); the likelihood that this harm would occur; the feasibility of an alternative safer design at the time of manufacture; the cost of an alternative design; and any disadvantages of an alternative design all weigh in favor of

Plaintiffs and the Class, and make clear that the risks associated with the Tile trackers outweigh the benefits.

125.    As a result of Defendants' actions, Plaintiffs and Class members seek injunctive relief, damages and punitive damages in an amount to be determined at trial.  Plaintiffs and Class members seek punitive damages because Defendants' actions—which were malicious, oppressive, and willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights.  Punitive damages are warranted to deter Defendants from engaging in future misconduct.

**COUNT IV**
**(Unjust Enrichment)**
**(On Behalf of the Class)**

126.    Plaintiffs repeat and reallege all preceding paragraphs contained herein.

127.    Defendants should have not released the Tile trackers into the stream of commerce, because of the dangers detailed herein.

128.    As a result of Defendants' selling the Tile trackers, Defendants received a benefit, which it is unjust for Defendants to retain.

129.    Under the circumstances, it is against equity and good conscience to permit Defendants to retain the ill-gotten benefits that it received from the conduct complained of herein.

130.    As a direct and proximate result of Defendants' actions, Defendants have been unjustly enriched. Plaintiffs and Class members have a right to restitution in an amount to be proven at trial.

**COUNT V**
**(Intrusion Upon Seclusion)**
**(On Behalf of the Class)**

131.    Plaintiffs repeat and reallege all preceding paragraphs contained herein.

132.    Plaintiffs and Class members have reasonable expectations of privacy in their persons and their whereabouts, generally.  Plaintiffs' and Class members' private affairs include their locations.

133.   The reasonableness of such expectations of privacy is supported by Defendants' unique position to monitor Plaintiffs' and Class members' behavior through the Tile trackers' access to Defendants' vast network of mobile devices running Defendants' apps, which in turn are used to locate Plaintiffs and Class members with unparalleled reach and precision.   It is further supported by the surreptitious and non-intuitive nature of Defendants' tracking.

134.   Defendants intentionally intruded on and into Plaintiffs' and Class members' solitude, seclusion, or private affairs by intentionally geolocating them.

135.   These intrusions are highly offensive to a reasonable person.   This is evidenced by, *inter alia*, Supreme Court precedent (most recently and forcefully articulated in the *Carpenter* opinion), legislation enacted by Congress, rules promulgated and enforcement actions undertaken by the FTC, and countless studies, op-eds, and articles decrying location tracking, particularly in the context of stalking and abuse.

136.   Plaintiffs and Class members were harmed by the intrusion into their private affairs as detailed throughout this Complaint.

137.   Defendants' actions and conduct complained of herein were a substantial factor in causing the harm suffered by Plaintiffs and Class members.

138.   As a result of Defendants' actions, Plaintiffs and Class members seek injunctive relief, damages and punitive damages in an amount to be determined at trial.   Plaintiffs and Class members seek punitive damages because Defendants' actions—which were malicious, oppressive, and willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights.   Punitive damages are warranted to deter Defendants from engaging in future misconduct.

**COUNT VI**
**(California Constitutional Right to Privacy)**
**(On Behalf of the Class)**

139.   Plaintiffs repeat and reallege all preceding paragraphs contained herein.

140.   Plaintiffs and Class members have reasonable expectations of privacy in their persons and their whereabouts, generally.   Plaintiffs' and Class members' private affairs include their locations.

141.   Defendants intentionally intruded on and into Plaintiffs' and Class members' solitude, seclusion, right of privacy, or private affairs by intentionally tracking their location with Tile trackers.

142.   These intrusions are highly offensive to a reasonable person, because they disclosed sensitive and confidential location information, constituting an egregious breach of social norms.   This is evidenced by, *inter alia*, Supreme Court precedent (most recently and forcefully articulated in the *Carpenter* opinion), legislation enacted by Congress, rules promulgated and enforcement actions undertaken by the FTC, and countless studies, op-eds, and articles decrying location tracking, particularly in the context of stalking and abuse.

143.   Plaintiffs and Class members were harmed by the intrusion into their private affairs as detailed throughout this Complaint.

144.   Defendants' actions and conduct complained of herein were a substantial factor in causing the harm suffered by Plaintiffs and Class members.

145.   As a result of Defendants' actions, Plaintiffs and Class members seek injunctive relief, damages and punitive damages in an amount to be determined at trial.   Plaintiffs and Class members seek punitive damages because Defendants' actions—which were malicious, oppressive, and willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights.   Punitive damages are warranted to deter Defendants from engaging in future misconduct.

**COUNT VII**
**(Violations of CIPA, Cal. Pen. Code §§ 630, *et seq.*)**
**(On Behalf of the Class)**

146.   Plaintiffs repeat and reallege all preceding paragraphs contained herein.

147.   Cal. Pen. Code § 630 provides that "[t]he Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communication and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."

148.    Defendants' acts and practices complained of herein violated and continue to violate Cal. Pen. Code § 637.7.

149.    Cal. Pen. Code § 637.7(a) prohibits the use of an electronic tracking device to determine the location or movement of a person. As used in Cal. Pen. Code § 637.7, "electronic tracking device" means "any device attached to a vehicle or other movable thing that reveals its location or movement by the transmission of electronic signals." Cal. Pen. Code § 637.7(d).

150.    In direct violation of this prohibition and without the consent of Plaintiffs or Class members, Defendants have knowingly introduced into the stream of commerce a standalone device whose sole purpose is to locate whatever it is affixed to.  Defendants have done this despite being warned prior to and immediately after the release of the Tile trackers that the product is a dangerous tool that enables stalkers and abusers.

151.    As described herein, Tile trackers are "electronic tracking devices" as defined by Cal. Pen. Code § 637.7(d), used "to determine the location or movement of a person." Cal. Pen. Code § 637.7(a).

152.    As a result of Defendants' violations of Cal. Pen. Code § 637.7, and pursuant to Cal. Pen. Code § 637.2, Plaintiffs and Class members are entitled to the following relief: (1) A declaration that Defendants' conduct violates CIPA; (2) Statutory damages and/or trebled actual damages; (3) Injunctive relief in the form of, *inter alia*, an order enjoining Defendants from using Tile trackers to geolocate Class members in violation of CIPA; (4) Injunctive relief in the form of, *inter alia*, an order requiring Defendants to destroy all data created or otherwise obtained from its illegal tracking of Class members; and (5) An award of attorney's fees and costs of litigation as provided by CIPA, the private attorney general doctrine existing at common law and also codified at California Civil Code Section 1021.5, and all other applicable laws.

## COUNT VIII
### (Negligence *Per Se*)
### (On Behalf of the Class)

153.    Plaintiffs repeat and reallege all preceding paragraphs contained herein.

154.    As set forth above, Defendants' conduct complained of herein violated both CIPA and California's Constitutional Right to Privacy.

155.    These violations of CIPA and California's Constitutional Right to Privacy proximately caused injury to Plaintiffs and the Class.

156.    These injuries resulted from an occurrence, the nature of which CIPA and California's Constitutional Right to Privacy were designed to prevent.

157.    Plaintiffs and the Class are a part of the class of persons for whose protection CIPA and California's Constitutional Right to Privacy were made into law, respectively.

158.    As a result of Defendants' actions, Plaintiffs and Class members seek injunctive relief, damages and punitive damages in an amount to be determined at trial.  Plaintiffs and Class members seek punitive damages because Defendants' actions—which were malicious, oppressive, and willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights.  Punitive damages are warranted to deter Defendants from engaging in future misconduct.

**COUNT IX**
**(California Bus. and Prof. Code § 17200, *et seq.* – Unlawful Prong)**
**(On Behalf of the Class)**

159.    Plaintiffs repeat and reallege all preceding paragraphs contained herein.

160.    As set forth above, Defendants' conduct violates multiple laws of the State of California, including CIPA and California's Constitutional Right to Privacy, and amount to acts of negligence, negligence *per se*, intrusion-upon-seclusion, and product liability.  Each of these independent violations of law also serve as predicate violations of the UCL's unlawful prong.

161.    Plaintiffs have standing to pursue this claim as they suffered injury in fact and have lost money or property as a result of Defendants' actions as set forth herein. Specifically, Plaintiffs have been forced to move at least once—and perhaps more times in the future—as a result of having their whereabouts monitored, by their stalker, via Defendants' Tile trackers.

162.    Pursuant to section 17203 of the UCL, Plaintiffs, individually and on behalf of the Class, seek restitution and an order of this Court enjoining Defendants from engaging in the unlawful business practices alleged herein in connection with the sale of Tile trackers.

**COUNT X**
**(California Bus. and Prof. Code § 17200, *et seq*. – Unfair Prong)**
**(On Behalf of the Class)**

163.    Plaintiffs repeat and reallege all preceding paragraphs contained herein.

164.    Defendants' business practices, as alleged herein, are unfair because their conduct in releasing Tile trackers into the marketplace is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. The gravity of the harm to consumers is not outweighed by the utility of Defendants' conduct.

165.    Defendants' business practices are also unfair because they undermine public policy, which is tethered to specific statutory provisions, including CIPA and the California Constitutional Right to Privacy.

166.    Lastly, Defendants' business practices are unfair because: (1) the injury to the consumer is substantial; (2) the injury is not outweighed by any countervailing benefits to consumers or competition; and (3) consumers could not reasonably have avoided the injury.

167.    There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described above.

168.    Defendants' wrongful business practices constituted, and constitute, a continuing course of conduct of unfair competition since Defendants is continuing to sell Tile trackers.

169.    Plaintiffs have standing to pursue this claim as they suffered injury in fact and have lost money or property as a result of Defendants' actions as set forth herein. Specifically, Plaintiffs have been forced to move at least once—and perhaps more times in the future—as a result of having their whereabouts monitored, by their stalker, via Defendants' Tile trackers.

170.    Pursuant to section 17203 of the UCL, Plaintiffs, individually and on behalf of the Class, seek restitution and an order of this Court enjoining Defendants from engaging in the unlawful business practices alleged herein in connection with the sale of Tile trackers.

**COUNT XI**
**(California Bus. and Prof. Code § 17200, *et seq*. – Fraudulent Prong)**
**(On Behalf of the Class)**

171.    Plaintiffs repeat and reallege all preceding paragraphs contained herein.

172.    Defendants have engaged in numerous fraudulent statements and omissions in connection with the release and sale of Tile trackers.

173.    First, Defendants affirmatively sought to deceive the public by representing, and causing to be represented in the media, that Tiles are safe *and* that Tile trackers have anti-stalking measures in place.  Such representations were meant to assuage or preempt concerns of advocacy groups, law enforcement, and members of the general public.  This deceptive representation had its intended effect, and further still has the likelihood of deceiving these same entities, by and large.

174.    Similarly, Defendants' failure to candidly and publicly address the dangers associated with Tile trackers—and their efforts to downplay same—deceive the general public (including Class members) by failing to alert them of the dangers associated with Tile trackers.  This is problematic for all Class members, as they are unlikely to learn of the dangers associated with Tile trackers until they have become victims of stalking.  At minimum, they will not learn about the dangers through any affirmative representations or public undertaking on the part of Defendants.

175.    Plaintiffs and members of the Class have been injured by Defendants' fraudulent representations and omissions for the reasons set forth above.  A material risk has manifested and/or is likely to manifest in the future, but Defendants have done their best to hide this fact from Plaintiffs and Class members.

176.    These misrepresentations and omissions were an immediate cause—if not the predominant, decisive or even sole factor—of the injury-producing conduct.

177.    Plaintiffs have standing to pursue this claim as they suffered injury in fact and have lost money or property as a result of Defendants' actions as set forth herein. Specifically, Plaintiffs have been forced to move at least once—and perhaps more times in the future—as a result of having their whereabouts monitored, by their stalker, via Defendants' Tile trackers.

178.    Pursuant to section 17203 of the UCL, Plaintiffs, individually and on behalf of the Class, seek restitution and an order of this Court enjoining Defendants from engaging in the unlawful business practices alleged herein in connection with the sale of Tile trackers.

1 | <u>**RELIEF REQUESTED**</u>

2 |     Plaintiffs, on behalf of themselves and members of the general public, requests the Court

3 | to enter judgment against Defendant, and accordingly, request the following:

4 |     a.  That judgment be entered against Defendants and in favor of Plaintiffs on the

5 |           causes of action set forth in this Complaint;

6 |     b.  That judgment be entered against Defendants for all injunctive, declaratory, and

7 |           other equitable relief sought, including but not limited to an order enjoining

8 |           Defendants from further unlawful, unfair and/or fraudulent practices with respect

9 |           to the design, manufacture, and release into the market of Tile trackers;

10 |     c.  That Plaintiffs and Class members be awarded actual, nominal, statutory, and/or

11 |           punitive damages, in an amount to be determined at trial;

12 |     d.  Reasonable attorney's fees and litigation costs, pursuant to Cal. Civ. Proc. Code §

13 |           1021.5; and

14 |     e.  All other such other relief as may be appropriate.

15 |

16 | Dated:  August 14, 2023           **MILSTEIN JACKSON**

17 |                      **FAIRCHILD & WADE, LLP**

18 |                      */s/ Gillian L. Wade*

                     Gillian L. Wade, State Bar No. 229124

19 |                      gwade@mjfwlaw.com

                     Sara D. Avila, State Bar No. 263213

20 |                      savila@mjfwlaw.com

                     Marc A. Castaneda, State Bar No. 299001

21 |                      mcastaneda@mjfwlaw.com

                     10990 Wilshire Blvd., 8th Floor

22 |                      Los Angeles, California 90024

                     Tel: (310) 396-9600

23 |                      Fax: (310) 396-9635

24 |                      **wh LAW**

                     David Slade

25 |                      slade@wh.law

                     Brandon Haubert

26 |                      brandon@wh.law

                     Jessica Hall

27 |                      jessica@wh.law

                     1 Riverfront Place, Suite 745

28 |                      North Little Rock, AR 72114

                     Telephone:  501.891.6000

Facsimile:  501.222.3027

*Attorneys for Plaintiffs individually
and on behalf of all others similarly situated*

CLASS ACTION COMPLAINT