**MILSTEIN JACKSON
FAIRCHILD & WADE, LLP**
Gillian L. Wade, State Bar No. 229124
gwade@mjfwlaw.com
Sara D. Avila, State Bar No. 263213
savila@mjfwlaw.com
Marc A. Castaneda, State Bar No. 299001
mcastaneda@mjfwlaw.com
2450 Colorado Ave., Suite 100E
Santa Monica, California 90404
Tel: (310) 396-9600
Fax: (310) 396-9635

**wh LAW**
David Slade
slade@wh.law
Brandon Haubert
brandon@wh.law
Jessica Hall
jessica@wh.law
1 Riverfront Place, Suite 745
North Little Rock, AR 72114
Telephone:  501.891.6000
Facsimile:  501.222.3027

*Attorneys for Plaintiffs individually and
on behalf of all others similarly situated*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

SHANNON IRELAND-GORDY,
STEPHANIE IRELAND GORDY,
MELISSA BROAD, and JANE DOE,
*individually and on behalf of all others
similarly situated,*

　　　　　Plaintiffs,

　　v.

TILE, INC., LIFE360, INC., and
AMAZON.COM, INC.

　　　　　Defendants.

Case No.: 3:23-cv-04119-RFL

**AMENDED CLASS ACTION COMPLAINT**

1. Negligence
2. Strict Liability-Design Defect (Risk-Benefit Test)
3. Unjust Enrichment
4. Intrusion Upon Seclusion
5. Violations of California's Constitutional Right to Privacy
6. Violations of CIPA, Cal. Pen. C. § 630, *et seq*.
7. Negligence *Per Se*
8. Violations of UCL's Unlawful Prong, Cal. Bus. & Prof. C. § 17200, *et seq*.
9. Violations of UCL's Unfair Prong, Cal. Bus. & Prof. C. § 17200, *et seq*.

**JURY TRIAL DEMANDED**

## <u>INTRODUCTION</u>

1.      Each year, an estimated 13.5 million people are victims of stalking in the United States, with nearly one in three women and one in six men experiencing stalking at some point in their lifetime.[1]

2.      Stalking can manifest in a host of ways, most often through unwanted and repeated behaviors such as phone calls, texts, visits, gifts, internet posts, or any other series of acts that would cause fear in a reasonable person.  Regardless of the acts the stalker employs, the common theme of stalking behavior is the fear elicited in the victim.

3.      This fear undermines and erodes a victim's autonomy and drastically disrupts their day-to-day life.  One in eight employed stalking victims miss time from work because of their victimization and more than half lose more than five days of work.[2]  One in seven stalking victims move as a result of their victimization.[3]  Unsurprisingly, stalking victims suffer much higher rates of depression, anxiety, insomnia, and social dysfunction than people in the general population.[4]

4.      Technology has increased the tools available to a stalker, with burner phones or call blocking software providing anonymity, and free email services and social media platforms providing a limitless vector for harassing electronic messages and posts.

5.      One of the most dangerous and frightening technologies employed by stalkers is the use of real-time location information to track victims.  These technologies allow stalkers to follow their victims' movements in real time and to undo any attempt on the part of the victim to

---

[1] Stalking Prevention Awareness and Resource Center (SPARC), Stalking Fact Sheet (available at https://www.stalkingawareness.org/wp-content/uploads/2019/01/SPARC_StalkngFactSheet_2018_FINAL.pdf)

[2] Baum, K., Catalano, S., & Rand, M. (2009). Stalking Victimization in the United States. Washington, DC: Bureau of Justice Statistics

[3] *Id.*

[4] Blaauw, E., Arensman, E., Winkel, F.W., Freeve, A., & Sheridan, L. (2002). The Toll of Stalking. Journal of Interpersonal Violence 17(1): 50-63

evade or hide from the stalker.  If one's location is constantly being transmitted to an abuser, there is no place to run.

6.      One of the very first products to make constant, location-based surveillance possible for average consumers is the Tile tracker.  First introduced in 2013, the Tile tracker is a small, plastic square, usually the size of a quarter, that transmits its location back to its owner.

7.      From the moment of the Tile tracker's release, Tile marketed its product both explicitly and implicitly for the purpose of tracking people—particularly women.  The platforms on which the company advertised included pornographic websites, where visitors would leave disturbing comments about using the trackers to find and stalk women.  When marketing consultants brought this to the attention of Tile's leadership, the company's executives mocked the findings and fiercely admonished female employees who expressed concern about this advertising strategy.

8.      Despite having knowledge of the propensity for misuse of the Tile tracker, Tile waited *nine years* before implementing any type of safety feature on its trackers.

9.      Worse still, shortly after the introduction of those safety features, the company released a mechanism by which Tile owners could *disable* the features, thereby intentionally thwarting any recourse or protection a potential victim might have.

10.      Importantly, Tile does not act alone.  Within the last several years, the company partnered with Amazon, in order to harness Amazon's nationwide location-tracking Sidewalk network.  This partnership exponentially expanded the reach and efficacy of the Tile tracker, and accordingly the partnership exponentially magnified the danger posed to victims.

11.      Plaintiffs, each of whom are victims of stalking through the use of a Tile tracker, bring this action on behalf of themselves and a class and subclasses of individuals who have been and who are at risk of stalking via this dangerous product.

12.      Defendants' acts and practices, as detailed further herein, amount to acts of negligence, negligence *per se*, intrusion-upon-seclusion, and product liability, constitute unjust enrichment, and violate California's constitutional right to privacy, California's Invasion of Privacy Act, Cal. Pen. Code § 630, *et seq*. ("CIPA"), and California's Unfair Competition Law,

Cal. Bus. & Prof. Code § 17200, *et seq.* ("UCL"). Plaintiffs, in a representative capacity, seek statutory damages, actual damages, and punitive damages, as well as injunctive and declaratory relief against Defendants, correcting Defendants' practice of releasing an unreasonably dangerous product into the stream of commerce, misrepresenting the harms associated therewith, and facilitating the unwanted and unconsented to location tracking of Plaintiffs and Class members.

## **PARTIES**

13.     At all times relevant to the events described herein, Plaintiff Shannon Ireland-Gordy was a citizen of Texas.

14.     At all times relevant to the events described herein, Plaintiff Stephanie Ireland Gordy was a citizen of Texas.

15.     Plaintiff Melissa Broad is a citizen of London, Ontario.

16.     Plaintiff Jane Doe is a citizen of California.

17.     Defendant Tile, Inc. ("Tile") is an American consumer electronics headquartered in San Mateo, California. Tile's flagship items of consumer electronics are tracking devices that consumers can attach to their belongings, and Tile generally oversees all aspects of these devices, including but not limited to their design, manufacture, marketing, and technical support and maintenance.

18.     Defendant Life360 Inc. ("Life360") is an American information technology company headquartered in San Francisco, California. Life360 provides location-based services to consumers on a global level. On or about November 2021, Life360 acquired Tile and announced that it would integrate the two companies' services (e.g., recognizing Tile trackers within the Life360 app), thereby expanding Tile's tracking reach. Life360 similarly oversees the Tile trackers, including but not limited to their design, manufacture, marketing, and technical support and maintenance.

19.     Defendant Amazon.com, Inc. is an online retail and media company headquartered in Washington. Defendant Amazon manufactures a host of Amazon-branded consumer products, from a range of household goods to consumer electronics, which include the

1  products that create the Amazon Sidewalk network—devices like, *inter alia*, the Amazon

2  Sidewalk Bridge, Echo, and Ring.

3  **JURISDICTION AND VENUE**

4  20.  Pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of

5  2005 ("CAFA"), this Court has subject matter jurisdiction over this putative nationwide class

6  action because the matter in controversy exceeds $5,000,000.00, exclusive of interest and costs,

7  and is a class action in which some members of the Class are citizens of states different than

8  Defendant. *See* 28 U.S.C. § 1332(d)(2)(A).

9  21.  This Court has personal jurisdiction over Defendant because its worldwide

10  headquarters are in California, and because it conducts in California substantial business from

11  which the claims in this case arise.

12  **INTRADISTRICT ASSIGNMENT**

13  22.  Venue properly lies in this district pursuant to 28 U.S.C. § 1391(b)(1) because

14  Defendants are headquartered in this district and a substantial part of the events or omissions

15  which give rise to the claims alleged herein occurred in in this district.

16  **GOVERNING LAW**

17  23.  While California law governs the claims of Plaintiff Jane Doe, it also governs the

18  claims of all other Plaintiffs and all members of the putative Class.

19  24.  Under California's choice-of-law rules, "[w]hether a nonresident plaintiff can

20  assert a claim under California law is a constitutional question based on whether California has

21  sufficiently significant contacts with the plaintiff's claims." *Opperman v. Path, Inc.*, 87

22  F.Supp.3d 1018, 1040 (N.D. Cal. 2014).

23  25.  The claims here meet this "sufficiently significant contacts" test, given

24  Defendants' myriad contacts with the State of California, which include, *inter alia*, the

25  following:

26  a.  Defendant Tile is headquartered in San Mateo, California;

27  b.  Defendant Life360 is headquartered in San Francisco, California;

28

         c.   A significant number of the Echo devices sold by Defendant Amazon—which make up the "network" over which Tile Tracker signals are transmitted—are purchased and used in California, and the Amazon data centers that process the data from these devices are located in California[5];

         d.   At all times relevant to this litigation, each of the three Defendants has conducted a significant portion of its business in California;

         e.   Tile's and Life360's decision to create the Tile Tracker and to release the product into the stream of commerce emanated from California;

         f.   The Tile Tracker was designed in California;

         g.   Tile's and Life360's press and marketing relating to the Tile Tracker was conceived, and emanates from, California; and

         h.   Defendants refuse to comply with any legal process related to stalking via Tile Trackers unless it emanates from a California-based law enforcement agency.

26.    Because of the contacts that Apple, generally, and AirTags, specifically, have with California, there are sufficient significant contacts with California to allow non-Californian Plaintiffs—who do not otherwise have privity of contract with Apple and the choice-of-law provision in its iOS terms—to bring their claims under California law.

## FACTUAL ALLEGATIONS

### A. Tile Trackers, Generally

27.    A Tile Tracker is a physical device that the owner attaches to objects for location purposes.



Fig. 1[6]

---

[5] *See, e.g.,* https://aws.amazon.com/solutions/case-studies/amazon-alexa-case-study/

[6] Ryan Haines, *Tile Pro review: The Bluetooth tracker that's built to last*, Android Authority (Aug. 28, 2021) (available at https://www.androidauthority.com/tile-pro-review-2739339/)

1
2
3
4
5
6
7
8
9
10



Fig. 2[7]

11      28.      Tile Trackers work by synching the physical Tracker to an app ("Tile App" or

12 "App") on the owner's smartphone.

13      29.      For nearby items, the Tile App uses Bluetooth Low Energy ("BTE") radio

14 technology to locate the synched Tracker, within a range of 100 feet.

15      30.      If the Tracker is more than 100 feet from the owner's smartphone, the Tile App

16 uses a "crowd GPS" feature, meaning that if the Tracker is reported as lost, and comes within

17 range of any smartphone with a Tile App, that nearby user's App will send the Tracker's owner

18 an update of the Tracker's location.

19      31.      On May 7, 2021, Defendant Amazon announced that it was partnering with Tile

20 to enhance its tracking network based on Wi-Fi and Bluetooth technology.[8]   The partnership

21 would allow Amazon to strengthen its tracking network, called Sidewalk, by letting Tile

22 Trackers tap into the Bluetooth networks created by Amazon's Echo, a home electronic device

23 that creates its own network by aggregating consumers' WiFi signals. Tile Trackers began

24 working with Amazon's network as of June 14, 2021.

25

26      _____

27 [7] Philip Michaels, *Tile Pro and Tile Mate review*, Tom's Hardware (Dec. 9, 2019) (available at https://www.tomsguide.com/us/tile-mate-tile-pro,review-5795.html)

28 [8] Jon Fortt, *Amazon partners with Tile to take on Apple AirTags*, CNBC (May 7, 2021) (available at https://www.cnbc.com/2021/05/07/amazon-partners-with-tile-to-take-on-apple-airtags.html)

AMENDED CLASS ACTION COMPLAINT

32.     This partnership allowed Tile to expand its "crowd GPS" network exponentially. Moving forward, Tile would not simply have to rely on the network of smartphones with the Tile App installed.  Instead, it could harness the far more ubiquitous network created by the millions of Amazon Echo products throughout the country.  This partnership between Defendants Tile and Amazon made the Tile Tracker vastly more effective, and therefore vastly more dangerous.

**B. Even before Tile Trackers were introduced to the general public, technology journalists quickly sounded the alarm at its potential abuses.**

33.     Initially, in 2013, Tile Trackers were released via Selfstarter, a crowd-funding website.  Because the product was being offered by a smaller technology company, Tile Trackers received little attention from mainstream media.  However, technology journalists were quick to sound the alarm on the potential use of the tracking device for stalkers to find the location of their victims.

34.     By July of 2013, in a piece titled *Tile: Crowdsourcing Lost Keys Or Pseudo GPS Stalking On The Cheap?* one reporter cautioned that "There is significant potential for abuse with this product. For example, how can you confirm the purse you put a tracking device in, such as this, belongs to you?"[9]



Fig. 3[10]

---

[9] Jean Taggart, *Tile: Crowdsourcing Lost Keys Or Pseudo GPS Stalking On The Cheap?,* Malwarebytes (July 12, 2013) (available at https://www.malwarebytes.com/blog/news/2013/07/tile-crowdsourcing-lost-keys-or-pseudo-gps-stalking-on-the-cheap)

[10] Sarah Perez, *Tile, The Lost-Item Tracker With Millions In Crowdfunding, Was Worth The Wait*, TechCrunch (June 12, 2014) (available at https://techcrunch.com/2014/06/12/tile-the-lost-item-tracker-with-millions-in-crowdfunding-was-worth-the-wait/)

AMENDED CLASS ACTION COMPLAINT

35.     Shortly thereafter, in August 2013, the news outlet Vice ran a piece titled *Should We Be Freaked Out About Tile, the World's Cheapest New Location Tracker?* in which the author wrote "When I first saw Tile being advertised, I got an itchy, all-over heebie-jeebies feeling. Adding a whole new matrix of location data to our digital world of oversharing has some potentially scary implications."[11]

36.     The author went on:

> Since Tile is just a small plastic square with an adhesive backing, could you slap one of those on your cheating ex-lover's car, fire up the Tile app, and track their whereabouts through the day?  Since the official FAQ glosses over most of the privacy and security concerns that Tile could potentially cause, I wrote the company and asked them some of my potentially paranoid questions.[12]

37.     In response to the reporter's questions, Tile glossed over the possibility that the product could be used to track people. "A Tile does not contain a GPS unit or a cellular radio and cannot provide continuous automatic location updates. Therefore it is not a good solution for real-time tracking of moving objects. The goal of Tile is to help people keep track of or find items they are likely to lose, and will not support long-distance tracking of moving items."[13]

38.     Unsatisfied by the response, the reporter noted that "the acceptance and reliance on location trackers in society could certainly result in a new wave of security threats, as the technology gets stronger and people learn new and crazy ways to manipulate it. This kind of tech has been available to law enforcement and spy-shop consumers for a while now, but we can be sure that having a cool, sexy marketing machine behind location trackers will put them in more people's hands than ever."[14]

39.     And, of course, this is precisely what happened.  As described, *supra*, Tile Trackers improved in their range and accuracy, rendering the assurances provided by Tile in

---

[11] Patrick McGuire, *Should We Be Freaked Out About Tile, the World's Cheapest New Location Tracker?*, Vice (August 30, 2013) (available at https://www.vice.com/en/article/qbedmx/should-we-be-freaked-out-about-tile-the-worlds-cheapest-new-location-tracker)

[12] *Id.*

[13] *Id.*

[14] *Id.*

AMENDED CLASS ACTION COMPLAINT

2013 totally meaningless. A more recent product review, put out by Mozilla in late 2021, cautioned that a Tile Tracker is

> great for people who have lost things outside of Bluetooth range. It's maybe not so great for people worried about potentially being stalked or unknowingly tracked by someone with bad intentions. While [Tile's competitors seem to] have incorporated protections to help prevent stalking and abuse [with comparable tracking products], we can't confirm Tile has taken the same threats as seriously. That is a concern for sure.
>
> …
>
> So, what's the worst that could happen with Tile's trackers? It's pretty scary to think someone could unknowingly slip a Tile tracker in your car and use it to stalk you all over the US thanks to the big Amazon Sidewalk community network.[15]

**C. From the Moment of Its Release, Tile Was Well Aware of Its Trackers' Capacity for Stalking, and Affirmatively Courted Stalkers and Sexual Predators as Potential Consumers.**

40.     In a 2015 lawsuit filed by a former Tile engineer for workplace discrimination, the engineer stated that in 2013 (i.e., during the initial phases of Tile's launch of the Tile Tracker), "Tile's advertising and marketing strategy…exhibited the Company's lack of respect for women and view of women as sexual objects. For example, Tile advertised on pornography sites, sites about erectile dysfunction, and other dubious outlets. Tile's advertising videos also prompted some viewers to post comments about using 'Tiles' to stalk women and commit sexual violence against them. When an external consultant presented a data finding to Tile's management that consumers perceived Tile's advertising to be sexist, [then-COO of Tile, Michael Farley] mocked the finding."[16]

41.     When the engineer acknowledged the finding of sexism in Tile's advertising, Farley "began yelling at her and telling her that she was out of line."[17]

---

[15] *Privacy Not Included – Tile Trackers,* Mozilla Foundation (No. 8, 2021) (available at https://foundation.mozilla.org/en/privacynotincluded/tile-mate/)

[16] Complaint at ¶18, *McCormack v. Tile Inc., et al.*, No. CIV-532992, Superior Court of California, County of San Mateo.

[17] *Id.*

42.     That said, at some point, Tile appears to have become concerned with the messages implied by its initial advertising, as the videos cited in the above-mentioned articles have been removed from YouTube.  If one goes to the July 16, 2013 Business Insider article titled *Here's The First Ad For A Small Device That Will Never Let You Lose Your Keys Again*, for example, one sees the following image for an embedded YouTube video:



Fig. 4[18]

43.     While the ad clearly has since been taken down, if one clicks on the "this video is private" image and selects "copy URL at current time"



Fig. 5[19]

---

[18] Laura Stampler, *Here's The First Ad For A Small Device That Will Never Let You Lose Your Keys Again*, Business Insider (Jul. 16, 2013) (available at https://www.businessinsider.com/first-ad-for-tile-app-that-finds-lost-keys-2013-7)

AMENDED CLASS ACTION COMPLAINT

Then the copied URL is https://youtu.be/pqDm3gZNZPM

44.     Use of the Wayback Machine allows one to see this URL as it was on July 8, 2013 (i.e., before the ad was taken down).[20]

45.     The ad shows imagery of, *inter alia*, a Tile Tracker attached to a bra:



Tile ™ - the world's largest lost and found

Fig. 6[21]

46.     But more alarming are the comments for the video.  For example:



**AzNightmare**   4 days ago
Not going to lie... watched the video several times because of the girl.

Reply    ·    4 👍 👎

…

---

[19] *Id.*

[20] https://web.archive.org/web/20130708170842/https://www.youtube.com/watch?v=pqDm3gZNZPM

[21] https://web.archive.org/web/20130708170842/https://www.youtube.com/watch?v=pqDm3gZNZPM (at 0:55)

**cupcake**  12 hours ago

no more worrying if your woman is cheating.. drop a tile in her purse and the day is saved lol!

Reply   ·   👍   👎

Figs. 7-8[22]

**D. After Its Release, Reports Emerged of People Being Stalked With Tile Trackers.**

47.    In April 2016, a former Texas beauty queen said a man used a Tile he placed in her purse to stalk her.[23]  "I sleep with my bedroom door locked now," the victim told a reporter. "I'm paranoid throughout the day. Sitting in traffic is the worst, thinking he's looking directly into my car."[24]

48.    Worse, Tile purposely engages in obfuscating and stymieing any inquiries from law enforcement.  This conduct puts victims' lives in serious risk, including but not limited to the lives of Plaintiffs.

49.    Similar reports continue to appear in news outlets,[25] online chat forums,[26] and social media platforms.[27]

---

[22] *Id.*

[23] Rachel Paula Abrahamson, *Texas Beauty Queen Claims Stalker Planted a Tracking Device in Her Purse at Bar*, US Weekly (May 2, 2016) (available at https://www.usmagazine.com/celebrity-news/news/texas-beauty-queen-claims-stalker-planted-a-tracking-device-in-her-bag-w204817/)

[24] *Id.*

[25] Alfonzo Galvan, *Brookings woman finds Bluetooth tracker device in her vehicle, warns others: 'Be careful'*, Sioux Falls Argus Leader (June 11, 2002) (available at https://www.argusleader.com/story/news/crime/2022/06/10/brookings-south-dakota-woman-finds-tile-bluetooth-tracker-vehicle-stalking-safety/7553290001/)

[26] *See, e.g.,* https://www.reddit.com/r/TwoXChromosomes/comments/cmscd2/be_aware_the_tile_app_can_be_used_to_stalk_you/; and https://www.quora.com/Why-did-my-boyfriend-get-angry-when-he-found-out-that-I-put-a-tile-tracker-in-his-wallet-and-inside-his-phone-case

[27] Carly Stern, *'Check your purses!' Texas woman reveals she found a Tile TRACKING device in her bag after a night out - as she warns others to beware of stalkers who could be using them*, Daily Mail (June 15, 2021) (available at TikToker warns women to beware of stalkers using Tile location trackers | Daily Mail Online)

**E. Almost Ten Years After the Release of the Tile Tracker, Tile Introduces An Anti-Stalking Feature, But Only For Users of the Tile App.**

50.    It was not until early 2022 that Tile finally provided an anti-stalking feature for its products.  Called "Scan and Secure," the technology would require the use of the Tile App, which would enable them to scan for unknown Tiles or Tile-enabled devices that may be traveling with them.[28]



Fig. 9[29]

51.    However, this safety feature—released almost ten years after the release of the Tile Tracker—still leaves the vast majority of the population vulnerable for several reasons.

52.    *First*, the individual would have to be alerted to, or suspect, the potential of being stalked by a Tile Tracker in the first instance.  For Tile owners, who have the Tile App, they are likely to be alerted, but only a negligible percentage of the population has the Tile App.  The download numbers on the Google Play Store show roughly 5 million downloads, worldwide.[30]  Apple's iTunes marketplace does not provide download numbers, but it is reasonable to assume

---

[28] Sarah Perez, *Tile launches its anti-stalking safety feature in its mobile app*, TechCrunch (Mar. 17, 2022) (available at https://techcrunch.com/2022/03/17/tile-launches-its-anti-stalking-safety-feature-in-its-mobile-app/)

[29] *Id*.

[30] https://play.google.com/store/apps/details?id=com.thetileapp.tile&hl=en&gl=US

1    a comparable number of downloads for Apple devices, as the app has approximately 745,000

2    reviews.[31]

3         53.    But apart from these (approximately) 10 million people on the planet, no one else

4    has the ability to scan for Tile Trackers—nor do they likely know about the threat posed by the

5    Trackers, much less the ability to seek out and download the Tile App.

6         54.    *Second,* even for individuals who do have the Tile App, there are severe

7    limitations to the App's functionality, making it of limited value.

8         55.    For example, the detection features are not "always on," and instead must be

9    triggered manually by the user.[32]  This limitation is critical and, potentially, deadly: an App user

10   must selectively, and intentionally, engage the App to conduct a scan.  Once that scan concludes,

11   the app will not scan for Tile Trackers again until the App owner once more engages the scan

12   feature.[33]  Put another way, any Tile App owner must decide when and where to scan for Tile

13   Trackers—something a person being unknowingly tracked is unlikely to do.

14        56.    Additionally, the scan process does not have a precision finding tool to allow

15   people to locate a Tile Tracker that's close to them. Instead, users have to walk or even drive a

16   certain distance away from their original location for the scan to work.[34]

17        57.    Further, the scan can take up to 10 minutes of uninterrupted time to complete and

18   deliver the most accurate results, and it won't work if the user is just walking around in their

19   home or in a crowded place, like on public transportation, because the scan might detect other

20   Tile Trackers nearby.[35]

---

[31] https://apps.apple.com/us/app/tile-find-lost-keys-phone/id664939913

[32] Sarah Perez, *Tile launches its anti-stalking safety feature in its mobile app*, TechCrunch (Mar. 17, 2022) (available at https://techcrunch.com/2022/03/17/tile-launches-its-anti-stalking-safety-feature-in-its-mobile-app/)

[33] *Id.*

[34] *Id.*

[35] *Id.*

AMENDED CLASS ACTION COMPLAINT

58.     Tile has stated that users may need to run multiple scans to eliminate the possibility of devices that had briefly passed by during a scan versus those that were actually traveling with them. It also suggests using the images in the scan to try to locate the devices by how they look. Unfortunately, without precision-finding capabilities, it's likely that users will have a hard time locating well-hidden devices.[36]

59.     Ultimately, it is a purely academic exercise to determine whether the above-described features and limitations of the Tile App are enough to prevent stalking.  This is because Tile recently rolled out features for users that render Tile Trackers undetectable by its own Tile App.

**F.  Tile Has Now Disabled Security Features for Tile Trackers, Under The Guise Of "Anti-Theft" Efforts, Thereby Rendering The Tile App's "Scan And Secure" Feature Useless.**

60.     In February of 2023, Tile released a new "Anti-Theft" feature for its Trackers, which disabled use of the "Scan and Secure App."[37] Ostensibly created to prevent Tile Trackers from being located in stolen goods, Tile is willing to allow customers to make their Tile Trackers completely undetectable, so long as they provide a government ID (verified with biometric identification).  Users will also have to agree to new terms of use that allow Tile to provide their personal information to law enforcement at its discretion when a criminal investigation is underway. And it further reserves the right to sue anyone who uses Tile to commit crimes that violate its terms of service.[38]

61.     The day of the feature's release, company CEO Chris Hulls published a blog post where he claimed that focus on Tile Trackers' role in stalking was "misguided," and that "anti-stalking features don't solve the problem." Hulls claimed that anti-stalking features within his

---

[36] *Id.*

[37] Charlie Sorrel, *Tile's Odd New Anti-Theft Mode May Make Stalking Even Easier*, LifeWire (Feb, 21, 2023) (available at https://www.lifewire.com/tiles-odd-new-anti-theft-mode-may-make-stalking-even-easier-7111890)

[38] Sarah Perez, *Tile takes extreme steps to limit stalkers and thieves from using its Bluetooth trackers*, TechCrunch (Feb. 16, 2023) (available at https://techcrunch.com/2023/02/16/tile-takes-extreme-steps-to-limit-stalkers-and-thieves-from-using-its-bluetooth-trackers/)

product would "put the onus on the victim," and that rather law enforcement and stricter regulation of GPS tracking technology and apps would be more effective.[39]

62.     Further, in a PR Statement, Tile claims that notifications provided to a person's phone that there is a nearby Bluetooth tracking device fail to prevent stalking and only emboldens thieves. "The proactive notifications found in the Bluetooth tracker industry were designed to prevent stalking; however, these anti-stalking measures have been criticized for being insufficient for victim protection. Instead, these alerts have the possibility of making Bluetooth trackers easily identifiable by thieves."[40]

63.     But these types of statements create a false equivalence. Whether a thief is able to find a Tile Tracker has nothing to do with whether a stalking victim is benefitted by safety measures like alerts.  Rather than trying to make anti-stalking measures *better*, Tile elected to do away with them entirely, in favor of amplifying the anti-theft use case for the Trackers.

**G. Notwithstanding the Dangerous Nature of Tile Trackers, Amazon Has Entered Into a Partnership with Tile, Greatly Expanding the Reach and Accuracy of Tile Trackers, and Accordingly Increasing Their Dangerousness.**

64.     On May 7, 2021, Defendant Amazon announced that it was partnering with Tile to enhance Tile's tracking network—and therefore the reach and efficacy of Tile Trackers.[41]  The partnership would allow Amazon to strengthen its tracking network, called Sidewalk, by letting Tile Trackers tap into the Bluetooth networks created Amazon's Echo, Ring, and Sidewalk Bridge products (among others), which are home electronic devices that can creates their own

---

[39]Chris Hulls, *Tile is Taking a New Approach to Combat Theft and Stalking*, Medium (Feb. 15, 2023)  (available  at  https://chrishulls.medium.com/tile-is-taking-a-different-approach-to-the-bluetooth-industrys-theft-and-stalking-problems-bd92d3ae4f3c#e643)

[40] Life360 Press Release, *Tile Takes Aim at Bluetooth Tracker Industry's Theft and Stalking Measures  with  Launch  of  Anti-Theft  Mode*  (Feb.  16,  2023)  (available  at https://www.prnewswire.com/news-releases/tile-takes-aim-at-bluetooth-tracker-industrys-theft-and-stalking-measures-with-launch-of-anti-theft-mode-301748350.html#:~:text=The%20proactive%20notifications%20found%20in,trackers%20easily%20identifiable%20by%20thieves)

[41] Jon Fortt, *Amazon partners with Tile to take on Apple AirTags*,  CNBC (May 7, 2021) (available  at  https://www.cnbc.com/2021/05/07/amazon-partners-with-tile-to-take-on-apple-airtags.html)

1   network by aggregating consumers' WiFi signals.[42] Tile Trackers began working with Amazon's

2   network as of June 14, 2021.

3       65.     Sidewalk was originally developed for use by Amazon's Ring Doorbell product,

4   to help it stay connected to the Internet even when the product was placed outside, far from the

5   source of the owner's residential WiFi (which emanates from the homeowner's router, which

6   typically is inside the home). This technology enabled Amazon to create a "mesh" network that

7   co-opted and extended existing WiFi networks.   To do this, Amazon uses Bluetooth and

8   unclaimed slices of the wireless spectrum, with Ring cameras and Echo speakers acting as the

9   main bridges (actually called Sidewalk Bridges) to keep everything connected.[43]

10      66.     Amazon rapidly expanded the Sidewalk network, seizing on the ubiquity of

11  Amazon devices in American homes.[44]  As of March 31, 2023, Amazon claims that the Sidewalk

12  network reaches of 90% of the United States population. In contrast, AT&T's cell service

13  reaches just 68%.[45]

14      67.     On or about June 14, 2022, Tile devices began utilizing Sidewalk to replace the

15  low-distance Bluetooth connectivity that they had previously been dependent upon.  This greatly

16  enabled Tile's reach and efficacy.  Per the company:

17              With this newly-expanded integration, eligible Echo devices can
                use Amazon Sidewalk to securely search for Tiles. This means that
18              Tiles could get location updates more often, which would make
                finding your Tiled items faster and more convenient at home and
19              on-the-go…. Tiled items that are lost outside of the home are

20  _____

21  [42] Amazon, *Welcome to Amazon Sidewalk* (available at https://www.amazon.com/Amazon-Sidewalk/b?ie=UTF8&node=21328123011)

22  [43] David Nield, *How Amazon Sidewalk Works—and Why You May Want to Turn It Off*, Wired
23  (May 11, 2021) (available at https://www.wired.com/story/how-amazon-sidewalk-works/)

24  [44]Jennifer Tuohy, *Amazon just opened up its Sidewalk network for anyone to build connected*
25  *gadgets on,* The Verge (Mar. 28, 2023)  (available at
    https://www.theverge.com/2023/3/28/23659191/amazon-sidewalk-network-coverage)

26

27  [45] *See* Angelo Ilumba, *AT&T Coverage Map: How It Compares,* WhistleOut (Jun. 6, 2023)
28  (available at https://www.whistleout.com/CellPhones/Guides/att-coverage-map)

typically outside of the Bluetooth range of their owner's phone or tablet and can't be found by making it ring.…Now, eligible Echo Devices around the neighborhood connected to Sidewalk can help you find your Tiled items. These Echo devices can also securely scan for and update the location of Tiles using Sidewalk's Bluetooth frequency. This expanded relationship will exponentially grow the already massive Tile Network, which means lost Tiles outside the home will receive more location updates more often, helping customers track them down faster.[46]

68.     Thus, Defendants' partnership makes Tiles more accurate, and therefore more dangerous.

**H. Victims of Stalking Via Tile Trackers Have Little Meaningful Recourse.**

69.     Even in the event that a victim of Tile stalking is able to discover the Tile Tracker and bring it to law enforcement, there are very few, meaningful protections that such a victim would then be able to receive.  At present, only 23 states have electronic tracking laws,[47] and stalking, in and of itself, is a crime that often goes unprosecuted:

Stalking goes unrecognized, uncharged, and unprosecuted for a number of reasons. Victims, police, and prosecutors often fail to recognize patterns of behavior as "stalking," or associate the term exclusively with following, monitoring, or surveillance--acts that represent only one variety of the many types of behavior that may fit the statutory definition of stalking. Police and prosecutors may focus on a specific incident that resulted in a law enforcement response (e.g., an assault, an isolated threat, an act of vandalism) and fail to explore the context within which the act was committed—context that may include a course of conduct chargeable as stalking. Prosecutors, failing to understand the strategic value of a stalking charge, may wonder why they should bother "complicating" their case when they have strong evidence of a crime that is perceived to be more serious and easier to prosecute.[48]

---

[46] Tile, *Amazon Sidewalk is About to Strengthen the Finding Power of Your Tiles* (May 7, 2021) (available at https://www.tile.com/en-us/blog/sidewalk-strengthening-the-power-of-your-tiles)

[47] Alexis McAdams, *Defendants AirTags, meant to help you track your stuff, have become tools of stalkers and criminals,* Fox News (June 14, 2022) (available at https://www.foxnews.com/tech/Defendants-airtag-stalking-dangerous-crime)

[48] Stalking Prevention Awareness and Resource Center ("SPARC"). *Prosecutor's Guide to Stalking* (2020) (available at https://www.stalkingawareness.org/wp-content/uploads/2020/01/SPA-19.005-Prosecutors-Guide-to-Stalking-00000002.pdf)

70.     Indeed, the number of individuals who are stalked in the United States is jaw-dropping.  More than 6 million people over the age of 18 are stalked each year in the United States, according to data from the Department of Justice's Bureau of Justice Statistics (BJS).[49] That number is believed to be much higher, however, as BJS statistics indicate just 40% of stalking cases are reported to police.[50]  According to the Stalking Prevention, Awareness, and Resource Center (SPARC), one in six women and one in 17 men are stalking survivors. Roughly 15% of those individuals said the stalking forced them to move.[51]  Yet, once reported to the police, only 8% of stalking perpetrators are arrested.[52]

## I.     The Federal Trade Commission Makes Clear That Stalking Technologies and Unwanted Location Tracking Violates Section 5 of the FTC Act.

71.     Recent enforcement actions by the FTC directly speak to the plainly-illegal, dangerous, and fundamentally unfair nature of Defendants' conduct.

72.     For example, in August 2022, the Commission filed suit against the data broker Kochava, Inc.

> [F]or selling geolocation data from hundreds of millions of mobile devices that can be used to trace the movements of individuals to and from sensitive locations. Kochava's data can reveal people's visits to reproductive health clinics, places of worship, homeless and domestic violence shelters, and addiction recovery facilities. The FTC alleges that by selling data tracking people, Kochava is enabling others to identify individuals and exposing them to threats of stigma, stalking, discrimination, job loss, and even physical violence.[53]

---

[49] Megan Stone, *After 9-year fight to prosecute her stalker, woman shares story to help other survivors*, ABC News (Jan. 5, 2021) (available at https://abcnews.go.com/GMA/Living/year-fight-prosecute-stalker-woman-shares-story-survivors/story?id=74878256)

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] Federal Trade Commission, *FTC Sues Kochava for Selling Data that Tracks People at Reproductive Health Clinics, Places of Worship, and Other Sensitive Locations*, (Aug. 29, 2022) (available at https://www.ftc.gov/news-events/news/press-releases/2022/08/ftc-sues-kochava-selling-data-tracks-people-reproductive-health-clinics-places-worship-other)

73.     Per the Commission, the lawsuit involves Kochava's "vast troves of location information derived from hundreds of millions of mobile devices….People are often unaware that their location data is being purchased and shared by Kochava and have no control over its sale or use."[54]

74.     Risks associated with the unwanted collection of location data include identification of individuals' home addresses, and, more broadly, "puts consumers at significant risk. The company's data allows purchasers to track people at sensitive locations that could reveal information about their personal health decisions, religious beliefs, and steps they are taking to protect themselves from abusers. The release of this data could expose them to stigma, discrimination, physical violence, emotional distress, and other harms."[55]

75.     Such acts and practices "reveal consumers' visits to sensitive locations, including, among others, locations associated with medical care, reproductive health, religious worship, mental health, temporary shelters, such as shelters for the homeless, domestic violence survivors, or other at-risk populations, and addiction recovery" and, in turn "cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition." Accordingly, they "constitute unfair acts or practices in violation of Section 5 of the FTC Act."[56]

76.     The enforcement action against Kochava is not an outlier.  In 2019, the FTC brought an enforcement action against Retina-X, a company accused of creating "stalking apps," that could be placed on users phones in order to surreptitiously surveil them.  Like the Kochava action, and like the instant action against Defendants, "these apps were designed to run surreptitiously in the background and are uniquely suited to illegal and dangerous uses. Under

---

[54] *Id.*

[55] *Id.*

[56] Complaint, *Federal Trade Commission v. Kochava, Inc.*, Case No. 2:22-cv-377 (D. Idaho), Dkt. No. 1 at ¶¶ 36-38.

1   these circumstances, we will seek to hold app developers accountable for designing and

2   marketing a dangerous product."[57]

3       77.     There, as here, the defendant "sold monitoring products and services that required

4   circumventing certain security protections implemented by the Mobile Device operating system

5   or manufacturer, and did so without taking reasonable steps to ensure that the monitoring

6   products and services will be used only for legitimate and lawful purposes by the purchaser.

7   Respondents' actions cause or are likely to cause substantial injury to consumers that consumers

8   cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to

9   consumers or competition. This practice is an unfair act or practice [in violation of the FTC

10  Act]"[58]

11  **J.  Plaintiffs' Experience Being Stalked by Tile Trackers.**

12      <u>**Plaintiffs Shannon Ireland-Gordy and Stephanie Ireland Gordy**</u>

13      78.     Plaintiffs Shannon Ireland-Gordy and Stephanie Ireland Gordy were stalked, via a

14  Tile Tracker, following a breakup between Plaintiff Stephanie Ireland Gordy and her then-

15  girlfriend, on or about October 17, 2016.

16      79.     Upon information and belief, on or about October 31st, 2016, Plaintiff Stephanie

17  Ireland Gordy's ex broke into her car, in her garage, and hid a Tile Slim in the console of

18  Plaintiff's Jeep.

19      80.     Over the next several months, the stalker would mysteriously and unexpectedly

20  appear at locations where Plaintiffs were. Plaintiffs had moved to a new residence, and refused

21  to tell the stalker where they lived when she asked. However, she quickly found the location and

22  would drive by the new house, in an effort to intimidate Plaintiffs.

23

24

25  ─────────────────────

26  [57] Federal Trade Commission, *FTC Brings First Case Against Developers of 'Stalking' Apps*, (Oct. 22, 2019) (available at https://www.ftc.gov/news-events/news/press-releases/2019/10/ftc-brings-first-case-against-developers-stalking-apps)

27

28  [58] *In the Matter of Retina-X Studios, LLC, a limited liability company; and James N. Johns, Jr., individually and as sole member of Retina-X Studios, LLC.*, FTC Matter/File Number 172-3118, Complaint, at ¶ 32.

81.     Shortly thereafter, Plaintiff Stephanie Ireland Gordy received a disturbing email from her stalker, which stated, *inter alia,* "I feel like the Stephanie Gordy I knew and loved has died.  You are no longer walking this earth."

82.     Plaintiffs knew that the stalker carried a gun in her car.  Plaintiff Stephanie Ireland Gordy purchased a bullet proof vest and began carrying it with her to her work.

83.     Plaintiffs' cars were also vandalized.  One car was keyed down the driver's side door it sat in front of Plaintiffs' new residence:



Fig. 10

84.     Plaintiffs' other car—the Jeep—had its rear-passenger door dented.  No other vehicles in the neighborhood were damaged.

85.     The stalker also began showing up at destinations out of town when Plaintiffs went on long trips.  For example, In February 2017, Plaintiffs drove to Fredericksburg, Texas—approximately 4 hours from their then-home in Houston—for a long weekend with friends.  That Saturday, Plaintiffs drove to a restaurant just outside of the town, only to be confronted by the stalker when they pulled into the parking lot.

86.     On March 10, 2017, Plaintiff Stephanie Ireland Gordy was driving home from work and searched for something in the middle console of her Jeep.  She found what she thought was an item of trash, but upon pulling it out and inspecting it, realized that it was a Tile Tracker.

1
2
3
4
5
6
7
8
9
10
11
12

 

13                                 Fig. 11

14          87.    That evening, Plaintiff Stephanie Ireland Gordy contacted Tile via the chat

15   function on its website.  The Tile employee confirmed that the Tile Tracker was associated with

16   the email account of Plaintiffs' stalker.

17          (09:19:36 PM) Tanya @ Tile: Do you no know anyone who's using Tile, Stephanie? :)
            (09:19:39 PM) Tanya @ Tile: *not
18          (09:19:46 PM) Stephanie Gordy MD: yes
            (09:19:50 PM) Stephanie Gordy MD: ██████████
19          (09:20:05 PM) Stephanie Gordy MD: but that's it
            (09:20:45 PM) Stephanie Gordy MD: when I press the middle of this tile, it beeps
20          (09:21:02 PM) Tanya @ Tile: All right! Was it in your vehicle as if it was dropped by
            accident or did it look like it's suspiciously in there for a reason? Hmm
21          (09:21:17 PM) Stephanie Gordy MD: I suspect that it was placed suspiciously...
            (09:21:28 PM) Stephanie Gordy MD: it was in my center console in the bottom
22

23          09:33:44 PM) Tanya @ Tile: I got your report and looks like it is someone's you know.
            Could be ██████
24          (09:34:22 PM) Tanya @ Tile: Let me give you the email address in censored kind of
            format for security purposes:
25          (09:34:35 PM) Stephanie Gordy MD: thank you SO much
            (09:34:40 PM) Tanya @ Tile: ███████████████████
26

27                                 Fig. 12

28

AMENDED CLASS ACTION COMPLAINT

88.     Shaken, Plaintiff called the Houston Police Department, who told Plaintiffs that they considered this evidence of stalking and took the Tile Tracker as evidence.

89.     Two weeks later, Plaintiff Stephanie Ireland Gordy arrived home from work to find her stalker sitting in her parked car, several houses away from Plaintiffs' new residence. Plaintiffs again called the police, who made another report.

90.     Several days later, in early April 2017, a Houston Police Department office called the stalker and told her to stay away from Plaintiffs.

91.     Plaintiffs began to fear that their stalker's behavior would escalated, and had locks changed at their work.  However, the behavior continued.  On June 4, 2017, the stalker appeared behind Plaintiffs during their morning commute, weaving in and out of traffic to try to catch up to their car.  The stalker got directly behind Plaintiffs' Jeep, then swerved along side the car and passed Plaintiffs, pulling in front of them and slamming on her brakes.  Plaintiff Shannon Ireland-Gordy was able to get pictures of the event:



Fig. 13

92.      By July 2017, Plaintiffs constantly changed their route to or from work and avoided the places that they previously frequented.  They removed anything recognizable on their Jeep and changed the license plate.  Plaintiff Shannon Ireland-Gordy replaced her car entirely.

93.     Similarly, they stopped gardening in their front yard and no longer allowed their dogs to play outside by themselves.  The stress of being stalked, and the sense of helplessness

1    that came from the fact that their stalker likely knew their whereabouts at all times, made

2    normalcy impossible.  Plaintiffs barely slept.

3            94.     Around this time, Plaintiffs moved again, breaking their lease with the consent of

4    their landlord and pursuant to the Texas Property Code 92.0161, which affords tenants the right

5    to vacate in the event of stalking.  The new house was unlisted, and Plaintiffs utilized a PO Box

6    for all correspondence and also installed security cameras at the new residence.

7            95.     At this point, Plaintiff Stephanie Ireland Gordy decided to press charges against

8    the stalker.

9            96.     However, as Houston Police Officers conducted their investigation, they found

10   that requests to Tile for information were routinely impeded and obstructed.

11           97.     At first, Tile told the officers that they could not help them unless they purchased

12   an iPhone and downloaded the Tile App.  The officers did this but were unable to get any

13   appreciable information this way.

14           98.     The officers then subpoenaed Tile for information such as

15   •   "Location history for the Tile, Inc. tracking device in question including Latitude and

16       Longitude and Date and Time for each time thew tracking device connected to or was

17       within Bluetooth range of the electronic or mobile device used or assigned to access the

18       account and device[.]"

19   •   "Any and all support services information related to the aforementioned Tile, Inc. device

20       to include: email request submissions, recorded outbound telephone calls and direct

21       emails, personal information provided to Tile's customer care team; name, email address,

22       phone number, and mailing address."

23           99.     Tile refused to comply, stating that they would not accept an out-of-state

24   subpoena.

25           100.    The officers from Houston then contacted the San Mateo police, who aided the

26   investigation by sending their own subpoena to Tile, who then produced only two pages of

27   responsive documents, which were of limited value.  Specifically, they only identified the

28   stalker's User ID and email, and the names and activation dates of the Tile Trackers associated

with the stalker's account.  Tile did not provide any information regarding the historical location of these devices, and stated that they had no further responsive information or documents. Moreover, any further requests from the police to help decipher the scant information that Tile did provide were rebuffed.

101.    Tile's obfuscatory responses caused significant concern among the law enforcement professionals tasked with prosecuting the case.

102.    For example, on or about November 15, 2018, an Assistant District Attorney explained to Plaintiffs that "the information Tile gave me is extremely limited and I don't believe it is all they have. I am still working with an attorney in California to try to get more information. The only geolocation data that I have at the moment is one ping for the HPD property room," and that, accordingly, there was not yet a significant enough amount of information to file charges.  Note that the DA's office only had "one ping" as their geolocation record, while in actuality, as set forth *supra*, the stalker's phone had pinged Tile's servers over 16,000 times.

103.    Similarly, when providing updates to Plaintiffs on the status of the investigation, the investigating officer, Officer Waldie, repeatedly informed Plaintiffs that he had difficulties getting cooperation from Tile's legal department.  In one report, dated October 16, 2017, Officer Waldie states as follows:

ON 10-10-17, I, OFFICER N WALDIE, OBSERVED I HAD STILL NOT RECEIVED ANY CONTACT BACK REGARDING THE TILE SUBPOENA. I EMAILED THEIR CUSTOMER SUPPORT REQUESTING AN UPDATE. ON 10-13-17, I RECEIVED A MISSED CALL FROM HANLEY CHU REGARDING HIS REPRESENTATION OF THE COMPANY WHO OWNS TILE. I WAS ABLE TO SPEAK TO HIM ON 10-16-17. HE ADVISED ME THAT THE DEVICE INFORMATION WOULD NOT BE ENOUGH TO LOCATE SUBSCRIBER DATA. I ADVISED HIM THAT THE SUBSCRIBER DATA WAS ALREADY LOCATED IN A CHAT HELD BY THE COMPLAINANT WITH A REPRESENTATIVE NAMED TANYA. I INQUIRED IF HE COULD LOCATE THAT INFORMATION SINCE IT WAS NOT FORMALLY GIVEN DURING HER CONTACT WITH TANYA. HE STATED HE DID NOT KNOW ABOUT THE PREVIOUS RESEARCH, BUT CONFIRMED THAT THE SUBSCRIBER INFORMATION COULD ONLY BE RETRIEVED THROUGH CONNECTION USING THE TILE APP NEAR THE DEVICE. I ADVISED HIM I WOULD BE UNABLE TO FACILITATE THAT DUE TO THE FACT IT REQUIRED A SMART PHONE, THE DOWNLOAD OF THE TILE APP, AND TO ACTUALLY HAVE THE DEVICE WITH ME. I HAD NEITHER OF THOSE AT THE MOMENT. HE INFORMED ME I COULD POSSIBLY USE THE INFORMATION FROM THE COMPLAINANTS APP TO LOCATE THE SPECIFIC ID# HE REQUIRED. I ADVISED HIM THAT I WOULD CONTACT HER ABOUT IT, BUT DID NOT KNOW IF SHE STILL HAD THE INFORMATION SINCE IT HAD BEEN A LONG TIME AGO WHEN SHE CONNECTED TO THE DEVICE. HANLEY STATED HE WOULD CALL ME BACK AFTER DOING SOME RESEARCH. HE ALSO MENTIONED TO ME THAT HE WAS PROVIDED THIS SUBPOENA REQUEST ON 10-12-17 SO HE WAS STILL NEW TO THE DETAILS.

Fig. 14

AMENDED CLASS ACTION COMPLAINT

104.    Subsequently, in a voicemail left by Officer Waldie to Plaintiffs, he informed them that Tile's response—via Hanley Chu—was that they would not provide further information absent a subpoena issued from within California.

105.    Armed with virtually no helpful information from Tile, the police nonetheless arrested the stalker and charged her with illegal installation of a tracking device in July 2018.

106.    But because Tile refused to provide any further information to the authorities, the case against the stalker ultimately was dismissed by the Harris County District Attorney—due to lack of evidence—on May 1, 2019.

107.    Ironically, it was only through the civil courts that Plaintiffs received fulsome discovery responses from Tile.  In or about June 2019, Plaintiffs were sued by their stalker following the dismissal of the criminal charges.

108.    But in so doing, the stalker opened herself up to discovery.  Among the responsive documents that were provided to Plaintiffs were multiple emails from Tile (found@thetileapp.com) to the stalker, from November 1, 2016 continuing through March 10, 2017, showing that the stalker had a Tile Slim labeled "SDG Jeep" (Stephanie D. Gordy) that showed the location of Plaintiffs.  *E.g.*



Fig. 15 (November 1, 2016)

AMENDED CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12



Fig. 16 (November 5, 2016)

13
14
15
16
17
18
19
20
21
22
23
24
25



Fig. 17 (November 6, 2016)

26
27
28

AMENDED CLASS ACTION COMPLAINT



Fig. 18 (January 25, 2017)

Fig. 19 (February 24, 2017)

109.    Notably, the above emails were *not* provided by Tile.  Rather, they were obtained by Plaintiffs, from their stalker's work email account (which was associated with her Tile account).  At no point has Tile provided any of the above documents or information.

110.    However, in response to the civil suit, Tile *did* provide log data associated with the stalker's Tile Trackers (which it had failed—or declined—to provide in the law enforcement subpoena), which demonstrated that prior to the stalker's breakup with Stephanie Ireland Gordy, her Trackers had been "pinged" (i.e., their location had been sought) only **30 times** from January 31, 2016 to October 25, 2016.  But within one week of the breakup, until March 10, 2017 (the date that Plaintiffs discovered the hidden Tile Tracker in their Jeep), the stalker's phone "pinged" Tile's servers **16,385 times**.

111.    Further, Tile had records of communications from the stalker—both over email and chat—shortly after March 10, 2016 (the date that Plaintiffs discovered the Tile Tracker hidden in their Jeep), seeking to rename the "SDG Jeep" Tile Tracker and then seeking to deactivate all Trackers associated with the account.

112.    Had Tile provided any of the above information in response to the initial inquiries from law enforcement, Plaintiffs' criminal case against their stalker likely would not have been dismissed.  This is made clear by multiple statements made by law enforcement to Plaintiffs during their ordeal, as noted in paragraphs 102-104, *supra*.

113.    Further, Tile admitted that it failed to *retain* critical data even *after* receiving a warrant from law enforcement in the criminal investigation.  In a July 29, 2021 communication from Tile's outside counsel, regarding Plaintiffs' subpoena in the civil lawsuit, Tile's counsel stated as follows:

> you asked whether Tile placed a hold on all data associated with the account after receipt of a search warrant in 2018. Upon collecting and producing information in response to the warrant, Tile did not place a hold on the account. Tile did retain a copy of its production in response to the warrant, which it previously produced to you and are included in page 27 and 28 of your June 1 letter.

> …you [also] asked whether Tile maintains logs of device activations. It did not retain activation logs of devices shown on page 27 of your June 1 letter.

114.    Beyond the fact of Tile's abridged production of relevant information to law enforcement, the above makes clear that Tile had no intention of responding in good faith to law enforcement's valid legal process.

115.    These obfuscatory tactics on the part of Tile caused significant harm to Plaintiffs over a period of years.  As noted above, Tile thwarted law enforcement's investigation from 2017 through 2018, resulting in a dismissal of the stalker's criminal case in May 2019.  But this did not end Plaintiffs' troubles, as their stalker, now emboldened, then sued *Plaintiffs* civilly, with this lawsuit dragging on until June of 2021, and costing significant amounts of money in legal fees.  Had Tile—at any point—acted in good faith and in a manner consistent with its public representations, all of this would have been avoided.

116.    Moreover, the impact of Tile's conduct continues to be felt by Plaintiffs to this day.  They have moved once more, and remain in effective hiding in an effort to stay undetectable by their stalker.  They are unable to live normal lives, and are in constant fear of reprisal.

117.    Further, two of the Tile Trackers purchased by their stalker remain unaccounted for.  Upon moving, Plaintiffs had—and continue to have—no idea whether they inadvertently packed the Tile Trackers along with the rest of their effects, meaning that there remains a possibility that their stalker knows their new location.

118.    And, as a result of Tile's latest effort to thwart detection of its Trackers, it is entirely possible that their stalker has placed or caused to be placed one or more Trackers that are incapable of being detected.  *See,* Paragraphs 60-63, *supra.*

### Plaintiff Melissa Broad

119.    Plaintiff Melissa Broad was stalked by an abusive partner over a period of years, via Tile Trackers.  Her abuser utilized the Tiles to exert control over Plaintiff, to intimidate her, and to coerce her into staying in the abusive relationship.

120. As early as 2021, Plaintiff Broad suspected that her partner was tracking her location. He would confront her about places she had been without him, and in doing so, would provide addresses.

121. Throughout this time, the relationship was emotionally and physically abusive. Plaintiff lived in constant fear, but felt unable to escape the relationship, in large part because she believed that her partner would find her, no matter where she went or how closely she guarded her location.

122. Plaintiff Broad's partner continued to show up, unannounced and unexpected, at various appointments and meetings that Plaintiff had, about which he would not—and even could not—have known, absent surreptitious tracking. Plaintiff's personal and professional relationships suffered tremendously, as a result.

123. In or about March 2022, Plaintiff confronted her partner, who denied tracking her and called her paranoid. Plaintiff began doubting herself, and further was afraid of angering her partner if she kept pressing the issue, so she let the matter drop.

124. By January 2023, the problems persisted and Plaintiff reached out to a local shelter for abused women. When speaking with a counselor and planning her escape from the relationship, she mentioned that she believed she was being tracked by her partner and asked how she might overcome this obstacle. The counselor warned Plaintiff to be "extra cautious," but had no further advice or instruction.

125. During this time period, Plaintiff's sister researched Tile trackers and suggested to Plaintiff that her abuser might be using them. Plaintiff was skeptical, as she did not believe their network was extensive enough to account for the lengths to which she had been tracked.

126. On or about March 1, 2023, Plaintiff's abuser texted her to ask if she had gotten her hair cut. Plaintiff was taken aback, as she had just gotten a haircut, but there was no plausible way for her abuser to know this.

127. On or about March 3, 2023, Plaintiff met with a colleague at a coffee shop, which had just opened and which she had never visited before. Following the meeting, after she said goodbye to her co-worker, Plaintiff Broad looked up and saw her partner in his car, across the

street, watching her.  Plaintiff hurried to her car and drove off, but her partner followed her in his vehicle for a significant period of time before eventually giving up pursuit.

128.    Plaintiff Broad then called her abuser, recording the conversation, at which point he admitted to knowing her location (during the phone call) before she told him where she was. Plaintiff then provided the phone call and other items of evidence to the police.

129.    That same day—March 3, 2023—Plaintiff contacted Victims Services and asked for help locating any Tile Trackers that might be on her person or in her effects.  They sent a law enforcement officer to her house to assist with a search and to provide advice to Plaintiff as to how she could protect herself and her family, but they had no idea how to search for Tile Trackers.

130.    Subsequently, on or about March 4 or 5, 2023, Plaintiff's parents helped her search her car, at which point they found two Tile Trackers—one hidden in the glove compartment and the other hidden in an overnight bag that Plaintiff kept in her car for emergencies.

131.    By March 6, 2023, Plaintiff orchestrated an elaborate escape with the help of friends and family, driving to a local mall and parking her vehicle, then sneaking into another car through a back entrance to the mall and returning to her home so that she could grab as many of her belongings as possible.

132.    Subsequently, Plaintiff's father drove around in his own vehicle with the Tile Trackers they had found, in an effort to throw Plaintiff's abuser off the scent.

133.    By Summer of 2023, Plaintiff worked with local law enforcement to bring charges against her abuser, which remain pending.  However, Plaintiff still lives in a state of constant fear, exhaustion, depression, and hopelessness.  She remains fearful of her stalker and convinced that nothing guarantees her from truly being free of him.  Plaintiff has experienced significant depression as a result of being tracked, which has resulted in lost professional opportunities and loss of income.

1

**Plaintiff Jane Doe**

2      134.   In or about March 2024, Plaintiff Jane Doe was stalked by her ex-boyfriend with

3  a Tile Tracker.

4      135.   On or about March 24, 2024, Plaintiff Doe became concerned when, following

5  the breakup, she was at friend's boyfriend's house, and was alerted, by her friend's boyfriend,

6  that there was a suspicious vehicle driving down the street.  Plaintiff Doe saw the vehicle being

7  described and realized it was her ex-boyfriend's car.

8      136.   Plaintiff knew that ex-boyfriend had a Life360 account and became suspicious

9  that he might be using a Tile Tracker to follow her.

10      137.   She then Googled how to find and deactivate Tile Trackers, and subsequently

11  learned about Scan and Secure on the Tile app.  She then downloaded the Tile app to deploy

12  Scan and Secure on her ride home.

13      138.   The results from the scan showed that a Tile Tracker was in her proximity (most

14  likely in her car).

15

16

17

18

19

20

21

22

23

24

25            Fig. 20

26

27

28

AMENDED CLASS ACTION COMPLAINT

139.   However, Scan and Secure did not allow Plaintiff Doe to locate the Tile Tracker, nor did it allow her to trigger a noise or any other sensory alert that enabled her to locate the device.

140.   Once home, she continued to search for how to locate and disable the device hidden in her car, but there was no option within the Scan and Secure app.

141.   Plaintiff Doe then looked online, both via Google and on YouTube, but could not find anything to help.

142.   Plaintiff Doe then downloaded several other, third-party apps in an effort not only to disable the tracker, but simply to find it.   None of these apps worked, however, and the Tracker remained unfound.

143.   On or about the evening of March 26, 2024, Plaintiff Doe attempted to contact Tile's customer support, but only could do so via an online chat bot.   Moments after midnight on March 27, 2024, Plaintiff replied to a customer support response, explaining her circumstances:



Fig. 21

144.   Tile refused to deactivate the Tracker (upon information and belief, Defendants are unable to do so, at present), and instead suggested that Plaintiff Doe put the device into a "blocking bag such as a Faraday bag[.]"

AMENDED CLASS ACTION COMPLAINT



Fig. 22

145. A Faraday bag, named after scientist Michael Faraday, blocks electromagnetic waves from reaching anything inside it, and similarly blocks whatever is contained therein from emitting electromagnetic signals; it works by surrounding an object with a conductive metal mesh—when an electromagnetic field encounters the bag it is conducted around the object or objects inside.[59]

146. However, these bags are not common household items, and cost money to purchase and time to ship[60].

147. Ultimately, beyond purchasing a separate device to protect herself from continued abuse, Tile had few, if any, recommendations for Plaintiff Doe.

148. On or about the following day (March 28, 2024), Plaintiff Doe physically removed the front seats of her car, but still could not find the Tile Tracker.

---

[59] Sydney Butler, *What Is a Faraday Bag, and Should You Use One?,* How To Geek (May 1, 2022) (available at https://www.howtogeek.com/791386/what-is-a-faraday-bag-and-should-you-use-one/)

[60] *See, e.g.,* Amazon.com, *Large Faraday Bags- 5 Pack Faraday Cages for Laptops & Tablets & Phones & Car Keys, Faraday Key Fob Protector, Fireproof & Waterproof RFID Faraday Pouch Key Fob Signal Blocker Anti-Theft Faraday Bag*, Retailing for $39.09 (available at https://www.amazon.com/Faraday-Protector-Fireproof-Waterproof-Anti-Theft/dp/B0C7FVS19F/ref=sr_1_5?crid=1XNT0VDSRH5EB&dib=eyJ2IjoiMSJ9.Bj_JtaXh9ninhwKRft8hwBy14DkPLKP15L-BF1daRdqVs9r3E_jjttLj-Fyhn02kKi5bRN62O3luA3bJnisq8NGotlxVYSWj2hQX_eNNXniBpJP1f3VePSZ32tC0anaLzOqBx87NmtmrAeRqreIPioRPKI4cK_fJKOSocNq7pfmnqcicMqDEqRQ9a3EC_2vZ4PCyThLyUTJCnuAmGSIHr0DjprMAXEtyganHjeGF2W6ITMuCV5Lff46gB4dhpTwnJsMPsQfy4yCnYmY_D__FKYzV9GTdJoLitcTF1UgLo_k.r8KdTeoVaIL0SWFlR5LfVDn1dKfglisn-7OKH8Ag5Aw&dib_tag=se&keywords=faraday%2Bbag&qid=1714091215&sprefix=faraday%2Bbag%2Caps%2C287&sr=8-5&th=1)

37

149.     Subsequently, she went to the police.  The officer at the front desk told her to wait in the lobby of the building while he went to talk to the detective, but returned to tell her that they could not do anything unless and until the device was found.

150.     The front desk officer offered to help her look for the Tile Tracker, but given that the device did not have a sound that could be triggered, they were unable to locate anything.

151.     One or two days later, Plaintiff used the Wunderfind App to continue her search, but had no luck.



Fig. 23

152.     Subsequently, Plaintiff Doe removed the entire back seat of her car and found the Tile Tracker hidden in the car's frame, between the felt and metal that separated the seats and cabin of the car from the trunk.

153.     Placement of the Tile Tracker had broken a portion of the clip that holds down the back seat.

154.     Once she found the Tile Tracker, Plaintiff Doe destroyed the device.  Plaintiff could not abide by the thought of continuing to be tracked.

155.     Further, she was convinced that the police could not help any further, given her prior experience and their unwillingness to make a report.

156.     Since the stalking, Plaintiff Doe has had profound trust problems, as well as a more omnipresent anxiety in her day-to-day life.  She will not park anywhere that is far from her ultimate destination or out of view of a security camera.  She has a hard time sleeping.  She feels a consistent nervousness and is convinced that she always is being followed.

**TOLLING**

157.   **Discovery Rule Tolling**: Plaintiffs and other Class members had no way of knowing about Defendants' unlawful practices complained of herein, both as to the dangers inherent in the Tile Tracker and in Defendants' unwillingness to assist victims of stalking, notwithstanding representations to the contrary.

158.   Within the period of any applicable statutes of limitation, Plaintiffs and the other Class Members could not have discovered through the exercise of reasonable diligence that Defendants were hiding their true practices.

159.   All applicable statutes of limitation have been tolled by operation of the discovery rule.

160.   **Fraudulent Concealment Tolling:** All applicable statutes of limitation have also been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the period relevant to this action.

161.   Defendants deliberately concealed this information from consumers, including Plaintiffs and Class members.

162.   **Estoppel:** Defendants were under a continuous duty to disclose to Plaintiff and the other Class members the true character, quality, and nature of the unlawful and harmful conduct of the Tile Tracker, and of their policies and procedures related thereto, including those relating to assistance—or lack thereof—of victims of stalking.

163.   Defendants knowingly, affirmatively, and actively concealed true facts from the public, including Plaintiff and Class members.

164.   Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

**CLASS ALLEGATIONS**

165.   Plaintiffs bring this class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of all members of the following classes, which are jointly referred to throughout this Complaint as the "Class:"

**The Stalked Class:** all persons who were tracked, without consent, by a Tile tracker.

**The At-Risk-Of-Stalking Class:** all persons who risk being tracked, without consent, by a Tile tracker.

166.   Plaintiffs are representatives for each Class.

167.   Excluded from each Class are the following individuals: officers and directors of Defendants and their parents, subsidiaries, affiliates, and any entity in which either Defendant has a controlling interest; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

168.   Plaintiffs reserve the right to modify or amend the definition of each of the proposed Classes before the Court determines whether certification is appropriate.

169.   This action readily satisfies the requirements set forth under Federal Rule of Civil Procedure 23:

a.   Each Class is so numerous that joinder of all members is impracticable. Upon Plaintiff's counsel's investigation, information, and belief, the Class numbers in the thousands if not greater.

b.   There are questions of law or fact common to the Classes.   These questions include, but are not limited to, the following:

i.   Whether Defendants' acts and practices complained of herein amount to the use of an electronic tracking device to determine the location or movement of a person, in violation of Cal. Pen. Code § 637.7;

ii.   Whether Tiles are "electronic tracking devices" under Cal. Pen. Code § 637.7(d);

iii.   Whether Defendants owe Plaintiffs and Class members a duty;

iv.   Whether Defendants breached any duty owed to Plaintiffs and Class members;

v.   Whether Defendants' acts and practices complained of herein amount to egregious breaches of social norms;

vi. Whether Defendants acted intentionally in violating Plaintiffs' and Class members' privacy rights;

vii. Whether an injunction should issue; and

viii. Whether declaratory relief should be granted.

c. Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs, like all Class members, were subject to unwanted stalking via the Tile tracker.

d. Moreover, like all Class members, Plaintiffs suffer a substantial risk of repeated injury in the future. Each Plaintiff continues to be at risk of unwanted and unlawful tracking via a Tile tracker. Because the conduct complained of herein is systemic, Plaintiffs and all Class Members face substantial risk of the same injury in the future. Defendants' conduct is common to all Class members and represents a common pattern of conduct resulting in injury to all members of the Class. Plaintiffs have suffered the harm alleged and have no interests antagonistic to any other Class member.

e. Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests do not conflict with the interests of the Class members. Furthermore, Plaintiffs have retained competent counsel experienced in class action litigation, consumer protection litigation, and electronic privacy litigation. Plaintiffs' counsel will fairly and adequately protect and represent the interests of the Class. FRCP 23(a)(4) and 23(g) are satisfied.

f. In acting as above-alleged, and in failing and refusing to cease and desist despite public outcry, Defendants have acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and corresponding declaratory relief each appropriate with respect to the Class as a whole. The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants.

g. Injunctive relief is necessary to prevent further unlawful and unfair conduct by Defendants. Money damages, alone, could not afford adequate and complete relief,

1   and injunctive relief is necessary to restrain Defendants from continuing to commit their illegal

2   and unfair violations of privacy.

4   **CAUSES OF ACTION**

5   **COUNT I**
**(Negligence)**
6   **(On Behalf of the Stalked Class)**

7   170.    Plaintiffs repeat and reallege all preceding paragraphs contained herein.

8   171.    Defendants owed Plaintiffs and Class members a duty of care in its design,

9   marketing, and introduction into the market of the Tile tracker.  *See,* Cal. Civ. Code § 1714(a)

10  ("Everyone is responsible . . . for an injury occasioned to another by his or her want of ordinary

11  skill in the management of his or her property or person.")

12  172.    This duty is evidenced further by, *inter alia*, Defendants' unique position to

13  monitor Plaintiffs' and Class members' behavior through the Tile trackers' access to Defendants'

14  vast network of devices, which in turn are used to locate Plaintiffs and Class members with

15  unparalleled reach and precision.  It is further supported by the surreptitious and non-intuitive

16  nature of Defendants' tracking.

17  173.    Furthermore, Defendants' duty of care extends to Plaintiffs and Class members

18  because each Defendant has Plaintiffs and Class members at an unreasonable risk of harm

19  through the reasonably foreseeable actions of third-party stalkers. Defendants' duty of care is

20  cognizable because (1) the harm resulting from the malicious use of Tile Trackers by third

21  parties to stalk Plaintiffs and similarly situated individuals was foreseeable to Defendants; (2)

22  Plaintiffs have suffered harm resulting from such stalking; (3) there is a logical causal connection

23  between the Tile Tracker's design, marketing, and introduction into the market (as well as the

24  Amazon device network's connection to and facilitation of the Tile Tracker) and the intervening

25  stalking that harmed Plaintiffs and similarly situated individuals; (4) there is moral blame

26  attached to Defendants' conduct in light of each Defendant's failure to adequately inform the

27  public of the risks associated with their respective products, as well as the failure to cooperate

28  with law enforcement in response to Tile stalking; (5) the policy of preventing future harm, in

the context of unwanted and unconsented location tracking, is enshrined in legislatively declared policy, including *inter alia* the Constitutional Right to Privacy (*see* California Constitution Article 1, Section 1) and Cal. Pen. Code § 630, *et seq.*; and (6) any burden on imposing such a duty on Defendants is outweighed by compelling policy interests that will benefit the public by such imposition.

174.    Defendants breached that duty by releasing Tile trackers into the marketplace with insufficient safeguards to prohibit their use for stalking purposes.

175.    This breach of duty on the part of Defendants was the proximate or legal cause of injury suffered by Plaintiffs and Class members. At minimum, (1) introducing a tracking device into the stream of commerce, (2) which Defendants knew would create a risk of being purchased and used for stalking, and (3) which *did* result in that anticipated misuse plainly caused the harm suffered by each Plaintiff.  Regardless of whether or when any individual Plaintiff became aware of the Tile that was tracking them, the Tile, itself (along with the Amazon-enabled network which facilitates the tracking), was the *sine qua non* of their harm.

176.    Beyond that, however, and merely as an illustration for purposes of a challenge to the pleadings—and while reserving all rights to make further averments based on the allegations contained herein and in response to forthcoming challenges from each Defendant—Plaintiffs further aver that additional facts identify Defendants' products as the proximate cause of their harm.  These include, *inter alia*:

      a.  Plaintiffs Shannon Ireland-Gordy and Stephanie Ireland Gordy: Plaintiffs' stalker was emboldened both because of the Tile's surreptitious nature and because of Tile's continued protection of her throughout the law enforcement investigation initiated by Plaintiffs.  Plaintiffs had their locations transmitted, without their knowledge, in over 16,000 unique instances; resulting in, *inter alia*, needing to move multiple times and being subjected to a vehicular chase on city streets.  Tile's obfuscatory tactics vis-à-vis law enforcement resulted in dismissal of criminal charges of Plaintiffs' stalker, and further subjected

1           Plaintiffs to their own lawsuit.   Plaintiffs remain afraid, to this day, of

2           continued stalking.

3        b.  Plaintiff Melissa Broad: Due to the surreptitious nature of the Tile Tracker,

4           Plaintiff Broad was had her movements tracked by her abuser for a period of

5           as much as years, during which time her abuser used that unlawfully obtained

6           information to control and harm Plaintiff.

7        c.  Plaintiff Jane Doe: Due to the surreptitious nature of the Tile Tracker, Plaintiff

8           Doe was tracked for an untold period of time by her stalker, and due to the

9           profound difficulties of locating the Tracker, had to almost entirely

10          disassemble her vehicle in order to locate and disable the Tile that was being

11          used to stalk her.

12      177.   As a result of Defendants' actions, Plaintiffs and Class members seek injunctive

13 relief (including public injunctive relief), damages and punitive damages in an amount to be

14 determined at trial.   Plaintiffs and Class members seek punitive damages because Defendants'

15 actions—which were malicious, oppressive, and willful—were calculated to injure Plaintiffs and

16 Class members and made in conscious disregard of Plaintiffs' and Class members' rights.

17 Punitive damages are warranted to deter Defendants from engaging in future misconduct.

18 **COUNT II**

19 **(Strict Liability – Design Defect – Risk-Benefit Test)**
**(On Behalf of the Stalked Class and the At-Risk of Stalking Class)**

20      178.   Plaintiffs repeat and reallege all preceding paragraphs contained herein.

21      179.   Defendants manufacture, distribute, and sell the Tile tracker product.

22      180.   The Tile trackers were defectively designed.

23      181.   Plaintiffs and Class members were harmed as a result of the Tile Trackers' design

24 defect.

25      182.   The Tile trackers' design defect was a substantial factor in causing Plaintiffs' and

26 Class members' harm.

27      183.   The benefits of Defendants' Tile Trackers' design do not outweigh the risks of the

28 design.  A consideration of the following factors—the gravity of the potential harm caused by the

design defect (*i.e.*, its propensity for use in stalking and other crimes); the likelihood that this harm would occur; the feasibility of an alternative safer design at the time of manufacture; the cost of an alternative design; and any disadvantages of an alternative design all weigh in favor of Plaintiffs and the Class, and make clear that the risks associated with the Tile trackers outweigh the benefits.

184.    As a result of Defendants' actions, Plaintiffs and Class members seek injunctive relief(including public injunctive relief), damages and punitive damages in an amount to be determined at trial.  Plaintiffs and Class members seek punitive damages because Defendants' actions—which were malicious, oppressive, and willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights. Punitive damages are warranted to deter Defendants from engaging in future misconduct.

**COUNT III**
**(Unjust Enrichment)**
**(On Behalf of the Stalked Class)**

185.    Plaintiffs repeat and reallege all preceding paragraphs contained herein.

186.    Defendants should have not released the Tile trackers into the stream of commerce, because of the dangers detailed herein.

187.    As a result of Defendants' selling the Tile trackers, Defendants received a benefit, which it is unjust for Defendants to retain.

188.    Under the circumstances, it is against equity and good conscience to permit Defendants to retain the ill-gotten benefits that it received from the conduct complained of herein.

189.    As a direct and proximate result of Defendants' actions, Defendants have been unjustly enriched. Plaintiffs and Class members have a right to equitable relief, including but not limited to injunctive relief (including public injunctive relief) and declaratory relief as well as restitution or disgorgement in an amount to be proven at trial.

**COUNT IV**
**(Intrusion Upon Seclusion)**
**(On Behalf of the Stalked Class)**

190.     Plaintiffs repeat and reallege all preceding paragraphs contained herein.

191.     Plaintiffs and Class members have reasonable expectations of privacy in their persons and their whereabouts, generally.  Plaintiffs' and Class members' private affairs include their locations.

192.     The reasonableness of such expectations of privacy is supported by Defendants' unique position to monitor Plaintiffs' and Class members' behavior through the Tile trackers' access to Defendants' vast network of mobile devices running Defendants' apps, which in turn are used to locate Plaintiffs and Class members with unparalleled reach and precision.  It is further supported by the surreptitious and non-intuitive nature of Defendants' tracking.

193.     Defendants intentionally intruded on and into Plaintiffs' and Class members' solitude, seclusion, or private affairs by intentionally geolocating them.

194.     These intrusions are highly offensive to a reasonable person.  This is evidenced by, *inter alia*, Supreme Court precedent (most recently and forcefully articulated in the *Carpenter* opinion), legislation enacted by Congress, rules promulgated and enforcement actions undertaken by the FTC, and countless studies, op-eds, and articles decrying location tracking, particularly in the context of stalking and abuse.

195.     Plaintiffs and Class members were harmed by the intrusion into their private affairs as detailed throughout this Complaint.

196.     Defendants' actions and conduct complained of herein were a substantial factor in causing the harm suffered by Plaintiffs and Class members.

197.     As a result of Defendants' actions, Plaintiffs and Class members seek injunctive relief (including public injunctive relief), damages and punitive damages in an amount to be determined at trial.  Plaintiffs and Class members seek punitive damages because Defendants' actions—which were malicious, oppressive, and willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights. Punitive damages are warranted to deter Defendants from engaging in future misconduct.

1

**COUNT V**
**(California Constitutional Right to Privacy)**
**(On Behalf of the Stalked Class)**

2

3        198.    Plaintiffs repeat and reallege all preceding paragraphs contained herein.

4        199.    Plaintiffs and Class members have reasonable expectations of privacy in their

5   persons and their whereabouts, generally.  Plaintiffs' and Class members' private affairs include

6   their locations.

7        200.    Defendants intentionally intruded on and into Plaintiffs' and Class members'

8   solitude, seclusion, right of privacy, or private affairs by intentionally tracking their location with

9   Tile trackers.

10       201.    These intrusions are highly offensive to a reasonable person, because they

11  disclosed sensitive and confidential location information, constituting an egregious breach of

12  social norms.  This is evidenced by, *inter alia*, Supreme Court precedent (most recently and

13  forcefully articulated in the *Carpenter* opinion), legislation enacted by Congress, rules

14  promulgated and enforcement actions undertaken by the FTC, and countless studies, op-eds, and

15  articles decrying location tracking, particularly in the context of stalking and abuse.

16       202.    Plaintiffs and Class members were harmed by the intrusion into their private

17  affairs as detailed throughout this Complaint.

18       203.    Defendants' actions and conduct complained of herein were a substantial factor in

19  causing the harm suffered by Plaintiffs and Class members.

20       204.    As a result of Defendants' actions, Plaintiffs and Class members seek injunctive

21  relief (including public injunctive relief), damages and punitive damages in an amount to be

22  determined at trial.  Plaintiffs and Class members seek punitive damages because Defendants'

23  actions—which were malicious, oppressive, and willful—were calculated to injure Plaintiffs and

24  Class members and made in conscious disregard of Plaintiffs' and Class members' rights.

25  Punitive damages are warranted to deter Defendants from engaging in future misconduct.

26

27

28

1
2

**COUNT VI**
**(Violations of CIPA, Cal. Pen. Code §§ 630, *et seq.*)**
**(On Behalf of the Stalked Class)**

3      205.    Plaintiffs repeat and reallege all preceding paragraphs contained herein.

4      206.    Cal. Pen. Code § 630 provides that "[t]he Legislature hereby declares that

5   advances in science and technology have led to the development of new devices and techniques

6   for the purpose of eavesdropping upon private communication and that the invasion of privacy

7   resulting from the continual and increasing use of such devices and techniques has created a

8   serious threat to the free exercise of personal liberties and cannot be tolerated in a free and

9   civilized society."

10      207.    Defendants' acts and practices complained of herein violated and continue to

11  violate Cal. Pen. Code § 637.7.

12      208.    Cal. Pen. Code § 637.7(a) prohibits the use of an electronic tracking device to

13  determine the location or movement of a person. As used in Cal. Pen. Code § 637.7, "electronic

14  tracking device" means "any device attached to a vehicle or other movable thing that reveals its

15  location or movement by the transmission of electronic signals." Cal. Pen. Code § 637.7(d).

16      209.    In direct violation of this prohibition and without the consent of Plaintiffs or Class

17  members, Defendants have knowingly introduced into the stream of commerce a standalone

18  device whose sole purpose is to locate whatever it is affixed to.  Defendants have done this

19  despite being warned prior to and immediately after the release of the Tile trackers that the

20  product is a dangerous tool that enables stalkers and abusers.

21      210.    As described herein, Tile trackers are "electronic tracking devices" as defined by

22  Cal. Pen. Code § 637.7(d), used "to determine the location or movement of a person." Cal. Pen.

23  Code § 637.7(a).

24      211.    As a result of Defendants' violations of Cal. Pen. Code § 637.7, and pursuant to

25  Cal. Pen. Code § 637.2, Plaintiffs and Class members are entitled to the following relief: (1) A

26  declaration that Defendants' conduct violates CIPA; (2) Statutory damages and/or trebled actual

27  damages; (3) Injunctive relief (including public injunctive relief) in the form of, *inter alia*, an

28  order enjoining Defendants from using Tile trackers to geolocate Class members in violation of

CIPA; (4) Injunctive relief in the form of, *inter alia*, an order requiring Defendants to destroy all data created or otherwise obtained from its illegal tracking of Class members; and (5) An award of attorney's fees and costs of litigation as provided by CIPA, the private attorney general doctrine existing at common law and also codified at California Civil Code Section 1021.5, and all other applicable laws.

**COUNT VII**
**(Negligence *Per Se*)**
**(On Behalf of the Stalked Class)**

212.    Plaintiffs repeat and reallege all preceding paragraphs contained herein.

213.    As set forth above, Defendants' conduct complained of herein violated both CIPA and California's Constitutional Right to Privacy.

214.    These violations of CIPA and California's Constitutional Right to Privacy proximately caused injury to Plaintiffs and the Class.

215.    These injuries resulted from an occurrence, the nature of which CIPA and California's Constitutional Right to Privacy were designed to prevent.

216.    Plaintiffs and the Class are a part of the class of persons for whose protection CIPA and California's Constitutional Right to Privacy were made into law, respectively.

217.    As a result of Defendants' actions, Plaintiffs and Class members seek injunctive relief (including public injunctive relief), damages and punitive damages in an amount to be determined at trial.  Plaintiffs and Class members seek punitive damages because Defendants' actions—which were malicious, oppressive, and willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights. Punitive damages are warranted to deter Defendants from engaging in future misconduct.

**COUNT VIII**
**(California Bus. and Prof. Code § 17200, *et seq.* – Unlawful Prong)**
**(On Behalf of the Stalked Class**
**and the At-Risk-Of-Stalking Class)**

218.    Plaintiffs repeat and reallege all preceding paragraphs contained herein.

219.    As set forth above, Defendants' conduct violates multiple laws of the State of California, including CIPA and California's Constitutional Right to Privacy, and amount to acts

1   of negligence, negligence *per se*, intrusion-upon-seclusion, and product liability.  Each of these

2   independent violations of law also serve as predicate violations of the UCL's unlawful prong.

3       220.    Plaintiffs have standing to pursue this claim as they suffered injury in fact and

4   have lost money or property as a result of Defendants' actions as set forth herein. Plaintiffs

5   Shannon Ireland-Gordy Stephanie Ireland Gordy and have been forced to move multiple times—

6   and perhaps more times in the future—as a result of having their whereabouts monitored, by

7   their stalker, via Defendants' Tile trackers.  Further, they have incurred significant legal fees due

8   to their being stalked, have had their property damaged by their stalker once she located their

9   new location (via the Tile Tracker).  Plaintiff Melissa Broad experienced significant depression

10   as a result of being tracked, which has resulted in lost professional opportunities and loss of

11   income. Plaintiff Doe experienced damage to her car in the course of locating and disabling the

12   Tile Tracker.

13       221.    Pursuant to section 17203 of the UCL, Plaintiffs, individually and on behalf of the

14   Class, seek injunctive relief (including public injunctive relief) in the form of an order of this

15   Court enjoining Defendants from engaging in the unlawful business practices alleged herein in

16   connection with the sale of Tile trackers.

**COUNT IX**
**(California Bus. and Prof. Code § 17200, *et seq*. – Unfair Prong)**
**(On Behalf of the Stalked Class**
**and the At-Risk-Of-Stalking Class)**

20       222.    Plaintiffs repeat and reallege all preceding paragraphs contained herein.

21       223.    Defendants' business practices, as alleged herein, are unfair because their conduct

22   in releasing Tile trackers into the marketplace is immoral, unethical, oppressive, unscrupulous or

23   substantially injurious to consumers. The gravity of the harm to consumers is not outweighed by

24   the utility of Defendants' conduct.

25       224.    Defendants' business practices are also unfair because they undermine public

26   policy, which is tethered to specific statutory provisions, including CIPA and the California

27   Constitutional Right to Privacy.

28

**AMENDED CLASS ACTION COMPLAINT**

225. Lastly, Defendants' business practices are unfair because: (1) the injury to the consumer is substantial; (2) the injury is not outweighed by any countervailing benefits to consumers or competition; and (3) consumers could not reasonably have avoided the injury.

226. There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described above.

227. Defendants' wrongful business practices constituted, and constitute, a continuing course of conduct of unfair competition since Defendants is continuing to sell Tile trackers.

228. As set forth in Paragraph 221, *supra*, Plaintiffs have standing to pursue this claim as they suffered injury in fact and have lost money or property as a result of Defendants' actions as set forth herein. Specifically, Plaintiffs have been forced to move at least once—and perhaps more times in the future—as a result of having their whereabouts monitored, by their stalker, via Defendants' Tile trackers.

229. Pursuant to section 17203 of the UCL, Plaintiffs, individually and on behalf of the Class, seek injunctive relief (including public injunctive relief) in the form of an order of this Court enjoining Defendants from engaging in the unlawful business practices alleged herein in connection with the sale of Tile trackers.

## **RELIEF REQUESTED**

Plaintiffs, on behalf of themselves and members of the general public, requests the Court to enter judgment against Defendant, and accordingly, request the following:

    a. That judgment be entered against Defendants and in favor of Plaintiffs on the causes of action set forth in this Complaint;

    b. That judgment be entered against Defendants for all injunctive, declaratory, and other equitable relief sought (including public injunctive relief), including but not limited to an order enjoining Defendants from further unlawful, unfair and/or fraudulent practices with respect to the design, manufacture, and release into the market of Tile trackers;

    c. That Plaintiffs and Class members be awarded actual, nominal, statutory, and/or punitive damages, in an amount to be determined at trial;

d.   Reasonable attorney's fees and litigation costs, pursuant to Cal. Civ. Proc. Code § 1021.5; and

e.   All other such other relief as may be appropriate.

Dated:  April 26, 2024

**MILSTEIN JACKSON FAIRCHILD & WADE, LLP**

*/s/ Gillian L. Wade*

Gillian L. Wade, State Bar No. 229124
gwade@mjfwlaw.com
Sara D. Avila, State Bar No. 263213
savila@mjfwlaw.com
Marc A. Castaneda, State Bar No. 299001
mcastaneda@mjfwlaw.com
2450 Colorado Ave., Suite 100E
Santa Monica, California 90404
Tel: (310) 396-9600
Fax: (310) 396-9635

**wh LAW**
David Slade
slade@wh.law
Brandon Haubert
brandon@wh.law
Jessica Hall
jessica@wh.law
1 Riverfront Place, Suite 745
North Little Rock, AR 72114
Telephone:  501.891.6000
Facsimile:  501.222.3027

*Attorneys for Plaintiffs individually*
*and on behalf of all others similarly situated*

AMENDED CLASS ACTION COMPLAINT