1

**MILSTEIN JACKSON**
**FAIRCHILD & WADE, LLP**
Gillian L. Wade, State Bar No. 229124
gwade@mjfwlaw.com
Sara D. Avila, State Bar No. 263213
savila@mjfwlaw.com
Marc A. Castaneda, State Bar No. 299001
mcastaneda@mjfwlaw.com
2450 Colorado Ave., Suite 100E
Santa Monica, California 90404
Tel: (310) 396-9600
Fax: (310) 396-9635

**wh LAW**
David Slade
slade@wh.law
Brandon Haubert
brandon@wh.law
Jessica Hall
jessica@wh.law
1 Riverfront Place, Suite 745
North Little Rock, AR 72114
Telephone:  501.891.6000
Facsimile:  501.222.3027

*Attorneys for Plaintiffs individually and*
*on behalf of all others similarly situated*

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

18

19

20

21

22

23

24

25

26

27

28

| | |
|---|---|
| SHANNON IRELAND-GORDY and STEPHANIE IRELAND GORDY, MELISSA BROAD, and JANE DOE individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TILE, INC., LIFE360, INC., and AMAZON.COM, INC.,<br><br>Defendants. | Case No. 3:23-CV-04119-RFL<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS TILE, INC. AND LIFE360, INC.'S MOTION TO COMPEL ARBITRATION**<br><br>Judge: Rita F. Lin<br>Dept.     15<br>Trial Date:  TBD<br>Date Action Filed: 08/14/2023 |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

I.    INTRODUCTION ................................................................................................ 1

II.    BACKGROUND ................................................................................................. 2

    A.    Plaintiff Broad ..................................................................................... 3

    B.    Plaintiff Doe ........................................................................................ 5

III.    ARGUMENT ...................................................................................................... 5

    A.    Gateway arbitrability issues, including formation, validity, and scope, should be decided by this Court. ................................................................................. 5

        1.    Plaintiffs Broad and Doe are not bound by the October 2023 Terms or the delegation language in that arbitration provision ................................ 6

        2.    The February 2021 and January 2023 Terms do not delegate arbitrability to an arbitrator ...................................................................................... 9

            i.    There is no clear evidence of the parties' intent to delegate arbitrability because of contract language indicating that such issues may be decided by a court .................................................................................... 12

    B.    Plaintiffs' claims are outside the scope of the January 2021 and February 2023 Arbitration Clauses .......................................................................................... 13

    C.    The January 2021 and February 2023 Arbitration Clauses Are Unenforceable Due To Unconscionability ....................................................................................... 15

        1.    The Agreement Has A High Degree of Substantive Unconscionability ............ 15

        2.    The Agreement Has A High Degree of Procedural Unconscionability.............. 18

    D.    There is no basis for a mandatory or discretionary stay, and none is warranted ..... 19

IV.    CONCLUSION ................................................................................................. 21

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**                                                                                          *Page*

3

*Ahlstrom v. DHI Mortg. Co., L.P.*
4       21 F.4th 631 (9th Cir. 2021)......................................................................... 6

*Alkutkar v. Bumble Inc.*
5       2022 U.S. Dist. LEXIS 162287 (N.D. Cal. Sep. 8, 2022)................................ 8

6   *Berman v. Freedom Fin. Network, LLC*
        30 F.4th 849 (9th Cir. 2022)..................................................................... 7, 8
7

*Brennan v. Opus Bank*
8       796 F.3d 1125 (9th Cir. 2015)........................................................ 6, 10, 11

9   *Cal. Crane Sch., Inc. v. Google LLC*
        621 F. Supp. 3d 1024 (N.D. Cal. 2022) ................................................ 20, 21
10

*Cook v. University of Southern California*
11      102 Cal.App.5th 312 (2024)........................................................................ 16

12  *Esparza v. SmartPay Leasing, Inc.*
        2017 U.S.Dist.LEXIS 164014 (N.D.Cal. Oct. 3, 2017).................................. 15
13

*G.G. v. Valve Corporation*
14      799 Fed. Appx. 557 (9th Cir. 2020) ........................................................... 10

15  *Galilea, LLC v. AGCS Marine Ins. Co.*
        879 F.3d 1052 (9th Cir. 2018)..................................................................... 10
16

*Garcia v. Cent. Coast Rests., Inc.*
17      2019 U.S. Dist. LEXIS 162588 (N.D. Cal. Sep. 23, 2019)............................... 7

18  *Goceri v. Amazon.com, Inc.*
        2024 U.S. Dist. LEXIS 41667 (N.D. Cal. Mar. 8, 2024)................................. 6
19

*Gray v. SEIU*
20      2020 U.S. Dist. LEXIS 259980 (N.D. Cal. Aug. 5, 2020)............................... 20

21  *Greenberg v. Amazon.com, Inc.*
        2021 U.S. Dist. LEXIS 256409 (N.D. Cal. May 17, 2021) ....................... 11, 12
22

*Henry Schein, Inc. v. Archer & White Sales, Inc.*
23      586 U.S. 63 (2019) ..................................................................................... 10

24  *In re Jiffy Lube Int'l, Inc.*
        847 F.Supp.2d 1253 (S.D.Cal. 2012) ......................................................... 16
25

*In re Tesla Advanced Driver Assistance Sys. Litig.*
26      2023 U.S. Dist. LEXIS 176556 (N.D. Cal. Sep. 30, 2023)....................... 12, 13

27  *Ingalls v. Spotify USA, Inc.*
        2016 U.S. Dist. LEXIS 157384 (N.D. Cal. Nov. 14, 2016).......... 10, 11, 15, 16, 17, 18, 19

28

*Ingle v. Circuit City Stores, Inc.*
    328 F.3d 1165 (9th Cir. 2003)..........................................................................15

*Lockyer v. Mirant Corp.*
    398 F.3d 1098 (9th Cir. 2005)..................................................................20, 21

*Love v. Equifax Info. Servs., LLC*
    2023 U.S.Dist.LEXIS 197388 (C.D.Cal. Oct. 30, 2023) ......................16, 18

*Milliner v. Bock Evans Fin. Counsel, Ltd.*
    114 F. Supp. 3d 871 (N.D.Cal. 2015) ................................................................19

*Norcia v. Samsung Telcoms. Am., LLC*
    845 F.3d 1279 (9th Cir. 2017)..........................................................................7

*O'Donovan v. Cashcall, Inc.*
    2009 U.S.Dist.LEXIS 53895 (N.D.Cal. June 24, 2009) ..............................19

*Sanchez v. Valencia Holding Co., LLC*
    353 P.3d 741 (Cal. 2015) ....................................................................................15

*Savage v. Citibank N.A.*
    2015 U.S.Dist.LEXIS 62343 (N.D.Cal. May 12, 2015) ..............................16

*Sellers v. Bleacher Report, Inc.*
    2023 U.S. Dist. LEXIS 131579 (N.D. Cal. July 28, 2023) ..........................8

*Sifuentes v. Dropbox, Inc.*
    2022 U.S. Dist. LEXIS 125273 (N.D. Cal. June 29, 2022) ......................7, 8

*Slaten v. Experian Info. Sols., Inc.*
    2023 U.S. Dist. LEXIS 158867 (C.D. Cal. Sep. 6, 2023) ..........................11

*Thomas v. Cricket Wireless, LLC*
    506 F. Supp. 3d 891 (N.D.Cal. 2020) ..........................................................15, 16

*Ting v. AT&T*
    319 F.3d 1126 (9th Cir. 2003)..........................................................................17

*Travelers Indem. Co. v. Premier Organics, Inc.*
    2017 U.S. Dist. LEXIS 161282 (N.D. Cal. Sep. 29, 2017)............................14

*United Communs. Hub, Inc. v. Qwest Communs., Inc.*
    46 Fed. Appx. 412 (9th Cir. 2002) ................................................................20, 21

*Victoria v. Superior Court*
    40 Cal. 3d 734 (1985) ..........................................................................................14

**Other**

9 U.S.C. § 2......................................................................................................................14

## I.    INTRODUCTION

Defendants move to compel arbitration of the claims of two of the four named plaintiffs in this case—Plaintiff Melissa Broad ("Plaintiff Broad") and Plaintiff Jane Doe ("Plaintiff Doe") and to stay the claims of the remaining Plaintiffs.[1] Defendants' Motion (ECF No. 33) is based on an arbitration provision at the tail end of Tile and/or Life360's Terms of Service ("Terms"). But several versions of the Terms, spanning a period of several years, are attached to the declaration of Steve Klinkner (ECF 34), which Defendants filed in support of their Motion. Defendants contend that Plaintiff Broad agreed to Tile's January 2021 Terms when she created a Tile account, and that Plaintiff Doe agreed to Tile's February 2023 Terms when she created a Tile account, but they further aver that both of these Plaintiffs subsequently became bound by revised Terms (October 2023 Terms) that were sent to them via mass email on October 26, 2023. *This* purported agreement, the argument goes, supersedes any prior Terms, and govern the instant dispute.

But none of these arbitration provisions compel Plaintiffs Doe or Broad to arbitrate their claims against Tile, for multiple reasons.

At the threshold, the October 2023 Terms do not apply, as neither Plaintiff assented to them. The inquiry then becomes whether the January 2021 Terms or the February 2023 Terms[2] require Plaintiffs Broad or Doe, respectively, to arbitrate their claims against Tile, and the answer to this is "no." This is because the claims at issue are unambiguously outside of the scope of any arbitration provision that may—or may not—have been formed between Plaintiffs Broad and Doe, respectively, and Tile. Indeed, to the extent that any agreement *could* be said to govern these claims—arising exclusively from the conduct of third-parties and using technology that neither Plaintiff ever purchased from Tile, then such an agreement plainly would be unconscionable and unenforceable.

Defendants seek to have the Court delegate these threshold determinations of scope and enforceability to an arbitrator, but once again, their arguments are without support from the law. It

---

[1] No one contests that Amazon cannot compel a single Plaintiff's claims to arbitration in the litigation. Moreover, neither Amazon nor Tile have moved to compel the claims of Plaintiffs Shannon Ireland-Gordy or Stephanie Ireland Gordy to arbitration, and their claims thus remain properly before this Court.

[2] The arbitration provisions in the January 2021 and February 2023 Terms are identical.

1    is this Court that should decide these issues, and it is this Court that should hold that Tile's Motion

2    stems from an impermissible interpretation of the law.  In short: Defendants' Motion should be

3    denied in its entirety.[3]

4        Should the Court, nonetheless, grant Defendants' motion to compel arbitration, there is no

5    basis for a mandatory stay of the remaining plaintiffs' claims and a discretionary stay is not

6    warranted.

7    **II.    BACKGROUND**

8        This case arises from the design, marketing, manufacturing, and sale by Defendants of a

9    small, physical device known as a Tile Tracker, which is small enough to be easily and covertly

10   planted almost anywhere, including, for example, within the frame of a vehicle or the lining of a

11   purse or suitcase. ECF 32 ¶ 27. These devices were creating well deserved concern in the media as

12   early as 2013 due to their suitability for use by stalkers to find their victims. ECF 32 ¶¶ 33-46. This

13   danger multiplied exponentially in 2021, when Tile teamed up with Amazon Sidewalk network

14   products (*e.g.*, Bridge, Echo, and Ring) to expand the reach and efficacy of the Trackers, resulting

15   in a network that now reaches 90% of the U.S. population. ECF 32 ¶¶ 65-66.

16       Defendants created a product capable of finding almost anyone anywhere, without their

17   knowledge or consent, and they did so without creating any effective safety precautions or

18   limitations. Then, Defendants presented this product to stalkers on a silver platter by marketing it

19   on pornographic and other questionable websites, obfuscating legal process in the context of stalker

20   lawsuits, and blocking access to courts and the class action device through unconscionably broad

21   and confusing arbitration agreements which they claim vast numbers of consumers, likely on the

22   scale of hundreds of thousands, accepted merely by accessing their website or opening an app. *See*

23   ECF 32 ¶¶ 7, 40, 52, 97-115.

24       The January 2021 Terms and the February 2023 Terms to which Plaintiffs purportedly

25   assented when creating their accounts contain identical arbitration clauses which state as follows:

26

---

27   [3] Separate Defendant Amazon.com, Inc. has joined the Tile Defendants' Motion. *See,* ECF 35.
     That motion, however, simply joins the arguments set forth in the Tile Defendants' Motion,
28   without advancing any further argument.  Plaintiffs' instant opposition, therefore, addresses that
     motion concurrently, and for the same reasons set forth herein.

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO COMPEL ARBITRATION
CASE NO. 3:23-CV-04119-RFL.**

1
2
3
4
5

> All disputes, claims or controversies arising out of or relating to this Agreement, any Tile product or service and its marketing, or the relationship between you and Tile ("Disputes") shall be determined exclusively by binding arbitration. This includes claims that accrued before you entered into this Agreement. The only Disputes not covered by this Section are claims (i) regarding the infringement, protection or validity of your, Tile's or Tile's licensors' trade secrets or copyright, trademark or patent rights; (ii) if you reside in Australia, to enforce a statutory consumer right under Australia consumer law; and (iii) brought in small claims court. ECF 34-2 at 18; ECF 34-9 at 22-23.

6

    The arbitration clause in the October 2023 Terms—implemented after this litigation was

7

filed—reads as follows:

8
9
10
11
12
13

> The term "Disputes," as used in this section, is intended to be interpreted broadly and includes any claim, dispute, or controversy between us that arises out of or relates to this Agreement, this Section 18 and/or any and all use of the Products or Services whether based in contract, statute, regulation, ordinance, tort (including fraud, misrepresentation, fraudulent inducement, or negligence), or any other legal or equitable theory, and includes all threshold issue of arbitrability including the validity, enforceability or scope of this Section 18. The only Disputes excluded from this obligation to arbitration are: (1) claims that could be brought in small claims court; and (2) Company claims for injunctive or other equitable relief. ECF 34-5 at 19.

14
15
16
17

Defendants claim they provided adequate notice of the October 2023 Terms through a mass email which does not mention "arbitration" at all (ECF 34-7). Plaintiff Broad never saw that email until January 2024 when she affirmatively searched and found it in her spam folder. Broad Decl. ¶ 14. Plaintiff Doe never saw that email at all. Doe Decl. ¶ 10. Of course, neither read the October 2023 Terms or manifested any affirmative assent to them. Broad Decl. ¶ 14; Doe Decl. ¶ 10.

18
19

### A. Plaintiff Broad

20
21
22
23
24
25
26
27

    Plaintiff Broad was stalked via a Tile Tracker from 2021 to 2023, if not longer.  ECF 32 ¶¶ 119-133. Broad Decl. ¶ 6. With the help of her family, she finally discovered and removed two Tile Trackers hidden in her vehicle in March 2023. ECF 32 ¶ 130; Broad Decl. ¶ 6. One of the Tile Trackers was purchased by her and was associated with her Tile account, to which her stalker had joint access. Broad Decl. ¶¶ 5-6. The other Tile Tracker was *not* purchased by her and was *not* associated with her Tile account or any other Tile account to which she has ever had access. *Id*. ¶ 6. Desperate to help, Plaintiff Broad's father devised an elaborate plan to help his daughter escape in which he drove around with the recently discovered Tile Trackers while she attempted to escape through a shopping mall. ECF 32 ¶¶ 131-32. Plaintiff Broad then moved in with her family and laid

28

1  low. While she achieved some degree of escape from her stalker, her nightmare is far from over.

2  Her stalker continues to call and harass her using blocked or unknown phone numbers. Broad Decl.

3  ¶ 7. She continues to suffer from extreme and pervasive fear, anxiety, and depression from being

4  tracked and reasonably so—to this day, she cannot be sure she isn't being tracked by a Tile. ECF

5  32 ¶ 133; Broad Decl. ¶ 7.

6      When Plaintiff Broad created her Tile account in 2021, she certainly did not contemplate

7  that she was releasing her right to hold Tile accountable for conduct relating exclusively to someone

8  else's use of Tile devices. Broad Decl. ¶¶ 3, 15.  She was able to create her Tile account without

9  opening the Terms at all. *Id*. ¶¶ 3, 14. Plaintiff Broad has no recollection of subscribing to a so-

10  called "Premium" package and suspects that it was her stalker who did so. *Id*. ¶ 4. Regardless, she

11  has taken no affirmative action to maintain her Tile account. *Id*. ¶ 13. As corroborated by the Terms,

12  her Tile subscription renews automatically and is billed automatically. *Id*. She has not used her Tile

13  device or account for any purpose other than to combat her stalker since before 2023.  *Id*. ¶ 9.

14  Indeed, she was careful not to "use" her Tile device or app because her stalker had access to her

15  Tile account. And, the only reason she has not closed her account is due to the instruction of law

16  enforcement, in order to preserve evidence relating to his criminal investigation. *Id*. ¶¶ 8-9, 13. In

17  fact, the police asked Broad not to close her Tile account due to their ongoing criminal investigation

18  of her stalker, and she hasn't had physical possession of her own Tile devices since July 2023 when

19  she surrendered them to the police. *Id*. ¶¶ 8-9, 11, 13. Broad lacks knowledge regarding what action

20  the police may have taken with respect to the Tile devices she surrendered to them. *Id*. ¶ 8.

21      While Broad recalls opening the Tile app in January 2024 for legal reasons, she does not

22  recall "connect[ing] a smart home device to one of her Tiles" and does not believe she did so. *Id*.

23  ¶¶ 11-12. She also does not recall opening the Tile app in April 2024 and does not believe she did

24  so, though, to this day, she frequently asks friends and family to confirm that her phone is not

25  sharing location data. *Id*. ¶¶ 10-12. She does not know whether they open or otherwise trigger the

26  Tile app in doing so. *Id*.

27  //

28  //

4

**B. Plaintiff Doe**

Plaintiff Doe got her Tile device through a Life360 promotional offer in or around July 2023 in which she would receive a free Tile Tracker if she paid Life360 for a month subscription. Doe Decl. ¶ 2. She received her free Tile Tracker sometime thereafter but did not open or unbox it immediately, and eventually her Tile app offloaded from her phone as a result of nonuse. *Id.* ¶ 4. When Doe became suspicious that she was being stalked via a Tile Tracker in March 2024, she sought help from the police and Tile, and she downloaded various mobile apps to try to evade her stalker. *Id.* ¶ 5; ECF 32 ¶¶ 135-51. She re-downloaded the Tile mobile app at that time. Doe Decl. ¶ 5. She did so specifically to use Tile's Scan and Secure feature to try to locate the device her stalker had planted to track her. *Id.*; ECF 32 ¶ 137. She had to open the Tile mobile app to use Scan and Secure, but she did not have to affirmatively login. Doe Decl. ¶ 6. The Scan and Secure feature suggested that someone had planted a Tile Tracker in her vehicle, but she was not able to find it. *Id.* ¶ 7; ECF 32 ¶ 139. She removed the front seats of her vehicle, to no avail. *Id.* ¶ 8; ECF 32 ¶ 148. It was not until she removed the entire back seat of her vehicle several days later (on or about March 29 or March 30, 2024) that Doe found the planted Tile Tracker in hidden in the portion of her vehicle's frame that separates the cabin of the car from the trunk. *Id.* ¶ 8; ECF 32 ¶¶ 152-53. She destroyed it immediately. Doe Decl. ¶ 8. Doe did not purchase the Tile Tracker she found hidden in her vehicle, and it was not associated with her Tile account. Doe Decl. ¶ 9.

Like Broad, Doe remains constantly fearful and anxious that she is still being tracked. ECF 32 ¶ 156. When she created a Tile account, she certainly did not contemplate that she was releasing her right to file a lawsuit in court for claims relating to someone else's misuse of a Tile she did not purchase, own, or control. Doe Decl. ¶¶ 3, 11.

**III. ARGUMENT**

**A. Gateway arbitrability issues, including formation, validity, and scope, should be decided by this Court.**

Before addressing why no arbitration agreement is enforceable as to either Plaintiff's claims against Tile, it is important to explain why the Court, and not an arbitrator, must make this determination. Tile argues that any and all issues before the Court must ultimately be decided by

1    an arbitrator due to a delegation clause in the October 2023 Terms or else by implication of the

2    language of the January 2021 or February 2023 Terms.  These arguments fail.

3        The general rule is that gateway issues presented by a purported arbitration agreement

4    (namely, formation, validity, and scope) should be decided by a court. *See Goceri v. Amazon.com,*

5    *Inc.,* 2024 U.S. Dist. LEXIS 41667, *5 (N.D. Cal. Mar. 8, 2024). There may be an exception to this

6    rule where parties clearly and unmistakably delegate gateway issues to an arbitrator. *See Brennan*

7    *v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015); *Goceri*, 2024 U.S. Dist. LEXIS 41667, at *5.

8    Not all gateway issues are delegable, however. Unlike validity and arbitrability, which may be

9    expressly delegated, issues of formation cannot be delegated to an arbitrator. *See Goceri*, 2024 U.S.

10   Dist. LEXIS 41667, at *5 (citing *Ahlstrom v. DHI Mortg. Co., L.P.,* 21 F.4th 631, 634-35 (9th Cir.

11   2021)). Each of these gateway issues is at play here, and each provides a separate basis to deny

12   Tile's Motion.

13               **1.   Plaintiffs Broad and Doe are not bound by the October 2023 Terms or the**
                        **delegation language in that arbitration provision.**

14

15       Tile asserts that Plaintiffs are bound by the arbitration provision in the Terms hyperlinked

16   to the October 26, 2023, mass email that Defendants claim to have sent to all Tile users, including

17   Plaintiffs Broad and Doe. *See* Motion at 4-6; ECF 34 ¶ 11. This agreement presumably superseded

18   any prior arbitration agreements to which Defendants aver that Plaintiffs agreed (the January 2021

19   Terms for Broad and the February 2023 Terms for Doe). The arbitration provisions in these earlier

20   (January 2021 and February 2023) Terms stated: "Tile will not enforce material changes to this

21   section in the future unless you expressly agree to them." *See* ECF 34-2, § 25; ECF 34-9 at 24.

22       According to Defendants, the October 26, 2023 mass email sent to Tile users included a

23   hyperlink to the October 2023 Terms and advised recipients that their use of the Tile app or mere

24   access to the Tile or Life360 website after November 26, 2023, constituted agreement to the new

25   Terms. Defendants aver that Plaintiffs Broad and Doe each used the Tile app after November 26,

26   2023, and thereby "consented" to the October 2023 Terms. Motion at 4-6.

27       This is wrong. Neither Plaintiff Broad nor Doe expressly—or even impliedly—agreed to

28   the October 2023 Terms, and thus Tile may not enforce them in this action. Plaintiff Doe did not

PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO COMPEL ARBITRATION
CASE NO. 3:23-CV-04119-RFL.

1    receive the October 26, 2023 email (Doe Decl. ¶ 10) and Plaintiff Broad only stumbled across the

2    email in January 2024 when she was affirmatively searching for case-related documents for her

3    attorneys and found it in her spam folder (Broad Decl. ¶14). Additionally, Plaintiff Broad has not

4    used her Tile app since well before October 2023—having handed all of her Tile Trackers to law

5    enforcement as evidence in her case against her stalker—and only maintains her Tile account in

6    order to comply with police instruction. Broad Decl. ¶¶ 8, 11.  And, Plaintiff Doe only accessed the

7    Tile app in March of 2024 (which did not require logging into her account) so she could use Tile's

8    Scan and Secure feature to try to detect the Tile her stalker planted in her vehicle. Doe Decl. ¶¶ 5-

9    8. She also attempted to close her Tile account in April 2024, which required her to login to the

10    Tile app. Id. ¶ 13. Simply put, there are no indicia of contract formation sufficient to show that the

11    October 2023 Terms govern this dispute.

12        Courts look to ordinary state-law principles that govern the formation of contracts when

13    deciding whether an agreement to arbitrate exists. *Norcia v. Samsung Telcoms. Am., LLC,* 845 F.3d

14    1279, 1283 (9th Cir. 2017). This is no less true of agreements purportedly formed online. *Berman*

15    *v. Freedom Fin. Network, LLC,* 30 F.4th 849, 855 (9th Cir. 2022). Mutual assent is an essential

16    element of any contract. *Garcia v. Cent. Coast Rests., Inc.,* 2019 U.S. Dist. LEXIS 162588, *7

17    (N.D. Cal. Sep. 23, 2019). Under Ninth Circuit precedent, a consumer who receives electronic

18    notice of contractual terms may be deemed to have assented to those terms only if: (1) the consumer

19    is provided reasonably conspicuous notice of the terms to which they will be bound, and (2) "the

20    consumer ***takes some action***, ***such as clicking a button or checking a box, that unambiguously***

21    ***manifests his or her assent*** to those terms." *Berman* at 856 (emphasis added).

22        Defendants' sending of the mass email (which neither Plaintiff was made aware of prior to

23    seeking legal representation) coupled with Plaintiffs' purported "use"[4] of the Tile app does not

24    meet this standard of assent, and several analogous cases involving terms of service linked to or

25    mentioned in mass emails make this clear. In *Sifuentes v. Dropbox, Inc.*, Judge Gilliam denied the

26    defendant's motion to compel arbitration based on a similar theory of inquiry notice advanced by

27

28    _____

    [4] Defendants appear to contend that "use" only requires opening the app, which could occur by
    inadvertently touching one's phone screen, for example. *See* ECF 34 ¶¶ 12, 18.

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO COMPEL ARBITRATION
CASE NO. 3:23-CV-04119-RFL.**

1    Defendants here. 2022 U.S. Dist. LEXIS 125273, *10-11 (N.D. Cal. June 29, 2022). There, the

2    defendant modified its terms of service and sent a mass email to its users, including the plaintiff,

3    explaining the addition of a mandatory arbitration clause. *Id.* at *11. Because the defendant put

4    nothing in the record indicating that either 1) the plaintiff could not use the defendant's service

5    until the plaintiff had indicated his assent to the new terms and arbitration clause, 2) the plaintiff

6    would have been advised of the new terms while using the defendant's services, or 3) the defendant

7    ever logged whether the plaintiff had opened its email, there was no unambiguous manifestation of

8    assent. *Id.* This was true regardless of whether the email itself constituted reasonably conspicuous

9    notice. The plaintiff's ongoing use of the defendant's service was irrelevant to the issues of inquiry

10   notice and manifestation of mutual assent. *Id.*

11        The same is true here. Defendants offer no evidence (1) that Plaintiffs could not use the Tile

12   app after October 26, 2023 without affirmatively indicating their assent to the October 2023 Terms;

13   (2) that Plaintiffs were advised of the new Terms while using the Tile app; or (3) that Plaintiffs ever

14   opened the October 26, 2023 email.[5] Defendants' theory of inquiry notice fails under *Sifuentes* and

15   *Berman*. By specifically referencing and explaining the addition of the mandatory arbitration

16   agreement in the text of its mass email, *Sifuentes* 2022 U.S. Dist. LEXIS 125273, at *10, the

17   defendant in *Sifuentes* did more to establish inquiry notice than Defendants did here. ECF 34 ¶ 11

18   (containing no mention of arbitration). And still, the defendant fell short under *Berman*. There can

19   be no doubt that Defendants have failed to meet the *Berman* standard for establishing mutual assent.

20        Moreover, like a defendant's failure to show that the plaintiff opened an email referencing

21   or linking new terms, a defendant's failure to prove that the email was sent to and received by the

22   plaintiff—the particular individual who the defendant seeks to contractually bind—is also fatal to

23   an attempted showing of mutual assent  *Alkutkar v. Bumble Inc.,* 2022 U.S. Dist. LEXIS 162287,

24   *17 (N.D. Cal. Sep. 8, 2022) ("Defendants' email record does not establish that plaintiff had actual

25   or constructive knowledge of the updated Terms because Bumble does not maintain records of the

26   actual emails sent to users, and it has no record that the email was received or even opened.");

27

28   _____
     [5] As to this latter point, neither Plaintiff received or reviewed the email. Broad Decl. ¶14; Doe Decl. ¶10.

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO COMPEL ARBITRATION
CASE NO. 3:23-CV-04119-RFL.**

*Sellers v. Bleacher Report, Inc.,* 2023 U.S. Dist. LEXIS 131579, *20 (N.D. Cal. July 28, 2023) ("[T]he email shows no recipient in the 'To:' field, so there is no evidence it was sent to anyone, much less that plaintiff received it. This email does not show evidence of plaintiff's assent."). Here, Defendants offer nothing more than Mr. Klinkner's statement that the October 2023 email was sent to "all Tile users," including Plaintiffs Broad and Doe. ECF 34 ¶¶ 11, 17. Defendants offer no evidence that the email was sent or received. Thus, Defendants' inquiry notice showing falls well short of what is required in the Ninth Circuit.

Equally fatal to Defendants' argument is the fact that there was no subsequent action taken by either Broad or Doe that would be sufficient to indicate a willingness to be bound by any terms, regardless of whether they received them (and they did not). As discussed above, Plaintiff Broad surrendered her Tile Trackers to the police long before October 2023 (Broad Decl. ¶ 8) and Plaintiff Doe only utilized the Tile app after October 2023 because she in order to discover whether and how she was being stalked. (Doe Dec. ¶¶ 5-8).  In neither case did Plaintiffs act in a way that manifested an intent to be bound.

Because there was no mutual assent to the October 2023 Terms, they do not impose an enforceable agreement to arbitrate. And because Plaintiffs never agreed to the October 2023 Terms, the express delegation language in its arbitration clause has no effect. *See* Motion at 10-11 (arguing that Plaintiffs are bound by the October 2023 Terms, which delegates threshold issues of arbitrability, including validity enforceability, and scope, to the arbitrator).[6]

### 2. The February 2021 and January 2023 Terms do not delegate arbitrability to an arbitrator.

Having established that no arbitration agreement was formed by way of the October 2023 mass email, Plaintiffs now explain why neither the January 2021 nor February 2023 Terms delegate threshold questions of arbitrability or scope to an arbitrator (and by extension deprive this Court of jurisdiction to hear such matters). The arbitration provisions in those agreements are identical (*see,* ECF 34-2; ECF 34-9) and read as follows:

---

[6] Defendants repeatedly cite to Section XVIII of the Terms (Motion at 10, 15, 16, 17), but the October 2023 Terms are devoid of a Section XVIII. ECF 34-5.

The arbitration shall be administered by the American Arbitration Association ("AAA") under its Commercial Arbitration Rules and, where appropriate, the AAA's Supplementary Procedures for Consumer Related Disputes ("AAA Consumer Rules"), both of which are available at the AAA website www.adr.org. Your arbitration fees and your share of arbitrator compensation shall be governed by the AAA Rules and, where appropriate, limited by the AAA Consumer Rules.

ECF 34-2 at 18-20; ECF 34-9 at 22-24.

According to Defendants, this language, and this language alone, effectuates a delegation of gateway issues to an arbitrator. Motion at 11, 16-17. But this rests on an incorrect understanding of governing caselaw. Mere incorporation of AAA rules—with nothing more—will not suffice to effectuate delegation where, as here, plaintiffs are ordinary consumers. In *Brennan v. Opus Bank*, the Ninth Circuit held that incorporation of AAA rules constituted evidence of the parties' intent to arbitrate arbitrability, but explicitly limited its holding to the facts of that case, which involved an agreement between two sophisticated parties. 796 F.3d 1125, 1131 (9th Cir. 2015); *see also Galilea, LLC v. AGCS Marine Ins. Co.,* 879 F.3d 1052, 1061 (9th Cir. 2018) (noting that, in *Brennan*, the Ninth Circuit explicitly limited its holding to agreements between sophisticated parties). And, in *G.G. v. Valve Corporation*, an unpublished decision cited by Defendants, the Ninth Circuit explicitly relied on *Washington* law in concluding that the parties' degree of sophistication did not alter the import of *Brennan*.[7] 799 Fed. Appx. 557, 558 (9th Cir. 2020).

In *Ingalls v. Spotify USA, Inc.*, Judge Alsup noted that import of *Brennan* was unclear where one party is an "unsophisticated consumer." 2016 U.S. Dist. LEXIS 157384, at *9 (N.D. Cal. Nov. 14, 2016). Upon surveying the case law, Judge Alsup also noted that every district court in the Ninth Circuit "to address the question since *Brennan* has held that incorporation of the AAA rules was insufficient to establish delegation in ***consumer contracts involving at least one unsophisticated party***." *Id.* (emphasis added) (collecting cases). Given this precedent, both binding

---

[7] Defendants also misconstrue Supreme Court precedent. In *Henry Schein, Inc. v. Archer & White Sales, Inc.*, which, incidentally, involved a dispute between two presumably sophisticated parties, a dental equipment distributor and dental equipment manufacturer, the Court stated that it was, "express[ing] no view about whether the contract at issue in [that] case in fact delegated the arbitrability question to an arbitrator." 586 U.S. 63, 71-72 (2019). *Henry Schein* does stand for the proposition that if an agreement effectively delegates the arbitrability issue to an arbitrator, courts must respect the parties' decision. *See id.* at 65. Plaintiffs in no way push back on that holding. There was no effective delegation here.

and persuasive, the court in *Ingalls* held that two "ordinary consumers who could not be expected to appreciate the significance of incorporation of the AAA rules, did not clearly and unmistakably intend to delegate the issue of arbitration to an arbitrator." *Id.* at \*10. *See also Slaten v. Experian Info. Sols., Inc.,* 2023 U.S. Dist. LEXIS 158867, \*9 (C.D. Cal. Sep. 6, 2023) (Plaintiff appears to be an ordinary consumer rather than a sophisticated party, nor does [the defendant] argue anything to the contrary. In such circumstances, incorporation of the AAA rules on its own does not evince an intent to arbitrate questions of arbitrability.").[8]

Plaintiffs Broad and Doe are ordinary consumers whose claims do not even stem from their own purchase or use of the product or app. Plaintiffs submit that their status as ordinary consumers matters on the question of their intent to arbitrate arbitrability, just as it mattered in *Ingalls* and *Slaten*. What's more, in their sworn declarations, both Plaintiffs Broad and Doe indicate that even if they had received and reviewed the January 2021 or February 2023 Terms, they would not have understood the meaning, consequences, or import of the incorporation of the AAA's "Commercial Arbitration Rules" or "Supplementary Procedures for Consumer Related Disputes." Broad Decl. ¶¶ 15-16; Doe Decl. ¶¶ 11-12. This would be no less true had Plaintiffs navigated to the AAA website using the URL provided in the Terms. On the home page of www.adr.org, "Rules, Forms & Fees" is one of the seven tabs. After clicking on that tab, there are seven options under "Most Viewed."[9] One option is labeled "Commercial Arbitration Rules and Mediation Procedure, " which links to a 49-page document[10], and another "Consumer Arbitration Rules," which links to a 38-page document.[11] Even if Plaintiff Broad or Doe had found their way to this page on the AAA website, the rules labels do not match up with the language in the Terms, which reference "Commercial Arbitration Rules" and "Supplementary Procedures for Consumer Related Disputes." And, unlike

---

[8] It is true that some courts have held that incorporation of the AAA rules constitutes clear evidence of the parties' intent to arbitrate arbitrability regardless of the parties' level of sophistication, *e.g., Greenberg v. Amazon.com, Inc.*, 2021 U.S. Dist. LEXIS 256409, \*17 (N.D. Cal. May 17, 2021), but Plaintiffs respectfully contend that such a holding is and outlier that is inconsistent with *Brennan*.

[9] *See* https://www.adr.org/Rules, last visited on July 10, 2024.

[10] *See* https://www.adr.org/sites/default/files/Commercial-Rules_Web.pdf, last visited on June 10, 2024.

[11] *See* https://www.adr.org/sites/default/files/Consumer-Rules-Web_0.pdf, last visited on June 10, 2024.

1    the arbitration agreement at issue in *Greenberg*, the Terms here would not have provided Plaintiffs

2    with a toll-free AAA phone number had Plaintiffs wanted to receive assistance locating the relevant

3    rules. *See Greenberg*, 2021 U.S. Dist. LEXIS 256409, at *20.

4            As would be the case with any ordinary consumer, Plaintiffs had no way of finding the

5    applicable rules, navigating those rules, finding the delegation language, and understanding what

6    that meant.[12] Incorporation of the AAA rules, then, is not clear and unmistakable evidence of

7    Plaintiffs' intent to delegate arbitrability in this case.

8                    **i.    There is no clear evidence of the parties' intent to delegate
                             arbitrability because of contract language indicating that such issues
9                            may be decided by a court.**

10           Setting aside the fact that Plaintiffs are ordinary consumers, and even if the Court chooses

11   not to consider the sophistication of the parties, there is another reason that the January 2021 and

12   February 2023 Terms did not effectively delegate arbitrability. Where an agreement, by its own

13   terms, leaves open the possibility that a court could decide arbitrability issues, there is no clear and

14   unmistakable evidence of the parties' intent to delegate such issues to an arbitrator. *See In re Tesla*

15   *Advanced Driver Assistance Sys. Litig.,* 2023 U.S. Dist. LEXIS 176556, *17 (N.D. Cal. Sep. 30,

16   2023) ("Although incorporation of the AAA rules may on its own constitute 'clear and

17   unmistakable evidence' of the parties' intent to delegate arbitrability issues, the arbitration

18   agreement here leaves open the possibility that a court could decide such issues too.").  In addition

19   to incorporating the AAA rules, the January 2021 and February 2023 Terms also state as follows:

20           The exclusive jurisdiction for all disputes, claims or controversies arising out of or
             relating to these Terms or the breach, termination, enforcement, interpretation or
21           validity thereof or the use of the Services or Content will be the state and federal
             courts located in the Northern District of California… If any part of these Terms ***is***
22           ***determined to be invalid or unenforceable by a court of competent jurisdiction***,
             that provision will be enforced to the maximum extent permissible and the
23           remaining provisions of these Terms will remain in full force and effect.

24

25   ───────────────────────
     [12] Not even Defendants locate the purportedly applicable delegation language in the AAA rules. By
26   way of a footnote, Defendants contend that "all versions of the AAA Commercial and Consumer
     Arbitration Rules potentially at issue" include language effectuating delegation of gateway issues.
27   Motion at fn. 3. Defendants fail to cite the location of that language. Rather, they simply cite two
     obscure pages on the AAA website that list more than 200 active and archived consumer,
28   commercial, and other AAA rules, apparently expecting Plaintiffs and the Court to scour those rules
     for the delegation language.

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'
                                                         MOTION TO COMPEL ARBITRATION
                                                         CASE NO. 3:23-CV-04119-RFL.**

*See* ECF 34-2 at 17; ECF 34-9 at 21-22 (emphasis added). This language is analogous to the language in *Tesla*, which defeated any showing of clear and unmistakable evidence of delegation. *Telsa*, 2023 U.S. Dist. LEXIS 176556, at *18 (the arbitration clause read, "If a court or arbitrator decides that any part of this agreement arbitrate cannot be enforced…"). The same is true here.

### B. Plaintiffs' claims are outside the scope of the January 2021 and February 2023 Arbitration Clauses.

Having established that the gateway issues of scope and validity are within the purview of this Court, as opposed to an arbitrator, Plaintiffs now explain why their claims are outside of the scope of any arbitration agreement at issue. Specifically, these arbitration provisions are meant to govern claims arising from the *accountholder's* use of Tile products, and cannot reasonably be read to address claims arising from unknown third parties and *their* use of Tile products. Such an overbroad, counter-intuitive interpretation runs counter to black letter contract law.

From start to finish, the Terms to which Plaintiffs Broad and Doe ostensibly agreed are (unsurprisingly) about Tile customers' use of Tile products, applications, and services. The first sentence in the Terms refers to the access or use of Tile applications and services. And the second introductory paragraph indicates that they are meant for "Tile customers." ECF 34-2; ECF 34-9. The first seven paragraphs deal with Tile customers' downloading, installation, and use of the Tile app and services, as well as the creation of their Tile accounts, payment, and membership options. ECF 34-2 §§ 1-7; ECF 34-9 §§ 1-7. Other covered topics include the type of content that customers are permitted to upload or post using Tile services, as well as Tile's hardware and product warranty provisions. ECF 34-2 §§ 10, 12-13, 18-19; ECF 34-9 §§ 10, 12-13, 18-19.

At the very end of the Terms, and following several boilerplate provisions about limitation of liability, exclusions, and general provisions, is Tile's "Dispute Resolution by Binding Arbitration" provision. ECF 34-2 § 25; ECF 34-9 at 22-24. Subsection (A) of that provision includes the following language:

> All disputes, claims or controversies arising out of or relating to this Agreement, any Tile product or service and its marketing, or the relationship between you and Tile ("Disputes") shall be determined exclusively by binding arbitration. This includes claims that accrued before you entered into this Agreement.

13

1    Defendants asks this Court to lift the "all claims arising out of or relating to any Tile product or

2    service and its marketing, or the relationship between [Plaintiffs] and Tile" language out of context

3    and apply it to this litigation—a case involving claims that have nothing to do with *either* Plaintiff's

4    use of any Tile product, service, or application. Motion at 12.

5           Basic contract law asserts that a contract should be considered as a whole, and contract

6    language interpreted in context, rather than in isolation. *Travelers Indem. Co. v. Premier Organics,*

7    *Inc.,* 2017 U.S. Dist. LEXIS 161282, *4 (N.D. Cal. Sep. 29, 2017). The February 2021 and January

8    2023 Terms relate entirely to Tile customers' use of Tile applications, services, and products. The

9    arbitration provision buried in those Terms, then, must be read in that context. While it is true that

10   Plaintiffs Broad and Doe have or had Tile accounts, their status as Tile account holders has virtually

11   no relevance to this litigation, as their claims do not arise from their own purchase, use, or

12   ownership of a Tile product, application, or service.

13          Where a plaintiff's claims involve facts—such as the criminal acts of third parties—that

14   could not have reasonably been intended to be covered by the parties' agreement, an arbitration

15   clause does not encompass them. *See Victoria v. Superior Court*, 40 Cal. 3d 734, 745 (1985) ([The]

16   employee's alleged misconduct was entirely outside the scope of his employment. He is accused

17   of the sexual assault and rape of petitioner. Surely it was not contemplated, let alone expected, by

18   either party to the Agreement that this sort of attack would befall petitioner while she was

19   hospitalized under Kaiser's care. It is, therefore, difficult to conclude that the parties intended

20   and *agreed* that causes of action arising from such an attack would be within the scope of

21   the arbitration clause."). Here, Plaintiffs suffered injuries because of Defendants' conduct in

22   enabling Plaintiffs' ***stalkers*** to use Tile products and services to hunt, haunt, and terrorize Plaintiffs.

23   Stated differently, Plaintiffs could have suffered these alleged injuries without having the Tile app

24   on their phones or owning the devices. Plaintiffs' claims, therefore, are outside the scope of the

25   January 2021 and February 2023 arbitration clauses. Further, because these arbitration clauses are

26   in standardized contracts drafted by Defendants, any ambiguity in the language must be interpreted

27   against Defendants. *See id.* at 747.

28

14

### C.  The January 2021 and February 2023 Arbitration Clauses Are Unenforceable Due To Unconscionability.

Under the FAA, arbitration agreements "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. One such ground is unconscionability. *Thomas v. Cricket Wireless, LLC* (N.D.Cal. 2020) 506 F. Supp. 3d 891, 903. An agreement is unenforceable if it is procedurally and substantively unconscionable, but both elements need not be present in the same degree. "[T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa.'" *Sanchez v. Valencia Holding Co., LLC*, 353 P.3d 741, 748 (Cal. 2015); *Ingalls v. Spotify USA, Inc.* (N.D.Cal. Nov. 14, 2016) 2016 U.S.Dist.LEXIS 157384, at *13. Defendants' arbitration agreements are corrupted with high degrees of both substantive and procedural unconscionability. Accordingly, even if Plaintiffs agreed to arbitrate (they didn't) and even if their claims interpreted to fall within the scope of the arbitration clause (they should not be), the Court should not enforce the agreement.

#### 1.  The Agreement Has A High Degree of Substantive Unconscionability.

Substantive unconscionability corrupts an agreement when its terms are unfairly one-sided. *E.g.*, *Ingle v. Circuit City Stores, Inc.* (9th Cir. 2003) 328 F.3d 1165, 1172. Defendants' arbitration agreement is tainted with a high degree of substantive unconscionability for numerous reasons.

<u>First</u> and foremost, the scope of claims captured by the literal language in the January 2021 and February 2023 arbitration agreements is unconscionably broad. Under Tile's interpretation, in addition to capturing every claim "arising out of or relating to this Agreement" or "the relationship between [Plaintiff] and Tile," the clause also purportedly captures all claims relating to "any Tile product or service and its marketing." No claim is exempt from its vast reach, no matter how unrelated it may be to the agreement or Plaintiffs' user account with Tile. Interpreting this clause literally to apply "to any and every claim arising between [Defendants] and its customers, even including employment and tort claims, with no limiting principle would render the clause impermissibly overbroad, and therefore inoperable." *Esparza v. SmartPay Leasing, Inc.* (N.D.Cal. Oct. 3, 2017) 2017 U.S.Dist.LEXIS 164014, at *7. Such a consequence would be "absurd" and

1   would not reflect the mutual intent of the parties. *Savage v. Citibank N.A.* (N.D.Cal. May 12, 2015)

2   2015 U.S.Dist.LEXIS 62343, at \*8-9; *Thomas v. Cricket Wireless, LLC* (N.D.Cal. 2020) 506 F.

3   Supp. 3d 891, 901 (mutual intent is determined from the written terms of the contract but only if it

4   is clear, explicit, and does not lead to absurd results).

5         "While courts in this district regularly enforce arbitration clauses with respect to claims that

6   arise directly out of or are somehow connected to the service agreement containing the arbitration

7   clauses," they do not enforce arbitration clauses "that are wholly divorced from the underlying

8   service contract." *Thomas v. Cricket Wireless, LLC* (N.D.Cal. 2020) 506 F. Supp. 3d 891, 904. In

9   fact, Plaintiffs are presently unaware of any authority or precedent in this jurisdiction which would

10  justify doing so here, where Plaintiffs' claims bear no direct relation to their own Tile tracking

11  devices, user accounts, or services agreements. Defendants' "incredibly broad" arbitration

12  agreement is unenforceable based on this reason alone. *Thomas v. Cricket Wireless, LLC* (N.D.Cal.

13  2020) 506 F. Supp. 3d 891, 903 (finding Waters' arbitration agreement unenforceable based

14  exclusively on the breadth of her arbitrate agreement). Other districts concur. *See, e.g.*, *Love v.*

15  *Equifax Info. Servs., LLC* (C.D.Cal. Oct. 30, 2023) 2023 U.S.Dist.LEXIS 197388, at \*10.)

16  ("Because Plaintiff is not required to arbitrate every conceivable claim but only those related to [his

17  services], the Arbitration Agreement is not substantively unconscionable."); *In re Jiffy Lube Int'l,*

18  *Inc.* (S.D.Cal. 2012) 847 F.Supp.2d 1253u, 1263 ("tort action arising from a completely separate

19  incident could not be forced into arbitration—such a clause would clearly be unconscionable"). The

20  arbitration clause is unenforceable for this reason alone.

21        <u>Second</u>, and relatedly, the January 2021 and February 2023 arbitration agreements are

22  substantively unconscionable due to their infinite durations. Not only do they reach into the past

23  for "claims that accrued before you entered into this Agreement," but they also purportedly "survive

24  termination of this Agreement." ECF 34-2; ECF 34-9. The Second District Court of Appeals

25  recently affirmed that an arbitration agreement that "survived indefinitely following [an

26  employee's] termination" is substantively unconscionable. *Cook v. University of Southern*

27  *California* (2024) 102 Cal.App.5th 312, 325-26.

28

Third, the January 2021 and February 2023 agreements are substantively unconscionable because they allow Defendants to make unilateral modifications. *See, e.g.*, *Ingalls v. Spotify USA, Inc.* (N.D.Cal. Nov. 14, 2016) 2016 U.S.Dist.LEXIS 157384, at *16. (finding unconscionability because "[defendant] retained the right to unilaterally change the terms of the arbitration agreement"). Both the January 2021 and February 2023 agreements state that Defendants "may update these Terms from time to time, so please review them frequently" and "Tile will not enforce material changes to [the arbitration section] in the future unless you expressly agree to them." ECF 34-2; ECF 34-9. The Terms do not explain how, when, or where the Terms will be updated, but apparently contemplate that they will "become effective 30 days after posting on tile.com." Such one-sided provisions that "grossly favor" party seeking to compel arbitration are substantively unconscionable because they "proscribe[] [the] ability to consider and negotiate the terms [of the agreement]."

Fourth, the January 2021 and February 2023 agreements are substantively unconscionable because they attempt to keep all information relating to any arbitration confidential through an incoherent incorporation of some undefined set of AAA rules.[13] Courts have found that such attempts to maintain confidentiality "favor [the] company over an individual, because the various attorneys representing individual plaintiffs cannot learn from the full body of arbitration, while the limited set of attorneys representing the company can." *E.g.*, *Ingalls v. Spotify USA, Inc.* (N.D.Cal. Nov. 14, 2016) 2016 U.S.Dist.LEXIS 157384, at *16, *18. "Thus, [Defendants have] placed [themselves] in a far superior legal posture by ensuring that none of [their] potential opponents have access to precedent while [Defendants accumulate] a wealth of knowledge on how to negotiate the terms of [their] own unilaterally crafted contract." *Ting v. AT&T* (9th Cir. 2003) 319 F.3d 1126, 1152. Even worse, "the unavailability of arbitral decisions may prevent potential plaintiffs from obtaining the information needed to build a case of intentional misconduct or unlawful discrimination against [Defendants]." *Id.* As discussed below, the fact that the confidential terms

---

[13] Depending on whether one references the consumer versus the commercial rules or the active versus the archived rules cited in Defendants' Motion (at fn. 3), the AAA Rules provide that they "will keep information about the arbitration private …"; that "[c]onsent awards will not be made available to the public …"; and that "[u]nless otherwise required …, the [AAA] shall keep confidential all matters relating to the arbitration or the award."

are not expressed within the four corners of the arbitration agreements, but instead are hidden across numerous other undisclosed documents on the AAA website, only increases their unconscionability.

### 2. The Agreement Has A High Degree of Procedural Unconscionability.

Procedural unconscionability encompasses oppression and unfair surprise. *Ingalls v. Spotify USA, Inc*. (N.D.Cal. Nov. 14, 2016) 2016 U.S.Dist.LEXIS 157384, at *13. Oppression is present when there is "an inequality of bargaining power that results in no real negotiation," and unfair surprise is present when the terms of an agreement are hidden or obfuscated. *Id*. Defendants' January 2021 and February 2023 arbitration agreements suffer from both defects.

First, Defendants' agreement is a mandatory adhesion contract, which unequivocally establishes some degree of procedural unconscionability due to zero bargaining power. *Ingalls* at 14; *Love v. Equifax Info. Servs., LLC* (C.D.Cal. Oct. 30, 2023) 2023 U.S.Dist.LEXIS 197388, at *9. This inequality is further apparent from the very first sentence of the January 2021 and February 2023 Terms, both of which state as follows:

> By accessing or using the applications and services owned or operated by Tile, Inc., whether through our software app(s) or website (our "Services"), you are accepting and agreeing to be bound by the terms and conditions set forth below (these "Terms").

Thus, according to the Terms, even if Plaintiffs had never created Tile accounts at all, they would nonetheless be bound by the arbitration agreement, merely as a result of accessing Tile's website or mobile app and *prior* to clicking the "Sign Up" buttons. *See* ECF 34 ¶¶ 6, 14. This language clearly conflicts with the language Defendants rely on to show contract formation. *See* ECF 34-1; ECF 34-8.[14]

Second, although Defendants contend that the January 2021 and February 2023 Terms delegated the issue of arbitrability to AAA, their attempted method of doing so was confusing and effectively hidden. Language delegating the issue of arbitrability appears *nowhere* within the four

---

[14] These circumstances are even more outrageous, inequitable, and confusing when one considers that terminating a Tile account; terminating auto-renewal subscriptions (such as Broad's "Premium" subscription) and related billing, and efforts to find a Tile tracker planted by a stalker through the use of Tile's "Scan and Secure" feature all require use and access of Defendants' website or mobile app (and thereby purportedly constitute acceptance).

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO COMPEL ARBITRATION CASE NO. 3:23-CV-04119-RFL.**

corners of Defendants' January 2021 or February 2023 agreements. Instead, the agreements simply refer the reader to the AAA website to sort it out on their own. Notably, the Terms state, "The arbitration shall be administered by the [AAA] under its Commercial Arbitration Rules and, where appropriate, the AAA's Supplementary Procedures for Consumer Related Disputes ('AAA Consumer Rules'), both of which are available at the AAA website www.adr.org." ECF 34-2; ECF 34-9. Even if a consumer does venture to the AAA website, the average consumer (including Plaintiffs Broad and Doe) has no way to determine which set of rules may be "appropriate" or to what degree one set of rules supplements another. Broad Decl. ¶ 16; Doe Decl. ¶12.

Third, the January 2021 and February 2023 arbitration agreements are procedurally unconscionable because they are confusing and result in unfair surprise. *See Milliner v. Bock Evans Fin. Counsel, Ltd*. (N.D.Cal. 2015) 114 F. Supp. 3d 871, 879 ("the language of the arbitration provision is confusing and conflicting, which calls into question the level of notice provided to Plaintiffs"); *O'Donovan v. Cashcall, Inc.* (N.D.Cal. June 24, 2009) 2009 U.S.Dist.LEXIS 53895, at *20. Among other points of confusion, AAA discontinued its so-called "Supplementary Procedures for Consumer Related Disputes" in 2014. *Ingalls v. Spotify USA, Inc.* (N.D.Cal. Nov. 14, 2016) 2016 U.S.Dist.LEXIS 157384, at *6. Thus, anyone trying to decipher either the January 2021 or February 2023 agreement is placed in the daunting position of wading through the myriad sets of rules on the AAA website to determine whether the active or the archived rules apply and whether and to what degree any "commercial" versus "consumer" rules may apply. Defendants themselves are apparently confused by which AAA rules apply to Plaintiffs' discrete claims, as they cite (Motion at fn. 3) "all versions" of the AAA Rules "potentially at issue," including the consumer, commercial, active, and archived (amongst other) rules.[15] If Defendants wanted to delegate the issue of arbitrability, they could have simply included express language to that effect.

**D.  There is no basis for a mandatory or discretionary stay, and none is warranted.**

In the event that the Court grants Tile's Motion, it should not stay the remainder of this action. As a threshold matter, Amazon remains a defendant in the litigation, and *no* Plaintiff has

---

[15] As discussed in detail at fn. 11 above, Defendants cite to over 200 sets of Rules on the AAA website.

agreed to arbitrate her claims against that company. Further, even if the Court were to compel Broad's or Doe's claims against Tile to arbitration, Tile nonetheless concedes that Plaintiffs Shannon and Stephanie Ireland Gordy are not governed by any arbitration agreement. Thus, regardless of any outcome in an arbitration, it is guaranteed that 100% of the parties will continue to litigate the majority of this case in this Court. The authority relied upon by Tile does not compel a different result.

When only some—as opposed to all—parties in a litigation have claims that are subject to an arbitration agreement, a "court may stay the litigation as a matter of discretion to await the outcome of the pending arbitration." *Cal. Crane Sch., Inc. v. Google LLC*, 621 F. Supp. 3d 1024, 1033 (N.D. Cal. 2022). When exercising its discretionary power to stay, a court must weigh the "competing interests which will be affected by the granting or refusal to grant a stay," including "the possible damage which may result from the granting of a stay, the hardship or inequity which a party may suffer in being required to go forward, and the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay." *Id.* (quoting *Lockyer v. Mirant Corp.*, 398 F.3d 1098, 1110 (9th Cir. 2005)). Importantly, the Ninth Circuit has expressed "a preference for proceeding with the non-arbitrable claims when feasible." *Gray v. SEIU*, 2020 U.S. Dist. LEXIS 259980, at *13 (N.D. Cal. Aug. 5, 2020) (citing *United Communs. Hub, Inc. v. Qwest Communs., Inc.*, 46 Fed. Appx. 412, 415 (9th Cir. 2002)).

This action arises from the design and marketing of a product that is used for profoundly dangerous purposes—the stalking of individuals—and a principal goal of the litigation is to seek classwide injunctive relief to remedy the dangers associated with this product. This, alone, differentiates the instant action from a typical consumer class action in which a court might consider whether or not to stay proceedings. The harm Plaintiffs seek to curtail is potentially deadly, and in all events implicates the health and safety of all members of the putative class. *Id.* Each day that Tile Trackers remain on the market in their current incarnation is another day that people around the country might be victimized—or worse—without their knowledge. Thus, evaluating "the possible damage which may result from the granting of a stay" weighs in favor of Plaintiffs.

1   *Lockyer,* 398 F.3d at 1110.

2          Tile argues that failure to stay this action might result in inconsistent rulings, but this is

3   wrong. As Judge Gilliam observed in a comparable context (with two defendants being accused of

4   violating identical laws, but only one defendant was subject to an arbitration provision with the

5   plaintiffs) the fact that an arbitrator might be required to make a conclusion on an issue of law that

6   the Court *also* will decide does not necessarily militate in favor of a stay.  621 F. Supp. 3d, 1033.

7   Instead, "in a case like [that], that redundancy seems inevitable." *Cal. Crane Sch., Inc.*, 621 F.

8   Supp. 3d at 1033. The real inquiry for this *Lockyer* factor is whether "the arbitrable claims

9   predominate, or [whether] the outcome of the nonarbitrable claims will depend upon the arbitrator's

10  decision." *Id.* (quoting *United Commc'ns Hub*, 46 Fed. Appx. at 415). Here, none of the arbitrator's

11  findings of fact or law in Plaintiff Broad's or Doe's arbitration against Tile would be binding on

12  this Court or otherwise have any impact on the non-arbitrable claims of any of the Plaintiffs.

13  Because each of the named Plaintiffs "will presumably need to eventually litigate the remaining

14  non-arbitrable claims irrespective of whatever happens in the arbitration, proceeding with this

15  lawsuit would not waste judicial resources." *Id*. To the contrary, staying the  non-arbitrable claims

16  would only serve to needlessly delay their resolution. "In these circumstances, where one alleged

17  co-[defendant] has an enforceable arbitration agreement and the other does not, the possibility that

18  parallel proceedings could produce inconsistent results is simply inevitable. Without more, that risk

19  does not require granting a stay." *Id*. at 1034.

20      **IV.    CONCLUSION**

21          Tile's Motion should be denied in its entirety. However, to the extent that the Court compels

22  any Plaintiff's claims or interpretive issues related to arbitrability or scope to an arbitrator, Plaintiffs

23  request that the Court nonetheless decline to stay the remainder of this case.

24  Dated:  July 12, 2024                **MILSTEIN JACKSON**
                                         **FAIRCHILD & WADE, LLP**
25
26                                       Gillian L. Wade, State Bar No. 229124
                                         gwade@mjfwlaw.com
27                                       Sara D. Avila, State Bar No. 263213
                                         savila@mjfwlaw.com
28                                       Marc A. Castaneda, State Bar No. 299001

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO COMPEL ARBITRATION
CASE NO. 3:23-CV-04119-RFL.**

mcastaneda@mjfwlaw.com
2450 Colorado Ave., Ste 100E
Santa Monica, CA 90404
Tel: (310) 396-9600
Fax: (310) 396-9635

**wh LAW**
David Slade
slade@wh.law
Brandon Haubert
brandon@wh.law
Jessica Hall
jessica@wh.law
1 Riverfront Place, Suite 745
North Little Rock, AR 72114
Telephone: 501.891.6000
Facsimile: 501.222.3027

*Attorneys for Plaintiffs individually
and on behalf of all others similarly situated*

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO COMPEL ARBITRATION
CASE NO. 3:23-CV-04119-RFL.**

1

## <u>CERTIFICATE OF SERVICE</u>

2    I hereby certify that a true and correct copy of the foregoing document was filed with the

3  Court and electronically served through the CM-ECF system which will send a notification of such

4  filing to all counsel of record.

5

6  Dated:  July 12, 2024

7

**MILSTEIN JACKSON
FAIRCHILD & WADE, LLP**

8

Gillian L. Wade, State Bar No. 229124
gwade@mjfwlaw.com
2450 Colorado Ave., Ste 100E
Santa Monica, CA 90404
Tel: (310) 396-9600
Fax: (310) 396-9635

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION TO COMPEL ARBITRATION
CASE NO. 3:23-CV-04119-RFL.**