UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHANNON IRELAND-GORDY, et al.,<br>Plaintiffs,<br>v.<br>TILE, INC., et al.,<br>Defendants. | Case No. 23-cv-04119-RFL<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO COMPEL ARBITRATION; GRANTING IN PART AND DENYING IN PART MOTION TO STAY**<br><br>Re: Dkt. Nos. 33, 35, 63, 64 |

Plaintiffs are stalking victims whose stalkers allegedly tracked them using hidden location devices designed and sold by Defendants Tile, Inc. and Life360 Inc. (collectively, "Tile"), in partnership with Defendant Amazon.com, Inc. Plaintiffs bring this putative class action alleging that Tile's trackers facilitated stalking. Plaintiffs contend that, although Tile was repeatedly warned that its trackers were being used by stalkers, Tile refused to adopt commonsense safety precautions that would allow stalking victims to detect, search for, or disable the trackers. Instead, Tile allegedly marketed its trackers in a way that subtly promoted their use for stalking and introduced features making a stalker's tracker even more difficult to disable.

Tile now moves to compel arbitration on the basis that two of the four Plaintiffs have their own Tile accounts and entered arbitration agreements in connection with their own accounts.[1] For the reasons explained below, the motion to compel arbitration is granted in part

[1] The parties' motions for leave to file supplemental authority are granted. (Dkt. Nos. 63, 64.)

and denied in part. The main thrust of Plaintiffs' complaint concerns their stalkers' Tile accounts, not their own. The motion to compel arbitration is denied as to those claims. Plaintiffs do, however, bring some claims based on their own Tile accounts, such as Plaintiff Melissa Broad's claim arising from an instance when her own Tile tracker was used to stalk her. The motion to compel arbitration is granted as to those claims based on Plaintiffs' own Tile accounts, and those claims are stayed pending arbitration. The motion to stay is denied as to the non-arbitrable claims, including the claims against Amazon, which will proceed to litigation.

## I. BACKGROUND

### A. Tile's Products and Services

The following is a recitation of the allegations of the First Amended Complaint, which must be taken as true at this stage of the proceedings.

Tile, a consumer electronics company, manufactures and sells a quarter-sized tracking device. (Dkt. No. 32 ("FAC") ¶¶ 6, 17, 27–29.) The real-time geolocation of a Tile tracker can be viewed on the user's phone through Tile's app. (*Id.* ¶¶ 5, 28.) Tile trackers are attachable to a user's belongings, like keys and bags, to help find or keep track of them. (*Id.* ¶ 27.)

These trackers were used by Plaintiffs' stalkers, who surreptitiously hid the devices in Plaintiffs' cars to trace their locations. (*Id.* ¶¶ 130, 152.) Plaintiffs fear that they continue to be at risk of being stalked by the use of Tile trackers. (*Id.* ¶ 169.) According to Plaintiffs, Tile has failed to implement adequate anti-stalking features to protect victims from being stalked via its trackers, including measures to detect, locate, or disable a stalker's tracker.

Since the release of the trackers in 2013, Tile has marketed them "both explicitly and implicitly for the purpose of tracking people," and specifically women, including on pornographic websites and with imagery of a Tile tracker being affixed to a bra. (*Id.* ¶¶ 6, 7, 45.) Viewers of Tile's ads on these sites have posted comments about using the trackers to "stalk women and commit sexual violence against them." (*Id.* ¶ 40.) Tile had been repeatedly warned for years that its trackers were being used by stalkers. (*E.g.*, *id.* ¶¶ 47–49.) Nevertheless, Tile waited until 2022, nine years after releasing its trackers, before implementing any type of

commonsense safety feature for stalking victims. (*Id.* ¶¶ 8, 50.) The feature, called "Scan and Secure," "require[s] the use of the Tile App" and enables an app user "to scan for unknown Tiles or Tile-enabled devices that may be traveling with them." (*Id.* ¶ 50.)

Plaintiffs allege that the defective nature of Tile's product was not cured by the introduction of the Scan and Secure feature. Principally, potential stalking victims do not have the ability to scan for Tile trackers unless they have downloaded Tile's app. (*Id.* ¶ 53.) Moreover, the Scan and Secure feature has various limitations that make it of limited value in mitigating the underlying dangers from the use of the trackers. For one, Scan and Secure works only by being manually initiated by a user on the app. (*Id.* ¶ 55.) So, a user "must decide when and where to scan for Tile Trackers—something a person being unknowingly tracked is unlikely to do." (*Id.*) For another, Scan and Secure lacks a "precision finding tool" to locate trackers. (*Id.* ¶ 56.) In addition, the feature's scanning process, which "can take up to 10 minutes of uninterrupted time to complete," may detect all nearby trackers. (*Id.* ¶ 57.) Scan and Secure thus does not "work if the user is just walking around in their home or in a crowded place, like on public transportation." (*Id.*) And, even if a tracker were found, Scan and Secure does not provide a user the option to disable it. (*Id.* ¶ 140.)

Plaintiffs further allege that Tile made its trackers even more dangerous in 2023 when Tile added an anti-theft feature that could disable a tracker from being detected by Scan and Secure. (*Id.* ¶ 60.) This feature, purportedly introduced to prevent a tracker from being located in stolen items, allows the owner of a tracker to make it "completely undetectable," subject to certain requirements. (*Id.*)

Based on the above allegations, Plaintiffs assert claims under California law for negligence, negligence per se, strict products liability, intrusion upon seclusion, unjust enrichment, as well as violations of California's Invasion of Privacy Act, constitutional right to privacy, and Unfair Competition Law. (*Id.* ¶¶ 12, 23.)

### B. Tile's Terms of Service

Tile moves to compel to arbitration as to two of the four named plaintiffs, Melissa Broad

and Jane Doe, claiming that they agreed to arbitrate their claims based on their assent to Tile's Terms of Service when they opened their own Tile accounts. (Dkt. No. 33.) Broad does not contest that she agreed to the Terms of Service in effect as of January 21, 2021 ("January 2021 Terms") when she signed up for her Tile account on June 11, 2021. (Dkt. No. 34 ¶¶ 5–7; *see* Dkt. No. 42 at 10–13.)[2] Doe likewise does not dispute that when she created her Tile account on July 6, 2023, she agreed to the Terms of Service effective on February 16, 2023 ("February 2023 Terms"). (Dkt. No. 34 ¶¶ 13–15; *see* Dkt. No. 42 at 10–13.)

The January 2021 and February 2023 Terms contain an identical arbitration agreement, which in relevant part provides:

> **Dispute Resolution by Binding Arbitration**
> . . .
> **A. Claims Covered by Arbitration**
> All disputes, claims or controversies arising out of or relating to this Agreement, any Tile product or service and its marketing, or the relationship between you and Tile ("Disputes") shall be determined exclusively by binding arbitration.

(Dkt. No. 34-2 at 18; Dkt. No. 34-9 at 22–23.)

Both the January 2021 and February 2023 Terms further provide that all disputes about the interpretation of the Terms and their validity will be handled by the courts exclusively, specifically the state and federal courts in this District:

> The exclusive jurisdiction for all disputes, claims or controversies arising out of or relating to these Terms or the breach, termination, enforcement, interpretation or validity thereof or the use of the Services or Content will be the state and federal courts located in the Northern District of California and you and Tile each waive any objection to jurisdiction and venue in such courts. If any part of these Terms is determined to be invalid or unenforceable by a court of competent jurisdiction, that provision will be enforced to the maximum extent permissible and the remaining provisions of these Terms will remain in full force and effect.

(Dkt. No. 34-2 at 17; Dkt. No. 34-9 at 21–22.)

At the same time, though, the Terms go on to incorporate the rules of the American Arbitration Association ("AAA"). Tile argues that the AAA rules contain a provision that

[2] Citations to page numbers refer to the ECF pagination.

overrides the venue provision above and instead delegates to the arbitrator alone all disputes over the interpretation and validity of the arbitration agreement. (*See* Dkt. No. 33 at 17 & n.3.) The Terms state:

> **Binding Arbitration**
> If you and Tile cannot resolve a Dispute informally, you or Tile may elect to have the Dispute finally and exclusively resolved by binding arbitration. Any election to arbitrate by one party shall be final and binding on the other. The arbitration shall be administered by the American Arbitration Association ("AAA") under its Commercial Arbitration Rules and, where appropriate, the AAA's Supplementary Procedures for Consumer Related Disputes ("AAA Consumer Rules"), both of which are available at the AAA website www.adr.org.

(Dkt. No. 34-2 at 19; Dkt. No. 34-9 at 23.) The January 2021 and the February 2023 Terms do not identify the applicable version of the incorporated AAA rules, nor are the rules attached to them. As the Terms suggest, in order to read the relevant AAA rules, a user must first access the AAA's website to view its Commercial Arbitration Rules and Supplementary Procedures for Consumer Related Disputes. (*Id.*) The user must then locate the Commercial Arbitration Rules on the AAA website. From the hyperlinks submitted by Tile (Dkt. No. 33 at 17 n.3), it appears that the user would find the relevant rule on page 13 of the 46-page document, which states:

> R-7. Jurisdiction
> (a) The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim.

AAA, *Commercial Arbitration Rules and Mediation Procedures* (effective Oct. 1, 2013), at 13, https://perma.cc/SGK5-Z5T4.[3]

Tile contends that, in addition to agreeing to these Terms, Broad and Doe agreed to its October 26, 2023 Terms ("October 2023 Terms"), which also contains an arbitration provision.

[3] Tile does not specify which version of the AAA's "Commercial Arbitration Rules" and the "Supplementary Procedures for Consumer Related Disputes" incorporated into the January 2021 and February 2023 Terms applies here, instead offering two hyperlinks to the AAA website that leads to all of AAA's archived and active rules. (Dkt. No. 33 at 12 n.3.) In any event, Tile concedes that "all versions of the AAA Commercial and Consumer Arbitration Rules potentially at issue include the language" as quoted above. (*Id.*)

(Dkt. No. 34 ¶¶ 9, 11–12, 16–18; Dkt. No. 34-5 at 19–20.) Tile maintains that it sent all of its accountholders, including Broad and Doe, the updated Terms in an email on October 26, 2023. (Dkt. No. 34 ¶¶ 10–11, 17.) The body of that email, which Tile submits as evidence, began with a large header, "Updated Terms of Service and Privacy Policy," and provided a hyperlink that connects to the October 2023 Terms. (Dkt. No. 34 ¶ 11; Dkt. No. 34-7 at 2–3.) That email did not require users to take any action, such as clicking on a link or sending a return receipt, to acknowledge that they had received the email or affirmatively communicate their assent to the new Terms. Instead, the email advised users that "[i]f you continue to use any of our apps, or access our websites (other than to read the new terms) on or after November 26, 2023, you are agreeing to the new Terms of Service." (Dkt. No. 34 ¶ 11; Dkt. No. 34-7 at 3.) The undisputed evidence is that Broad and Doe did not see the email at issue when it was sent. (Dkt. No. 42-1 ¶ 14; Dkt. No. 42-2 ¶ 10.) However, according to Tile, Broad and Doe continued to use the Tile app following this update to the Terms. (Dkt. No. 34 ¶¶ 12, 18.)

## II. LEGAL STANDARD

The Federal Arbitration Act ("FAA") provides that an agreement to arbitrate disputes arising from "a contract evidencing a transaction involving commerce" shall be "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Under the FAA, district courts are required "to compel arbitration of claims covered by an enforceable arbitration agreement." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022) (citing 9 U.S.C. § 3). The district court's role under the FAA is limited "to determining whether a valid arbitration agreement exists and, if so, whether the agreement encompasses the dispute at issue." *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004). The burden to make those showings rests on the party seeking to compel arbitration. *Ashbey v. Archstone Prop. Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015).

The summary judgment standard of Federal Rule of Civil Procedure 56 applies to motions to compel arbitration. *See Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir.

2021). Under that standard of review, "the party opposing arbitration receives the benefit of any reasonable doubts and the court draws reasonable inferences in that party's favor, and only when no genuine disputes of material fact surround the arbitration agreement's existence and applicability may the court compel arbitration." *Hicks v. Utiliquest, LLC,* No. 2:24-CV-00911, 2024 WL 3011242, at *2 (E.D. Cal. June 11, 2024) (cleaned up).

## III. DISCUSSION

### A. Whether Plaintiffs Agreed to the October 2023 Terms of Service

A foundational principle under the FAA is that "arbitration is a matter of contract," so "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 565 (9th Cir. 2014) (cleaned up). It is also well-settled that the issues reserved to courts "always include" whether an agreement to arbitrate was formed. *See Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1030 (9th Cir. 2022) (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010)). "In determining whether the parties have agreed to arbitrate a particular dispute, federal courts apply state-law principles of contract formation." *Berman*, 30 F.4th at 855. To form a contract under California law, which the parties agree governs, there "must be actual or constructive notice of the agreement and the parties must manifest mutual assent." *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 512–13 (9th Cir. 2023). While parties may manifest assent through their conduct, "[t]he conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents." *Berman*, 30 F.4th at 855 (quoting Restatement (Second) of Contracts § 19(2) (1981)).

There is no dispute that *an* agreement to arbitrate was formed in this case. The parties instead disagree about which version of the Terms of Service, and therefore which arbitration provision, applies. Plaintiffs Broad and Doe do not dispute that they are bound by the January 2021 and February 2023 Terms, respectively, which they agreed to when creating their Tile accounts and contain identical arbitration provisions. (*See* Dkt. No. 42 at 10–13; Dkt. No. 34

¶¶ 5–7, 13–15.) But Tile argues that Plaintiffs also later agreed to the October 2023 version of the Terms, including its broader arbitration agreement. In support, Tile submits evidence of an email sent to Tile accountholders notifying them of an "Updated Terms of Service." (Dkt. No. 34 ¶ 11; Dkt. No. 34-7.) That email provided a hyperlink to the October 2023 Terms and informed users that "[if] you continue to use any of our apps, or access our websites (other than to read the new terms) on or after November 26, 2023, you are agreeing to the new Terms of Service." (Dkt. No. 34 ¶ 11; Dkt. No. 34-7 at 3.) Thus, Tile's argument goes, Plaintiffs assented to the October 2023 Terms by continuing to use the Tile app after being emailed a notice of the update.

"Unless the website operator can show that a consumer has actual knowledge of the agreement, an enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Berman*, 30 F.4th at 856. As the party seeking arbitration, Tile bears the burden to make those showings. *See Jackson v. Amazon.com, Inc.*, 65 F.4th 1093, 1099 (9th Cir. 2023). "[T]he onus must be on website owners to put users on notice of the terms to which they wish to bind consumers." *Id.* at 1100 (citation omitted).

Tile presents no evidence that Plaintiffs had actual knowledge of the October 2023 Terms. Nor has Tile met its burden to show that Plaintiffs were on inquiry notice of those Terms based on its email. Even assuming Tile's email provided reasonably conspicuous notice of the October 2023 Terms, there is insufficient evidence that Plaintiffs unambiguously manifested assent to them. Courts have declined to adopt a per se rule finding that inquiry notice is satisfied "in any instance in which a defendant sends an email giving notice of updated terms and a plaintiff continues to use the defendant's service." *See, e.g.*, *Sadlock v. Walt Disney Co.*, No. 22 Civ. 9155 (EMC), 2023 WL 4869245 at *13 (N.D. Cal. July 31, 2023); *Sifuentes v. Dropbox, Inc.*, No. 20-CV-07908-HSG, 2022 WL 2673080, at *4 (N.D. Cal. June 29, 2022). But that is

what Tile essentially urges here. Both Broad and Doe attest in declarations that they "never knew that Tile sent a notice that it updated its Terms of Service in October 2023." (Dkt. No. 42-1 ¶ 14; Dkt. No. 42-2 ¶ 10.)[4] Doe denies ever seeing the email. (Dkt. No. 42-2 ¶ 10.) Broad denies seeing it until January 2024, after the filing of this lawsuit, when she searched for it and found it in her spam folder. (Dkt. No. 42-2 ¶ 14.)[5] Tile provides no evidence to the contrary. *See Sifuentes*, 2022 WL 2673080, at *4 (finding no inquiry notice based on plaintiff's continued use of service after defendant sent a mass email regarding updated terms where no evidence that "Defendant ever tracked whether Plaintiff had opened its email"); *cf. Sadlock*, 2023 WL 4869245 at *12–13 (finding inquiry notice where the plaintiff did "*not* contend[] he did not receive or see" the change-of-terms email but recognizing "potential problems with a defendant relying on notice via email," including whether there is evidence that "the email [was] in fact received, or was the email shunted into a spam folder" or "that the plaintiff actually saw the email" (emphasis added)).

Absent such evidence, Tile has not met its burden to show Plaintiffs' unambiguous manifestation of assent to the October 2023 Terms merely by their continued use of the Tile app. *See Berman*, 30 F.4th at 856. Beyond its email notice, Tile provides no evidence demonstrating, for example, that Plaintiffs "could not use the service until [they] indicated [their] assent" to the October 2023 Terms, or that Plaintiffs "would have been advised of new terms and conditions while using [Tile's] services." *See Sifuentes*, 2022 WL 2673080, at *4 (N.D. Cal. June 29, 2022) (finding no inquiry notice on similar facts); *see also Pliszka v. Axos Bank*, No. 24-CV-445, 2024 WL 4194338, at *6 (S.D. Cal. Sept. 13, 2024) (finding no assent despite the plaintiff's continued

[4] Plaintiffs' motion to file Doe's declaration under seal (Dkt. No. 43), which seeks redaction of her name, is granted. (*See* Dkt. No. 58 (granting Doe's motion to proceed under a pseudonym).) The superseded motion regarding the same (Dkt. No. 39) is terminated as moot.

[5] Tile does not argue that Broad agreed to arbitrate by viewing the notice, which does not mention this lawsuit, in her spam folder in January 2024 after suit was filed. *See Shanahan v. IXL Learning, Inc.*, No. 24-CV-02724-RFL, 2024 WL 4658276, at *4 (N.D. Cal. Nov. 1, 2024) (arguments never raised in briefing are waived); *see also Kleiser v. Chavez*, 55 F.4th 782, 784 (9th Cir. 2022) (arguments not made before the district court are waived).

use of account after opening an e-mail providing notice of updated terms because "absent evidence that Plaintiff acknowledged receiving the change-of-terms e-mail, the Court declines to conclude that Plaintiff manifested his intent to use silence as a means of acceptance").[6]

Therefore, on this record, Tile fails to show that Plaintiffs unambiguously manifested their assent to the October 2023 Terms. But as previously discussed, it is uncontested that Plaintiffs are bound by the arbitration provisions in the January 2021 and February 2023 Terms.

### B. Whether Plaintiffs Agreed to Arbitrate Arbitrability in the January 2021 and February 2023 Terms of Service

Having established that an agreement to arbitrate exists, the next question is who decides whether Tile may enforce this agreement against Plaintiffs. Tile argues that pursuant to the January 2021 and February 2023 Terms, which are substantively identical for purposes of this motion, Plaintiffs agreed that an arbitrator, rather than a court, would resolve any disputes about the enforcement of the arbitration agreement.

"Arbitration clauses may delegate to the arbitrator, for determination in the arbitration, certain threshold issues about the agreement," including "whether the parties have agreed to arbitrate" or "whether the arbitration agreement covers a particular controversy." *Fli-Lo Falcon, LLC v. Amazon.com, Inc.*, 97 F.4th 1190, 1199 (9th Cir. 2024) (cleaned up). Courts presume that parties intend courts, not arbitrators, to decide these gateway questions of arbitrability, "unless the parties *clearly and unmistakably provide otherwise*." *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1072 (9th Cir. 2013) (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)); *see also Cape Flattery Ltd. v. Titan Mar., LLC*, 647 F.3d 914, 920 (9th Cir. 2011) ("[T]he usual presumption that exists in favor of the arbitrability of merits-based disputes is replaced by a presumption *against* the arbitrability of arbitrability.").

---

[6] *Matera v. Google Inc.*, No. 15-CV-04062-LHK, 2016 WL 5339806 (N.D. Cal. Sept. 23, 2016), is not to the contrary. That case relied on the plaintiffs' affirmative assent to a prior version of the terms of service advising them to check regularly for updated terms, which Tile does not argue applies here. *Id.* at *17. Also, that case predates the Ninth Circuit's refusal to enforce terms of service that place the burden on consumers to monitor an agreement for changes. *See Jackson*, 65 F.4th at 1100–01.

In Tile's view, because the operative Terms expressly incorporate the AAA's rules, the parties clearly and unmistakably delegated questions of arbitrability to the arbitrator. (*See* Dkt. No. 34-2 at 19; Dkt. No. 34-9 at 23.) Tile is correct that incorporation of the AAA rules in an arbitration agreement can constitute clear and unmistakable evidence that the parties agreed to arbitrate arbitrability. *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015). At the same time, "[a]lthough parties are free to authorize arbitrators to resolve" arbitrability, courts "will not conclude that they have done so based on 'silence or ambiguity' in their agreement, because 'doing so might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator, would decide.'" *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 186 (2019) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 945 (1995)) (emphasis omitted). Thus, while incorporating the AAA rules "may on its own constitute 'clear and unmistakable evidence' of the parties' intent to delegate arbitrability issues," it may not where the arbitration agreement "leaves open the possibility that a court could decide such issues too." *In re Tesla Advanced Driver Assistance Sys. Litig.*, No. 22-CV-05240-HSG, 2023 WL 6391477, at *6 (N.D. Cal. Sept. 30, 2023) (no clear and unmistakable evidence of delegation where "there is an inherent tension in the arbitration agreements").

Such is the case here. On page 13 of the 46-page October 2013 Commercial Arbitration Rules, the AAA rules include a provision stating that the "arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." AAA, *Commercial Arbitration Rules and Mediation Procedures* (effective Oct. 1, 2013), at 13, https://perma.cc/SGK5-Z5T4.[7] By its plain terms, that jurisdictional rule states only that arbitrators have "the power" to decide questions of arbitrability, but it does not expressly give them the *exclusive* power to do so. Nor does any other AAA rule (and Tile points to none) provide that the arbitrator, to the exclusion of the courts, must resolve arbitrability disputes.

---

[7] As previously noted, Tile concedes that "all versions" of the AAA rules "potentially at issue" in this case include this provision as quoted. (Dkt. No. 33 at 17 n.3.)

Certainly, the AAA rule provides a clear and unmistakable delegation of power to an arbitrator to decide arbitrability if the parties' arbitration agreement is otherwise silent as to who decides the issue. *See Brennan*, 796 F.3d at 1130; *In re Tesla*, 2023 WL 6391477, at *5–6. At the same time, the AAA rule does not *preclude* the parties from allowing or even requiring the courts to decide arbitrability, if they chose to do so in their arbitration agreement. As Tile's counsel observed at oral argument, "it wouldn't have made sense for the AAA to put into its rules, you know, the sole and exclusive right to address questions of arbitrability, scope, [and] unconscionability shall lie with the arbitrator" because that would have "potentially created conflict with the default rule" that courts determine arbitrability. (Dkt. No. 60 at 24:20–25:2.) By phrasing its rule in an open-ended way, the AAA provided the parties the flexibility to provide for concurrent, or even exclusive, jurisdiction in the courts on matters of arbitrability.

That is exactly what Tile has done here. Specifically, the Terms include the following venue provision: "The *exclusive jurisdiction* for all disputes, claims or controversies arising out of or relating to these Terms," which is defined to include the arbitration agreement, "or the . . . *enforcement, interpretation or validity* thereof . . . will be the state and federal courts located in the Northern District of California." (Dkt. No. 34-2 at 17; Dkt. No. 34-9 at 21 (emphasis added).) That provision goes on to discuss the consequences if "any part of these Terms is determined to be invalid or unenforceable by a court." (*Id.*) At the very least, this provision contradicts the AAA's grant of authority to the arbitrator, and renders any purported delegation of arbitrability ambiguous. Indeed, the most reasonable interpretation is that the parties agreed to have "all disputes" relating to the "enforcement, interpretation or validity" of the Terms, including the arbitration provision, be decided exclusively by courts in this District, despite the arbitrator's usual authority to decide those issues under the AAA rules absent such a provision. (*Id.*)

*Mohamed v. Uber Technologies, Inc.*, 848 F.3d 1201 (9th Cir. 2016), is not to the contrary. There, the arbitration agreement contained its own delegation clause requiring "disputes to be resolved only by an arbitrator through final and binding arbitration and not by

way of court or jury trial," which "include[d] without limitation disputes arising out of or relating to interpretation or application of this Arbitration Provision, including the enforceability, revocability or validity of the Arbitration Provision or any portion of the Arbitration Provision." *Id.* at 1207–08. That clause, the Ninth Circuit held, constituted clear and unmistakable evidence of the parties' intent to delegate questions of arbitrability, even though the arbitration agreement also contained a venue provision granting "exclusive jurisdiction" to state and federal courts in San Francisco over "any disputes, actions, claims or causes of action arising out of or in connection with this Agreement." *Id.* at 1209 (citation omitted). The court concluded that the delegation clause remained clear and unmistakable despite the presence of the venue provision because any conflicts between them were "artificial." *Id.*

Here, unlike in *Mohamed*, the conflict between the AAA rule and the venue provision is direct and unavoidable. Crucially, in *Mohamed*, the venue provision only conferred courts with exclusive jurisdiction over "any disputes, actions, claims or causes of action." *Id.* (citation omitted). It did not reserve the interpretation or validity of the arbitration agreement to courts. *Cf. Meadows v. Dickey's Barbecue Rests. Inc.*, 144 F. Supp. 3d 1069, 1077 (N.D. Cal. 2015) (agreement sending "all disputes" to arbitrator did not delegate arbitrability to arbitrator). By contrast, the venue provision in this case explicitly grants courts exclusive jurisdiction over not only "all disputes, claims or controversies arising out of or relating to these Terms," but also their "interpretation or validity." (Dkt. No. 34-2 at 17; Dkt. No. 34-9 at 21.) Thus, unlike in *Mohamed*, the venue provision here is on a direct collision course with any attempt to read the AAA's rules as delegating arbitrability exclusively to the arbitrator. At best, that collision renders any delegation to the arbitrator ambiguous, rather than clear and unmistakable.

Also, *Mohamed* did not confront the issue of how to reconcile the AAA's open-ended grant of authority to the arbitrator with an exclusive venue provision. The delegation clause in *Mohamed* unequivocally required "disputes to be resolved *only* by an arbitrator." 848 F.3d at 1207 (emphasis added). That phrasing, of course, does not accommodate concurrent or exclusive jurisdiction in the courts. Accordingly, the delegation clause in *Mohamed* could only

be reconciled with its venue provision if the venue provision was interpreted to be limited to the court's adjudication of claims to "enforce an arbitration agreement" or "other claims that were not covered by the arbitration agreement," as the Ninth Circuit ultimately did. *Id.* at 1209. By contrast, the AAA's open-ended grant of authority does not present that type of "unambiguous statement" giving the arbitrator exclusive jurisdiction. *Id.*

Accordingly, because the Terms do not clearly and unmistakably delegate questions of arbitrability to an arbitrator, it is for the Court to resolve Plaintiffs' challenge to the enforceability of the arbitration agreement.[8]

### C. Whether the Arbitration Agreement Is Enforceable

Plaintiffs contend that the arbitration agreement cannot be enforced because it is unconscionable under California law. A court "may declare an arbitration agreement unenforceable" where a generally applicable state contract defense applies, including unconscionability. *Heckman v. Live Nation Ent., Inc.*, 120 F.4th 670, 680 (9th Cir. 2024). "Under California law, '[a] contract is unconscionable if one of the parties lacked a meaningful choice in deciding whether to agree and the contract contains terms that are unreasonably favorable to the other party.'" *Ronderos v. USF Reddaway, Inc.*, 114 F.4th 1080, 1089 (9th Cir. 2024) (quoting *OTO, L.L.C. v. Kho*, 447 P.3d 680, 689 (Cal. 2019)); *see also* Cal. Civ. Code § 1670.5(a). To establish this defense, the party asserting it must demonstrate both substantive and procedural unconscionability, though they "need not be present in the same degree." *Ronderos*, 114 F.4th at 1089 (quoting *OTO*, 447 P.3d at 690). Instead, California law follows a sliding scale approach under which "[t]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable," and vice versa. *Id.* (quoting *OTO*, 447 P.3d at 690).

---

[8] In light of this conclusion, the Court need not reach Plaintiffs' argument that whether incorporation of the AAA rules constitutes clear and unmistakable evidence of delegation depends on the sophistication of the parties. *See Patrick v. Running Warehouse, LLC*, 93 F.4th 468, 481 (9th Cir. 2024) (recognizing that the Ninth Circuit has not yet decided the issue and declining to do so).

Here, Tile's arbitration agreement with Plaintiffs provides in pertinent part: "All disputes, claims or controversies arising out of or relating to this Agreement, any Tile product or service and its marketing, or the relationship between you and Tile . . . shall be determined exclusively by binding arbitration." (Dkt. No. 34-2 at 18; Dkt. No. 34-9 at 22–23.) Enforcement of that arbitration agreement would be both substantively and procedurally unconscionable to the extent it compels arbitration of claims that have nothing to do with Plaintiffs' contract with Tile or Tile's service on Plaintiffs' accounts. Just as a customer would not waive their right to bring suit over being hit by an Amazon delivery truck because they happened to have an Amazon account with an arbitration provision, Plaintiffs did not waive their right to sue Tile over a third party's separate use of Tile products or services to engage in stalking or other crimes against Plaintiffs. However, insofar as the claims concern Plaintiffs' own Tile accounts, Plaintiffs have not shown that the arbitration agreement is unconscionable.

**1. Claims Regarding Third Party's Use of Tile**

**a. Substantive Unconscionability**

Substantive unconscionability "pertains to the fairness of an agreement's actual terms." *Heckman*, 120 F.4th at 683 (quoting *OTO*, 447 P.3d at 690). "When determining substantive fairness, the relevant question is whether one party used their superior bargaining position to impose terms that are overly harsh, unduly oppressive, or unfairly one-sided." *Ronderos*, 114 F.4th at 1094 (cleaned up).

In this case, there is a high degree of substantive unconscionability to the extent the arbitration agreement purportedly encompasses claims relating to third-party conduct using Tile's products or services for stalking and other criminal purposes. Arbitration agreements have been found to be unconscionable where their scope is "overly broad . . . as to the subject matter [they] purport[] to cover." *See Thomas v. Cricket Wireless, LLC*, 506 F. Supp. 3d 891, 903–04 (N.D. Cal. 2020) (cleaned up) (collecting cases). "Even agreements traditionally classified as broad because they cover all disputes 'arising out of' or 'relating to' the underlying agreement evidences only the parties' intent to have arbitration serve as the primary recourse for disputes

connected to the agreement containing the clause." *Id.* at 904 (cleaned up). Consequently, "[w]hile courts in this district regularly enforce arbitration clauses with respect to claims that arise directly out of or are somehow connected to the service agreement containing the arbitration clauses," they have refused to do so for claims "that are wholly divorced from the underlying service contract." *See id.*

Similarly, it would be "overly harsh, unduly oppressive, or unfairly one-sided" to enforce an arbitration provision in Plaintiffs' consumer contracts as applying to claims about a third party's use of Tile products or services to stalk Plaintiffs. *See Ronderos*, 114 F.4th at 1094 (citation omitted). Such claims are untethered to Plaintiffs' contracts with Tile, bearing no relation to either Plaintiffs' own use of a Tile tracker or the services provided to Plaintiffs as part of their Tile accounts. *Cf. Thomas*, 506 F. Supp. 3d at 906 (declining to enforce as unconscionable an overly broad arbitration clause "against a plaintiff that has raised claims completely untethered to underlying contract that contains it"). While Tile points to other cases in which similarly broad arbitration provisions were enforced, none of them considered the unconscionability of enforcing such a provision to cover a third party's use of the defendant's products or services. *See Yeh v. Tesla, Inc.*, 2023 WL 6795414, at *6–7 (N.D. Cal. Oct. 12, 2023); *Swift v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 915 (N.D. Cal. 2011); *Guadagno v. E*Trade Bank*, 592 F. Supp. 2d 1263, 1271–72 (C.D. Cal. 2008).[9]

Tile's own reading of the provision to cover claims regarding a third party's use of Tile products or services only proves its overbreadth. Tile argues that such claims arise from the same subject matter as Plaintiffs' consumer contracts because they relate to a Tile product or service. But it is difficult to conceive of a consumer's claim against Tile that would not involve the subject matter of its product or services in some way. *Cf. Thomas*, 506 F. Supp. 3d at 904

[9] *In re TFT-LCD (Flat Panel) Antitrust Litigation*, cited by Tile at oral argument, is likewise inapposite. No. C 09-05609 SI, 2011 WL 2650689 (N.D. Cal. July 6, 2011). There, the party opposing arbitration did "not assert[] any of the more commonly proffered reasons for seeking non-enforcement of an arbitration agreement, such as . . . unconscionability." *Id.* at *4. Rather, the court simply considered whether the arbitration clause should be interpreted to govern the claims at issue. *Id.*

("[R]eading an arbitration provision as applying to any and every claim between the parties . . . with no limiting principle would render the clause impermissibly broad, and therefore inoperable." (quoting *Esparza v. SmartPay Leasing, Inc.*, No. C 17-03421 WHA, 2017 WL 4390182, at *3 (N.D. Cal. Oct. 3, 2017), *aff'd*, 765 F. App'x 218 (9th Cir. 2019))). And, more fundamentally, Tile's argument ignores the animating principle behind the line of cases cited above: that no reasonable consumer expects that an arbitration provision would cover claims that have nothing to do with the service agreement containing the arbitration clause. *See id.*; *see also Revitch v. DIRECTV, LLC*, 977 F.3d 713, 720–21 (9th Cir. 2020) (a consumer's "reasonable expectations" do not include arbitrating claims that do not "bear any material relation to the services provided under the initial agreement").

**b. Procedural Unconscionability**

Procedural unconscionability "addresses the circumstances of contract negotiation and formation, focusing on oppression or surprise due to unequal bargaining power." *OTO*, 447 P.3d at 690 (citation omitted). A procedural unconscionability analysis "begins with an inquiry into whether the contract is one of adhesion, defined as a standardized contract, imposed upon the subscribing party" by the party with superior bargaining strength "without an opportunity to negotiate the terms." *Heckman*, 120 F.4th at 681 (cleaned up).

It is undisputed that the standard-form Terms of Service agreements, drafted by Tile and offered to consumers on a take-it-or-leave-it basis, are adhesion contracts. *See id.* at 681–82. Because the arbitration agreement is part of a contract of adhesion, it is therefore at least procedurally unconscionable to a low degree, even assuming no other oppression or surprise exists beyond that inherent to any adhesion contract. *See Serpa v. Cal. Sur. Investigations, Inc.*, 155 Cal. Rptr. 3d 506, 512 (Ct. App. 2013) ("When, as here, there is no other indication of oppression or surprise, the degree of procedural unconscionability of an adhesion agreement is low." (cleaned up)); *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1261–62 (9th Cir. 2017) ("[T]he adhesive nature of a contract, without more, would give rise to a low degree of procedural unconscionability at most."). As such, given the agreement's high degree of

substantive unconscionability, its low level of procedural unconscionability as an adhesive contract alone suffices to render it unenforceable. *See Alberto v. Cambrian Homecare*, 308 Cal. Rptr. 3d 230, 237 (Ct. App. 2023) (an agreement with "a low degree of procedural unconscionability due to [its] adhesive nature" is rendered unconscionable if found to have "a high degree of substantive unconscionability"); *Ronderos*, 114 F.4th at 1099 (an agreement with a high degree of substantive unconscionability is unenforceable "[e]ven if the procedural unconscionability were only minimal").

In any event, the arbitration agreement evinces more than a minimal degree of procedural unconscionability because it contains a strong element of surprise. *See Ronderos*, 114 F.4th at 1090. "Surprise is a 'function of the disappointed reasonable expectations of the weaker party.'" *Heckman*, 120 F.4th at 682 (quoting *Harper v. Ultimo*, 7 Cal. Rptr. 3d 418, 422 (Ct. App. 2003)); *see also Morris v. Redwood Empire Bancorp*, 27 Cal. Rptr. 3d 797, 808 (Ct. App. 2005) ("Procedural surprise focuses on whether the challenged term is . . . beyond the reasonable expectation of the weaker party.").

Tile interprets the arbitration provision to cover claims about a third party's separate use of Tile products or services. But it is beyond a consumer's reasonable expectation that this provision would cover claims having no relation to their own use of a Tile tracker or the services provided to them as part of their Tile accounts. *See Revitch*, 977 F.3d at 717, 720–21; *see also Munoz v. Earthgrains Distrib., LLC*, No. 22-CV-1269, 2023 WL 5986129, at *6 (S.D. Cal. Sept. 13, 2023), *aff'd*, No. 23-55818, 2024 WL 4144081 (9th Cir. Sept. 11, 2024) (an "attempt to enforce" an arbitration provision "beyond the reasonable expectations of Plaintiffs, the weaker party, . . . constitutes surprise"). A consumer would not reasonably expect, for example, that signing up for a company's streaming service binds them to arbitrate a dispute arising out of its theme park. *See* Gustavo Berrizbeitia, *The Political Economy of Arbitration Law*, 134 Yale L.J. 266, 322 n.285 (2024) (recounting recent case where Disney attempted to arbitrate widower's wrongful death claim after his wife died from "an allergic reaction at a Disney theme park" because "he signed up for a one-month free trial of Disney+ four years before her death," but

withdrew its motion to compel arbitration "[a]fter intense public outcry"). So too would Plaintiffs be reasonably shocked to learn that creating a Tile account forces them to arbitrate claims about a third party's use of Tile products or services to stalk them. *Cf. Harper*, 7 Cal. Rptr. 3d at 421–22 ("Here is the surprise: The customer must inevitably receive a nasty shock when he or she discovers that no relief is available" under arbitration rules that "limit the damages and remedies available to dissatisfied customers."); *Heckman*, 120 F.4th at 682–83 (surprise present for customers where terms of use "state they may be changed without notice and changes apply retroactively," are "affirmatively misleading," and "permit unilateral modification . . . without prior notice").

Finally, the contradiction apparent between the Terms' exclusive venue provision and the incorporated AAA rule's open-ended grant of authority to the arbitrator to decide arbitrability, as previously explained, only further supports a finding of surprise here. *See id.* at 683 ("internally contradictory" arbitration rules contributed to their surprise).

In sum, the arbitration agreement is unenforceable under California law to the extent it compels arbitration of claims regarding the use of Tile's products or services by third parties. The motion to compel arbitration of those claims is therefore denied.

**2. Claims Regarding Plaintiffs' Own Tile Accounts**

Conversely, Plaintiffs have failed to demonstrate the requisite degrees of substantive and procedural unconscionability of the arbitration agreement to the extent it applies to claims about services provided to Plaintiffs as part of their own Tile accounts. In particular, as to those claims, the arbitration agreement does not suffer from the same overbreadth defect explained above. Nor do Plaintiffs assert any other contract defenses against enforceability. Accordingly, because the arbitration agreement is enforceable with regard to claims involving Plaintiffs' own Tile accounts, which fall squarely within the scope of that agreement, the motion to compel arbitration of these claims is granted.

To be clear, most of the claims in the First Amended Complaint do not appear to fall into this category. Plaintiffs' principal claim is that Tile released "trackers into the marketplace with

insufficient safeguards to prohibit their use for stalking purposes." (*E.g.*, FAC ¶ 174; *see also id.* ¶ 183 (Tile trackers are defective due to their "propensity for use in stalking and other crimes"); *id.* ¶¶ 193, 200 (Tile invaded Plaintiffs' privacy with its trackers); *id.* ¶ 209 (Tile "introduced into the stream of commerce a standalone device whose sole purpose is to locate whatever it is affixed to . . . despite being warned . . . that the product is a dangerous tool that enables stalkers and abusers").)

The First Amended Complaint does anticipate a potential defense from Tile that it introduced anti-stalking measures for those who have downloaded the Tile app. (*Id.* ¶ 50.) Specifically, Plaintiffs discuss the "Scan and Secure" feature, which enables Tile app users "to scan for unknown Tiles or Tile-enabled devices that may be traveling with them." (*Id.*) Plaintiffs describe the inadequacies of those anti-stalking measures in addressing the original product defect, noting that the Scan and Secure feature "still leaves the vast majority of the population vulnerable." (*Id.* ¶ 51.) Generally, Plaintiffs' discussion of the deficiencies in Tile's potential defense does not change the gravamen of their claims, which are based on Tile putting a dangerous product on the market and the misuse of its trackers by third-party stalkers. Such claims, which do not arise from Plaintiffs' own use of a Tile tracker or their own Tile account, exist separate and apart from the parties' contractual relationship. In other words, Plaintiffs' status as Tile accountholders is entirely incidental to these claims, and Plaintiffs would have the same claims regardless whether they had Tile accounts.

However, there are portions of the First Amended Complaint that could be read as asserting a separate claim based on Plaintiffs' *own* use of the Scan and Secure feature. (*E.g., id.* ¶ 139 ("Scan and Secure did not allow Plaintiff Doe to locate the Tile Tracker, nor did it allow her to trigger a noise or any other sensory alert that enabled her to locate the device."); *id.* ¶ 140 ("[Doe] continued to search for how to locate and disable the device hidden in her car, but there was no option within the Scan and Secure app.").) To the extent that Plaintiffs claim that the Scan and Secure feature is itself a deficient product and seek to represent a putative class based on Plaintiffs' own use of that feature, such allegations fall well within the expected ambit of the

arbitration agreement.

Moreover, any claims based on the stalkers' use of Plaintiffs' own Tile trackers are also within the scope of the arbitration agreement. Although the First Amended Complaint does not specify the ownership of any particular Tile tracker, Broad's declaration attests that one of the Tile trackers used to stalk her "was purchased by [her] and associated with [her] [Tile] account," to which her stalker had joint access. (Dkt. No. 42-1 ¶¶ 5, 6.) Her claim based on that incident is arbitrable. Broad also attests the other tracker used by her stalker "was *not* purchased by [her] and was *not* associated with [her] [Tile] account in any way." (*Id.*) That claim remains non-arbitrable.

**D. Whether Proceedings Should Be Stayed Pending Arbitration**

Tile and Amazon move to stay all claims against them pending resolution of the arbitration, including the non-arbitrable claims brought by Broad and Doe, as well as the claims of the other named plaintiffs, Stephanie Ireland-Gordy and Shannon Ireland Gordy, who did not agree to arbitration.

With regard to the arbitrable claims, a stay is mandated under § 3 of the FAA, and the motion to stay must be granted as to them. *See* 9 U.S.C. § 3 (a court "shall on application of one of the parties stay the trial of the action until [the] arbitration has been had in accordance with the terms of the agreement"). But where some, but not all, claims are subject to arbitration, it is "within a district court's discretion whether to stay" or proceed with the litigation on the non-arbitrable claims. *See Congdon v. Uber Techs., Inc.*, 226 F. Supp. 3d 983, 989–90 (N.D. Cal. 2016) (cleaned up). "In deciding whether to stay non-arbitrable claims, a court considers economy and efficiency, the similarity of the issues of law and fact to those that will be considered during arbitration, and the potential for inconsistent findings absent a stay." *Wolf v. Langemeier*, No. 2:09-CV-03086, 2010 WL 3341823, at *8 (E.D. Cal. Aug. 24, 2010) (citation omitted). "A stay is generally 'appropriate where the arbitrable claims predominate, or where the outcome of the nonarbitrable claims will depend upon the arbitrator's decision.'" *Cal. Crane Sch., Inc. v. Google LLC*, 621 F. Supp. 3d 1024, 1033 (N.D. Cal. 2022) (quoting *United*

*Commc'ns Hub, Inc. v. Qwest Commc'ns, Inc.*, 46 F. App'x 412, 415 (9th Cir. 2002)). There is "a preference for proceeding with the non-arbitrable claims when feasible." *United Commc'ns Hub*, 46 F. App'x at 415.

Tile argues that a stay of the non-arbitrable claims against it is warranted here, contending that they involve common factual and legal questions as the arbitrable claims and that there is a risk of inconsistent rulings if both arbitration and litigation were to proceed in parallel. However, the main thrust of Plaintiffs' claims, as noted above, is non-arbitrable. To be sure, there is a likelihood of some overlap in proof between the arbitrable and non-arbitrable claims, particularly if Tile chooses to mount a defense based on the Scan and Secure feature. But that concern is not particularly weighty because "regardless of the outcome of the arbitration," the non-arbitrable claims "will need to be litigated in this court." *See Congdon*, 226 F. Supp. 3d at 991 (denying motion to stay claims of non-arbitrating plaintiffs where their claims "involve[d] the same operative facts"); *Cal. Crane*, 621 F. Supp. 3d at 1033–34 (denying motion to stay non-arbitrable claims in part because the parties "will presumably need to eventually litigate the remaining non-arbitrable claims irrespective of whatever happens in the arbitration"). The Court will eventually need to adjudicate not only the non-arbitrable claims of Plaintiff Broad and Plaintiff Doe, but also all claims of the other two Plaintiffs, Stephanie Ireland-Gordy and Shannon Ireland Gordy.

Also, despite the risk of inconsistent rulings posed by parallel proceedings, "the arbitrator's findings of fact or law" would not "be binding on this Court or otherwise have any impact on the non-arbitrable claims left here." *Cal. Crane*, 621 F. Supp. 3d at 1033–34 (denying motion to stay non-arbitrable claims notwithstanding such a risk); *see also Chen v. Bank of Am., N.A.*, No. CV 19-6941, 2020 WL 4561658, at *3 (C.D. Cal. Mar. 31, 2020) ("[T]he possibility that parallel proceedings covering related disputes could produce inconsistent results does not necessitate granting a stay.").

The same reasoning "holds true with respect to claims involving non-signatories to an arbitration agreement." *See Congdon*, 226 F. Supp. 3d at 990. Amazon, which joins Tile's

motion to stay this action as to all non-arbitrating parties, does not maintain that any Plaintiff has agreed to arbitrate their claims against it. (Dkt. No. 35 at 2.) Thus, for the same reasons as above, the balance of interests does not justify exercising the Court's discretion to stay Plaintiffs' claims against Amazon. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20 n.23 (1983) (recognizing that the decision to stay litigation between non-arbitrating parties pending the outcome of arbitration is "one left to the district court . . . as a matter of its discretion to control its docket").

Accordingly, under these circumstances, "proceeding with this lawsuit would not waste judicial resources," and "staying the non-arbitrable claims," including those against the non-arbitrating parties, "would only serve to needlessly delay their resolution." *See Cal. Crane*, 621 F. Supp. 3d at 1033–34. The motion to stay the non-arbitrable claims is therefore denied.

## IV. CONCLUSION

Based on the foregoing, the motion to compel arbitration is **GRANTED IN PART** and **DENIED IN PART**. The motion to stay proceedings pending resolution of the arbitration is **GRANTED** as to the arbitrable claims and is **DENIED** in all other respects. The parties shall file a joint report on the status of the arbitration proceedings every 180 days or within 14 days of the resolution of the arbitration, whichever is earlier. As previously ordered, Defendants' response to the First Amended Complaint is due within **28 days of the date of this Order**. (Dkt. No. 30 at 3.)

**IT IS SO ORDERED.**

Dated: December 19, 2024

RITA F. LIN
United States District Judge